```
                 IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS (EL PASO)

UNITED STATES OF AMERICA,     .  Case No.: 3:25-MJ-02401-LE-1
                              .
          Plaintiff,          .       FILED
                              .     June 17, 2025
     vs.                      .   CLERK, U.S. DISTRICT COURT
                              .   WESTERN DISTRICT OF TEXAS
ADELY VANESSA                 .  BY:  Belinda Gamez
DE LA CRUZ-ALVAREZ,           .         DEPUTY
                              .
          Defendant.          .  Wednesday, June 4, 2025
. . . . . . . . . . . . . . . .  9:25 A.M.




              TRANSCRIPT OF CRIMINAL JURY TRIAL, DAY 2
              BEFORE THE HONORABLE LAURA ENRIQUEZ
                UNITED STATES MAGISTRATE COURT JUDGE




APPEARANCES ON NEXT PAGE


For the Interpreter:   T. McEneny, J  Font


Deputy Clerk:          Adriana Quezada
                       United States District Court
                       525 Magoffin Avenue, Suite 105
                       El Paso, Texas 79901




Transcription Service: Liberty Transcripts
                       9107 Topridge Drive
                       Austin, Texas 78750
                       (847) 848-4907
                       DBPATEL1180@GMAIL.COM


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

```
APPEARANCES:

For the Government:        United States Attorney's Office
                          BY: PHILLIP COUNTRYMAN, ESQUIRE
                          700 East San Antonio Avenue, Suite 200
                          El Paso, Texas 79901
                          (915) 534-3498
                          phillip.countryman@usdoj.gov

                          United States Attorney's Office
                          BY: DEBRA KANOF, ESQUIRE
                          700 East San Antonio Avenue, Suite 200
                          El Paso, Texas 79901
                          (915) 534-3434
                          debra.kanof@usdoj.gov

For the Defendant:        Law Office of Veronica Teresa Lerma
                          BY: VERONICA TERESA LERMA, ESQUIRE
                          1417 Montana Avenue
                          El Paso, Texas 79902
                          (915) 533-4779
                          vtlermalaw@gmail.com

                          Office of the Federal Public Defender
                          BY: SHANE MCMAHON, ESQUIRE
                          700 E. San Antonio, D-401
                          El Paso, Texas 79901
                          (915) 352-2904
                          shane_mcmahon@fd.org
```

```
                              INDEX
                                                     Page
Case Called                                            4
Preliminary Matters                                    4
Government rests case-in-chief                        101
Defense Motion for Judgment of Acquittal             102
  Argument by Mr. McMahon                            104
  Argument by Mr. Countryman                         107
Court's Ruling on Defense Motion as to Count 1       108
Court's Ruling on Defense Motion as to Count 2       114
  Argument by Mr. McMahon                            115
  Argument by Mr. Countryman                         117
Court's Ruling on Defense Motion as to Count 3       119
Defendant Rests                                      124
Final Jury Instructions                              136
Closing Argument by Mr. Countryman                   154
Closing Argument by Mr. McMahon                      163
Closing Argument by Ms. Lerma                        168
Rebuttal Closing Argument by Ms. Kanof               171
Jury Excused for Deliberations                       176
Court addresses juror questions                      178
End of Proceedings                                   186
Certification of Transcriber                         186
```

WITNESSES FOR THE GOVERNMENT:

EDGAR CONTRERAS
    Direct Examination by Mr. Countryman              7
    Cross-Examination by Ms. Lerma                   40
    Redirect Examination by Mr. Countryman           61
    Recross-Examination by Ms. Lerma                 68
    Further Redirect Examination by Mr. Countryman   72

MARIA PARGA DAVIS
    Direct Examination by Mr. Countryman             80
    Cross-Examination by Ms. Lerma                   93
    Redirect Examination by Mr. Countryman           99

WITNESSES FOR THE DEFENDANT:

 (None)

                                       Identified    Received

EXHIBITS FOR THE GOVERNMENT:

9   I-213 First Page                       75            77


EXHIBITS FOR THE DEFENDANT:

 (None)

1       **EL PASO, TEXAS, WEDNESDAY, JUNE 4, 2025, 8:59 A.M.**

2     (Outside the presence of the jury; Defendant present.)

3        THE CLERK:  All rise.  United States Magistrate for

4 the Western District of Texas, sitting in El Paso, the

5 Honorable Judge Laura Enriquez presiding.  United States

6 Magistrate Court is now in session.

7        THE COURT:  You may be seated.

8        Good morning, ladies and gentlemen.

9        Calling the case EP:25-M-02401, Adely Vanessa De La

10 Cruz-Alvarez, United States versus Adely Vanessa De La

11 Cruz-Alvarez.

12        Can I get announcements of Counsel?

13        MR. COUNTRYMAN:  Good morning, Your Honor.

14        Phillip Countryman and Debra Kanof on behalf of the

15 United States; ready.

16        MS. LERMA:  Good morning, Your Honor.

17        Veronica Teresa Lerma and Shane McMahon for the

18 Defendant.  We are ready.

19        THE COURT:  Okay.  We'll bring in the jury.

20        MS. KANOF:  Your Honor, could I bring something up

21 for just one second?

22        THE COURT:  Sure, absolutely.

23        MS. KANOF:  Thank you.  And later, I may actually

24 do something in this trial.  We're not sure yet.  But if I

25 do, I would like to be able to sit to cross-examine because

1  it takes me forever to get up.

2          THE COURT:  Absolutely, Ms. Kanof.  Not an issue at

3  all by the Court.

4          MS. KANOF:  The other issue deals with this issue

5  of politics, Your Honor.  When the agent was on the stand

6  describing the K2 fence, I don't know if the microphones

7  picked it up or not.  But counsel for the Defense said, what

8  did they call it, the K2 fence, the so-and-so fence, and then

9  he said the Trump fence.  I'd ask the Court to admonish

10  everybody in the courtroom to leave politics out.

11          And one of the reasons that that was unusual is

12  Trump didn't build that fence.  President Obama did.  And so

13  it was not only political, it was inaccurate.

14          THE COURT:  Response by the Defense?

15          MR. McMAHON:  Your Honor, Counsel for the

16  Government elicited with this question, this fence has

17  different names.  The answer was the K1 fence and the border

18  fence.  That question, colloquially, because I live in El

19  Paso, I know it's called the Trump fence.  So based on the

20  Government's question, the cross-examination question was,

21  another name is the Trump fence.

22          And it is specifically in answer to the question

23  that the Government elicited.  It was not political in

24  nature.  It's another name that's known colloquially here in

25  El Paso.

```
 1              THE COURT:  Understood.  And let's stay away from
 2   politics, but understood.  I think that's an issue, and we're
 3   past that.  And I did ask Defense Counsel not to get into
 4   politics, and he didn't even ask that question again.  So I
 5   appreciate it when we took the break.  So let's go on, and
 6   let's stay away from politics so we can get through this
 7   trial.
 8              We're ready for the jury.
 9              MS. KANOF:  And thank you, Your Honor, for letting
10   me sit.  I appreciate it.
11              THE COURT:  Any time, Ms. Kanof.  No problem
12   whatsoever.
13          (Whereupon, there was a brief pause in the proceedings.)
14              THE CLERK:  All rise for the jury.
15          (Whereupon, the jury entered the courtroom.)
16              THE COURT:  You may be seated.
17              The Government can call their next witness.
18              MR. COUNTRYMAN:  Thank you, Your Honor.
19              The Government calls Border Patrol Agent Edgar
20   Contreras.
21              Agent Contreras, if you could make your way to the
22   witness chair there in the back of the courtroom.  It's on
23   our left.
24              THE COURT:  Agent, if you can raise your right hand
25   so I can swear you in.
```

```
 1            EDGAR CONTRERAS, GOVERNMENT'S WITNESS, SWORN

 2            THE COURT:  Thank you, sir.

 3            And if you'll sit right in front of that microphone

 4  and speak very loudly so that the recorder can pick you up,

 5  sir.

 6            THE WITNESS:  Okay.

 7            THE COURT:  Thank you.

 8            MR. COUNTRYMAN:  Thank you, Your Honor.

 9                       DIRECT EXAMINATION

10  BY MR. COUNTRYMAN:

11  Q    Agent Contreras, can you state your full name?

12  A    Yes, sir.  Edgar Tomas Contreras.

13  Q    Can you spell your last name?

14  A    Contreras, C-O-N-T-R-E-R-A-S.

15  Q    And, sir, where are you currently employed?

16  A    Border Patrol, Clint Station.

17  Q    Which station?

18  A    Clint Station.

19  Q    And what do you do for the Border Patrol?

20  A    I'm a Border Patrol agent.

21  Q    And how long have you been a Border Patrol agent?

22  A    Eighteen years.

23  Q    And what are some of your duties and responsibilities as

24  a Border Patrol agent?

25  A    My duties, detect illegal entries of people who don't
```

Contreras - Direct/Countryman

```
 1  have documents to be in the United States, detect people who
 2  come in in this country and bring drugs, make arrests, patrol
 3  the border.
 4  Q    And is that all part of Border Patrol's mission?
 5  A    Yes, sir.
 6  Q    And did you go through training as part of your job?
 7  A    Yes, I did.
 8  Q    What is that?
 9  A    I went to an academy at Artesia, New Mexico, for about
10  five months.
11  Q    And you said you work in the Clint area?
12  A    Yeah, Clint, Texas.
13  Q    Okay.  What area is that?  Could you describe that in
14  more detail?
15  A    It will be the Zone 31 area.
16  Q    What is --
17  A    That's Socorro, Clint.
18  Q    And you said Zone 31?
19  A    Zone 31.
20  Q    That's the Clint-Socorro sort of area?
21  A    Yes.
22  Q    Was that an area that you -- were you working back on
23  May 12th of this year?
24  A    I was working in that area, Zone 31.
25  Q    And you were working on May 12th?
```

Contreras - Direct/Countryman

1    A    Yes.

2    Q    Back on May 12th of this year, in that area, what shift

3    were you working?

4    A    Swings.

5    Q    What does that mean?

6    A    Swings, we start at 2 and end at 12.  2 p.m. to 12 a.m.

7    Q    During the course of your shift back on May 12th, were

8    you involved in the apprehension of a Ms. Adely Vanessa De La

9    Cruz-Alvarez?

10    A    Yes, I was.

11    Q    And do you see Ms. De La Cruz in the courtroom today?

12    A    Yes, I do.

13    Q    At the time that you apprehended Ms. De La Cruz, was she

14    wearing makeup?

15    A    She was.

16    Q    Now, as you see Ms. De La Cruz in the courtroom today,

17    do you have any trouble identifying Ms. De La Cruz?

18    A    No, I don't.

19    Q    Could you please describe for the Court where Ms. De La

20    Cruz is sitting and what she is wearing?

21    A    She's sitting right there, but there's a screen.  I'm

22    not able to see what she's wearing.

23    Q    And if you need to, sir, you can stand up.

24    A    Oh, okay.

25              MR. COUNTRYMAN:  If it's okay with the Court?

1          THE COURT:  Absolutely, Mr. Countryman.

2          THE WITNESS:  (Indiscernible).  It looks like a

3  black dress.

4          MR. COUNTRYMAN:  And, Your Honor, may the record

5  reflect identification of the Defendant by the witness.

6          THE COURT:  The record will so reflect.

7          MR. COUNTRYMAN:  Thank you, Your Honor.

8  BY MR. COUNTRYMAN:

9  Q    This area where, in Zone 31, where Ms. De La Cruz was

10 apprehended, is that a location within the Western District

11 of Texas?

12 A    Yes, it is.

13 Q    Back on May 12th of this year, when you were working in

14 that zone and during your shift, what were your duties and

15 responsibilities that day?

16 A    I was to patrol the area of Zone 31.

17 Q    And specifically, where in Zone 31 were you patrolling?

18 A    I was patrolling from West Davis all the way to

19 (indiscernible).

20 Q    Where is that?

21 A    That's pretty much what covers Zone 31.

22 Q    Agent Contreras, if I were to show you, if I could --

23          MR. COUNTRYMAN:  And Your Honor, if I may publish

24 to the jurors Government Exhibit 1?

25          THE COURT:  Absolutely.

1              MR. COUNTRYMAN:  Thank you, Your Honor.

2    BY MR. COUNTRYMAN:

3    Q    Agent Contreras, do you see there what's being shown in

4    Government Exhibit 1?

5    A    Yes.

6              MR. COUNTRYMAN:  And I apologize, Your Honor.

7    Again, with the lights, I don't know if the map is too light

8    for the jurors or not.  If --

9              THE COURT:  We'll do the dim lights.  Hopefully, it

10   won't flicker today.

11             MR. COUNTRYMAN:  Thank you, Your Honor.

12   BY MR. COUNTRYMAN:

13   Q    Agent Contreras, what are we looking at here in

14   Government Exhibit 1?

15   A    It's a map of the area of Zone 31.

16   Q    And this was the area that you were working back on May

17   12th?

18   A    Yes.

19             THE COURT:  And let's try to turn them off and turn

20   them on back on again and see if it will -- it seemed to

21   stop.

22             MR. COUNTRYMAN:  I was going to say, only when the

23   Government talks.

24        (Laughter)

25   BY MR. COUNTRYMAN:

1   Q    Agent Contreras, is there a laser pointer up there by

2   you?

3   A    It looks like this one?

4   Q    Yes, sir.

5   A    Yes.

6   Q    Could you please highlight in Government Exhibit 1 with

7   that laser pointer where the Rio Grande River is located?

8   A    Yes.  About here.

9   Q    I'm sorry, are you having trouble seeing the map, Agent

10  Contreras?

11  A    Yeah, it's a little --

12  Q    Agent Contreras, there should be a binder there in front

13  of you.

14        MR. COUNTRYMAN:  And may I approach the --

15        THE COURT:  Absolutely.  Go ahead.  Go ahead,

16  Mr. Countryman.

17        THE WITNESS:  It's a little blurry.

18  BY MR. COUNTRYMAN:

19  Q    Agent Contreras, if at any time you have trouble seeing

20  --

21  A    Yeah, it's a little -- okay, I can see it.

22  Q    -- the images being depicted here, but --

23  A    It should be right here.

24        MR. COUNTRYMAN:  And Agent Contreras is using the

25  laser pointer to highlight the Rio Grande River sort of in a

1   vertical line in the middle of Government Exhibit 1.

2   BY MR. COUNTRYMAN:

3   Q     Is that the demarcation line between Mexico and the

4   United States?

5   A     Yes, it is.

6   Q     And in relation to the Rio Grande River as we're looking

7   here in Government Exhibit 1, where is Mexico?

8   A     Mexico is this part, this right here.

9           MR. COUNTRYMAN:  And using the laser pointer, Agent

10  Contreras is highlighting to the left of the Rio Grande

11  River.

12  BY MR. COUNTRYMAN:

13  Q     And where is the United States?

14  A     It's right here, starting here.

15          MR. COUNTRYMAN:  And using the laser pointer to

16  highlight everything to the right of the Rio Grande River as

17  being the United States.

18  BY MR. COUNTRYMAN:

19  Q     And in this particular case, can you identify the

20  general area where Ms. De La Cruz was apprehended?

21  A     Yes, it would be around here.

22          MR. COUNTRYMAN:  And Agent Contreras is

23  highlighting, circling around the red dots sort of in the

24  middle of Government Exhibit 1.

25  BY MR. COUNTRYMAN:

Contreras - Direct/Countryman

1  Q    Now, Agent Contreras, that day were you working, where

2  were you patrolling, where were you at?

3  A    I was west of the Kermit Gate.

4  Q    What is the Kermit Gate?

5  A    It's a gate that we have, and it's more or less around

6  this area right here.  So I was pretty much west of it here,

7  south of the border fence.

8            THE COURT:  And Agent Contreras used the laser

9  pointer to circle around the red dot in the middle of

10  Government Exhibit 1 and then highlight just towards the top

11  of Government Exhibit 1.

12  BY MR. COUNTRYMAN:

13  Q    And were you in a marked vehicle?

14  A    Yes, I was.

15  Q    And in that marked vehicle, what were you doing?

16  A    I was -- I was patrolling the area pretty much.

17  Q    Were you patrolling the area -- in this photo, can --

18  A    Do you want me to show you?

19  Q    Can you see where what's known as the border wall?  Can

20  you identify that in Government Exhibit 1?

21  A    I believe it's going to be this one.

22            MR. COUNTRYMAN:  And Agent Contreras is

23  highlighting sort of just to the north of that red dot in the

24  middle of Government Exhibit 1.

25  BY MR. COUNTRYMAN:

1   Q    And in your Government vehicle, were you patrolling on

2   the north side of the wall or on the south side of the wall?

3   A    On the south side of the wall.

4   Q    And why were you patrolling on the south side of the

5   wall?

6   A    Usually, we patrol on both sides, north and south.  In

7   this case, I was patrolling south.

8   Q    And that south side of the border wall, is that still

9   part of the United States?

10  A    Yes, it is.

11         MR. COUNTRYMAN:  Your Honor, if I may show Agent

12  Contreras what has been marked as Government Exhibit 5 and

13  published to the jurors?

14         THE COURT:  You may.

15  BY MR. COUNTRYMAN:

16  Q    Agent Contreras, in Government Exhibit 5, you described

17  the Kermit Gate, is that correct?

18  A    It would be, from the picture, it would be this right

19  here.  This is the Kermit Gate.

20         MR. COUNTRYMAN:  And Agent Contreras is using the

21  laser pointer to circle the gate along the border wall, sort

22  of the top right of Government Exhibit 5.

23  BY MR. COUNTRYMAN:

24  Q    And in relation to that, you were in your official

25  Border Patrol vehicle where?

Contreras - Direct/Countryman

1    A    Farther west, but it won't show here, more or less

2    around here.

3    Q    Approximately --

4    A    Approximately.

5    Q    -- how far west of the border gate were you?

6    A    Maybe about 600 yards.

7              MR. COUNTRYMAN:  And Agent Contreras used the laser

8    pointer to highlight an area off screen west of the top of

9    Government Exhibit 5.

10    BY MR. COUNTRYMAN:

11    Q    Now that particular day, do you recall approximately

12    when you took custody of Ms. De La Cruz?

13    A    Yes, I do.

14    Q    Approximately what time was that?

15    A    It was approximately 6:02 p.m. -- 6:03 p.m., 6:03.

16    Q    And now, Agent Contreras, if we could talk about the

17    circumstances leading up to your apprehension of Ms. De La

18    Cruz.

19    A    Okay.

20    Q    Leading up to the apprehension of Ms. De La Cruz, what

21    were you doing?

22    A    I was patrolling my area.

23    Q    In that area that you described being west of the

24    Kermit-Williams Gate?

25    A    Yes.  I was going back and forth east and west of that

Contreras - Direct/Countryman

1    area.

2    Q    In your Government vehicle?

3    A    Yes.  Pretty much coming this way and going that way.

4         MR. COUNTRYMAN:  And Agent Contreras used the laser

5    pointer to highlight sort of to the right of Government

6    Exhibit 5.

7    BY MR. COUNTRYMAN:

8    Q    Is that referred to as a levee road?

9    A    That's the levee road, yes.

10   Q    And you were driving in your vehicle on that levee road?

11   A    Yes.

12   Q    And was that in an east to west fashion?

13   A    East and then west.

14   Q    Now, shortly before you apprehended Ms. De La Cruz, did

15   you receive a radio call-out from an Agent Torres?

16   A    Yes, I did.

17   Q    And what was that radio call-out?

18   A    Mr. Torres said that there was --

19        MS. LERMA:  Objection to hearsay, Your Honor.

20        THE COURT:  Sustained.

21        MR. McMAHON:  May I have an instruction to the

22   jury?

23        THE COURT:  The jury will disregard any hearsay

24   statements.  Disregard the last statement made by the witness

25   here.

Contreras - Direct/Countryman

1           MR. COUNTRYMAN:  Your Honor, the Government is not

2    offering it for the truth of the matter asserted.  It's being

3    offered what Agent Contreras did after receiving the

4    information.  It's not hearsay.

5           THE COURT:  Sustained.

6    BY MR. COUNTRYMAN:

7    Q    Agent Contreras, you received a call-out --

8    A    Yes.

9    Q    -- radio call-out from Agent Torres?

10   A    Yes.

11   Q    After receiving that call-out from Agent Torres, what

12   did you do?

13   A    I stayed west of the Kermit Gate because he said there

14   was a group --

15          THE COURT:  Sir, if you could not testify about any

16   out-of-court statements.  Just listen to the question and

17   answer the question.  Thank you, sir.

18   BY MR. COUNTRYMAN:

19   Q    Agent Contreras, after you received that radio call-out

20   from Agent Torres, what did you do?

21   A    I was waiting for a group to come in to make entry into

22   the United States.  They were just south of the Kermit Gate.

23   Q    And you said they were just south of the Kermit Gate.

24   A    Yes.

25   Q    Is that in this area here that you just described for

Contreras - Direct/Countryman

```
 1   the jurors?
 2   A    Yes.  It was more or less around this area right here.
 3         MR. COUNTRYMAN:  And Agent Contreras has used that
 4   laser pointer to circle around the Kermit-Williams Gate and
 5   the levee road.
 6   BY MR. COUNTRYMAN:
 7   Q    And so what actions did you take to prepare for that
 8   entry?
 9   A    I was just waiting and waiting for them to come in
10   because I would be able to see them.  And also, we had agents
11   north and also we had a drone flying over there.
12   Q    And agents north, were those Border Patrol agents north
13   of the border wall?
14   A    Yes, north of the border wall.
15   Q    Do you recall approximately what time Agent Torres put
16   out his radio call?
17   A    It would be approximately at 5:55 p.m.
18   Q    After you then received that radio call-out from Agent
19   Torres and you began to get ready for that, was there a
20   follow-up radio call-out?
21   A    Yes, there was.
22   Q    Was that from members of the National Guard?
23   A    Yes, it was.
24         MS. LERMA:  Objection, Your Honor, to the leading.
25         THE COURT:  Overruled.
```

Contreras - Direct/Countryman

1   BY MR. COUNTRYMAN:

2   Q    Was that radio call-out from members of the National

3   Guard?

4   A    Yes, it was National Guard.

5   Q    After that -- and did you actually receive that radio

6   call-out?

7   A    Yes.

8   Q    What did you do after you received that radio call-out?

9   A    I responded to the area -- do I point it?  I responded

10  to this area right here, the Kermit Gate area, and there was

11  a subject by the fence and I arrested her.

12  Q    Now, you circled, so how did you get to --

13             MR. COUNTRYMAN:  -- and Agent Contreras used the

14  laser pointer to again circle around the Kermit-Williams

15  Gate.

16  BY MR. COUNTRYMAN:

17  Q    Agent Contreras, how did you get there -- how did you

18  respond to that area?

19  A    Because National --

20  Q    How did you respond to the area?  Did you drive in your

21  vehicle?

22  A    I drove in my vehicle, yes.

23  Q    And when that second radio call-out had come,

24  approximately how far away from the Kermit-Williams Gate were

25  you?

1  A    About maybe 600 yards.

2  Q    And in your vehicle, were you still driving on the levee

3  road?

4  A    I was parked west of it, just parked facing south.

5  Q    And then you proceeded in your Government vehicle to

6  this area?

7  A    Yes.

8  Q    And what did you observe?

9  A    I observed that there was a subject by that area, by the

10  Kermit Gate right here, and next to them it was National

11  Guard.

12          MR. COUNTRYMAN:  And Agent Contreras used the laser

13  pointer to circle around the Kermit-Williams Gate.

14  BY MR. COUNTRYMAN:

15  Q    And the subject that you're referring to, who was that?

16  A    It was her.

17  Q    And by her, who do you mean?

18  A    It was Ms. De La Cruz.

19  Q    After you approached the area, did you get out of your

20  vehicle?

21  A    Yes, I did.

22  Q    And what did you observe?

23  A    She was just sitting by the fence.  And National Guard

24  was there with her, and they had detained her.

25  Q    Now, does the National Guard have arrest authority?

Contreras - Direct/Countryman

1   A    They have authority to detain.

2   Q    And then you have the authority to arrest?

3   A    Yes, I do.

4   Q    Now, prior to you responding, and you said this was

5   approximately around 6:03 p.m.?

6   A    Yes, approximately.

7   Q    Had you observed any other individuals other than Border

8   Patrol or National Guard there in that area?

9   A    No.

10  Q    In that area, is it normal for you to be out there with

11  National Guard members?

12  A    Yes.

13  Q    In this particular case, what kind of vehicle were the

14  National Guard members in?

15  A    They were driving an F-150 truck, a Government vehicle.

16  Q    A Government vehicle?

17  A    Yes.

18  Q    And after then, you didn't see any other individuals in

19  that area other than Border Patrol or National Guard?

20  A    No, I didn't.

21  Q    And after you respond to that area, did you say that the

22  Defendant was sitting down by the fence?

23  A    Yes.

24  Q    Did you approach the Defendant?

25  A    Yes, I did.

Contreras - Direct/Countryman

```
 1  Q    Did you identify yourself?

 2  A    Yes, I did.

 3  Q    And how is it that you identified yourself to her?

 4  A    I said I was a U.S. Border Patrol agent.

 5  Q    Did you ask her to identify herself?

 6  A    (No audible response)

 7  Q    Would you like me to rephrase the question?

 8  A    Can you rephrase it?

 9  Q    Did you ask her -- did you ask Ms. De La Cruz if she had

10  any documents to be in the United States?

11  A    Yes, I did.

12  Q    And what was her response?

13  A    She said she didn't.

14  Q    She said she did not?

15  A    She did not have any legal documents.

16  Q    Did you ask her where she's from?

17  A    Yes, I did.

18  Q    And where did she say she was from?

19  A    From Peru.

20  Q    Were the National Guard members in military uniform?

21  A    Yes, they were.

22  Q    And I want to make sure that we have this clear.  Agent

23  Contreras, I don't -- I want to have this clear for the

24  jurors.  You specifically asked Ms. De La Cruz where she's

25  from?
```

Contreras - Direct/Countryman

```
1    A    Yes, I did.

2    Q    And she responded that she was from Peru?

3    A    Yes.

4    Q    Did you have any trouble communicating with Ms. De La

5    Cruz?

6    A    No, I didn't.

7    Q    Did you speak with Ms. De La Cruz in the Spanish

8    language?

9    A    Yes, in Spanish.

10   Q    Did you have any trouble understanding or talking or

11   speaking in Spanish?

12   A    No.

13   Q    And did you have any problems communicating with

14   Ms. De La Cruz in the Spanish language?

15   A    No, I didn't.

16   Q    And you specifically asked her if she had documents to

17   be in the United States?

18   A    Yes, I did.

19   Q    And how did she respond?

20   A    She said she didn't have any legal documents.

21   Q    Now, did Ms. De La Cruz have something, like any

22   documents in her possession?

23   A    Yes, she did.

24   Q    What did she have in her possession?

25   A    She had a passport from Peru.
```

1   Q    And did you seize that passport?

2   A    Yes, I did.

3   Q    Do you recall if Ms. De La Cruz had any money in her

4   possession?

5   A    Yes, she did.  But when we got to the station, that's

6   when we verified.

7   Q    So Ms. De La Cruz had money in her possession, that was

8   verified later?

9   A    Yes.

10  Q    And to be clear, Agent De La Cruz, you were the one who

11  physically arrested Ms. De La Cruz?

12  A    Yes, I was.

13  Q    And did you transport her back to the station for

14  processing?

15  Q    Yes, I did.

16  A    And you seized a passport from Ms. De La Cruz?

17  A    Yes.

18  Q    There in that binder in front of you, if you could flip

19  to what's been marked as Government Exhibit 10.

20       Do you see that there in front of you, Agent Contreras?

21  A    Yes.

22  Q    And could you flip through each one of the pages of

23  Government Exhibit 10?

24  A    All of them?

25  Q    Yes, please.

1   A      (Witness reviewing document).

2   Q      And do you recognize what's being depicted in Government

3   Exhibit 10?

4   A      Yes.

5   Q      What is being depicted in Government Exhibit 10?

6   A      It's Ms. De La Cruz's passport from Peru.

7   Q      And those photographs that are in Government Exhibit 10

8   are those of her inaccurate copy of the photographs of

9   Ms. De La Cruz's passport?

10  A      Yes, they are.

11          MR. COUNTRYMAN:  Your Honor, at this time, the

12  Government would move to admit Government Exhibit 10.

13          MS. LERMA:  Your Honor, we object based on improper

14  predicate and 802 hearsay.

15          THE COURT:  Is this an exception to the hearsay

16  rule?

17          MR. COUNTRYMAN:  Your Honor, this is evidence as to

18  the elements the Government must prove.  It is physical

19  evidence seized from the Defendant and it goes straight to

20  her alienation.  It's evidence in the case, Your Honor, that

21  this witness seized from the Defendant.

22          THE COURT:  And I understand that.  What I'm trying

23  to say is it appears to be hearsay.  Is it an exception?  Do

24  you find that it's an exception under the hearsay rule under

25  any one of the things?  That was my question is.

1           MR. COUNTRYMAN:  Your Honor, there is also an

2    exception to the hearsay rule.  Do you want me to state this

3    on the record?

4           THE COURT:  We can take a break if y'all want to do

5    that.

6           MR. COUNTRYMAN:  Or if you want me to approach, but

7    it is also a public record under 803-8, Your Honor.

8           MS. LERMA:  Yes, Judge, we can approach.

9           THE COURT:  Okay, let's approach.

10        (Whereupon, at 9:27 a.m., a bench conference began.)

11           MS. LERMA:  Judge, I understand that they're

12   arguing it's a public record.  But this witness hasn't

13   verified the authenticity that it is a public record in

14   itself.  How do we know this isn't a fraudulent passport and

15   --

16           THE COURT:  No, it is a public -- that's my

17   problem.

18           MS. LERMA:  I mean --

19           THE COURT:  A public-record exception is American

20   public records.  Am I wrong on this?  Did you all find cases

21   that say that any foreign document and just say, oh, this is

22   a public record?  How do we know that?

23           MR. COUNTRYMAN:  Your Honor, that passport is a

24   normal course of business, it's part of the Defendant's A-

25   file.  Documents in the A-file are public records.  It's part

 1   of the Defendant's A-file.  So not only was it seized

 2   directly from the Defendant, Defense counsel is more than --

 3   more --

 4          THE COURT:  It just makes it hearsay within

 5   hearsay, doesn't it?  I mean, just because it's a first-part

 6   document, it's not hearsay.  But to me, I have a problem

 7   with, how do I know that this is a public record?  I mean,

 8   it's a --

 9          MR. COUNTRYMAN:  Both Ms. Lerma and Ms. McMahon had

10   an opportunity to review the Defendant's A-file.

11          MS. LERMA:  Yes.

12          MR. COUNTRYMAN:  And it was in the A-file.

13          MS. LERMA:  Yes.

14          MR. COUNTRYMAN:  And it's kept in the --

15          THE COURT:  I don't have a problem with the A-file

16   coming in.  Like that other document, the paper.  I'm going

17   to say that's a public record.  But this passport, I have an

18   issue with that.  I think it's hearsay.  And I don't know how

19   you authenticate it.  I don't know how it's a proper public

20   record.  To me, a public record is something, you know, like,

21   hey, this is a public record in the United States of America.

22   I have no idea what this is.

23          MR. COUNTRYMAN:  And then going back to the fact

24   that it is relevant evidence as to the elements, as if it

25   were any other piece of evidence, drugs seized, a firearm,

 1   any other piece of evidence that could be seized during the

 2   course of the trial, Defense Counsel is more than free to

 3   say, oh, that document has no credibility.  But it's exactly

 4   what was seized from the Defendant after she said she was

 5   from Peru.

 6           THE COURT:  And she's already made that admission,

 7   so I don't know why you need it.  But my thought is I was

 8   looking to see if it could be an admission of a party

 9   opponent.  It doesn't qualify as that.  It's not a public

10   record.  It's hearsay within hearsay.  I understand the other

11   document.  I do think it's a public record.  I'm not doubting

12   that it's relevant.  I agree that it's relevant.  But I don't

13   see how I admit it in an American court of record as a public

14   record.  I just don't see it.

15           MS. LERMA:  I agree, Judge.  And, I mean --

16           THE COURT:  I heard both of y'all talk outside.

17           MS. LERMA:  No, no, no.  I just, for the purposes

18   for which he's trying to admit it to prove her alienage, that

19   is hearsay.  That's the essence of hearsay.  It's an

20   out-of-court statement.  Just because he received it from her

21   or seized it from her doesn't mean he can admit it from her.

22           THE COURT:  Yeah.  It's hearsay, no doubt.

23           Go ahead, Mr. Countryman.

24           MR. COUNTRYMAN:  No, Your Honor.  Obviously, the

25   Government feels that it's evidence.  It's not hearsay.  It's

1    directly on point for what the Government has to prove.  It

2    was seized from the Defendant that she had in her possession

3    after she admitted to being from Peru, Your Honor.  So,

4    again, it seems like anything now we're saying is hearsay,

5    which is --

6              THE COURT:  I think it's an out-of-court statement

7    offered to prove the truth of matters.  I don't think it's a

8    public record because I don't think it's a United States

9    public record.  I don't know what it is.  I've never seen a

10   Peruvian passport.  I don't know how you would prove that,

11   that it is what it's supposed to be.  And I don't think it's

12   an admission of a party opponent.  So I don't see how it's an

13   exception under the hearsay rule.  So I'm going to move -- I

14   mean, I'm going to sustain the objection that it's hearsay on

15   that document.

16         (Whereupon, at 9:31 a.m., a bench conference ended.)

17   BY MR. COUNTRYMAN:

18   Q    Agent Contreras, did you seize a Peruvian passport from

19   the Defendant?

20   A    I did, sir.

21   Q    And you had an opportunity to review that passport?

22   A    Yes.

23   Q    Did you find anything in that passport that would allow

24   Ms. Contreras to be in the United States legally?

25             MS. LERMA:  Judge, I'm going to object as eliciting

Contreras - Direct/Countryman

1  hearsay and asking for a legal conclusion and invading the

2  province of the jury.

3          THE COURT:  Sustained.

4          MS. LERMA:  May I have an instruction for the jury

5  to disregard?

6          THE COURT:  It was just a question.  A question is

7  not evidence, but the jury will disregard the question.

8          MS. LERMA:  I'll ask for a motion for mistrial,

9  Your Honor.

10          THE COURT:  Your motion is denied.

11 BY MR. COUNTRYMAN:

12 Q    Agent Contreras, did Ms. De La Cruz have any documents

13 in her possession that would allow her to be in the United

14 States legally?

15          MS. LERMA:  Objection, Your Honor.  Asked and

16 answered.

17          THE COURT:  Sustained.

18 BY MS. LERMA:

19 Q    Agent Contreras, later on after you took Ms. Contreras

20 back to the station for processing, did you take her

21 fingerprints?

22 A    Yes, I did.

23 Q    And could you please describe for the jurors how you did

24 that?

25 A    We have, like, a machine and we just rolled her

1  fingerprints one by one.

2  Q    And did you get results back from those fingerprints?

3  A    I did, sir.

4  Q    And what were the results of the fingerprints?

5  A    It was negative.

6  Q    What does that mean?

7  A    That means she has never been in the United States.

8  Q    Does that also mean that she has no permission to be in

9  the United States?

10  A    Yes.

11         MS. LERMA:  Objection to the leading, Your Honor.

12         THE COURT:  Sustained.

13         MS. LERMA:  May I have an instruction to the jury?

14         THE COURT:  The jury was disregarded.

15         You can rephrase your question, Mr. Countryman,

16  sir.

17  BY MR. COUNTRYMAN:

18  Q    Agent Contreras, you testified that the results of the

19  fingerprints came back negative?

20  A    Yes.

21  Q    What does that mean?

22  A    That means she doesn't -- she has never been here in the

23  United States.  There's no records of her here in the United

24  States.

25  BY MR. COUNTRYMAN:

1    Q    Would that include any applications that Ms. De La Cruz

2    may have made to come to the United States?

3    A    Yes.

4    Q    And were there any?

5    A    No.

6    Q    Do you know if Ms. De La Cruz had a tourist visa or

7    anything else that would have allowed her permission to be in

8    the United States legally?

9    A    No.

10            MR. COUNTRYMAN:  Your Honor, if I may publish to

11   the jurors what's been marked as Government Exhibit 6?

12            THE COURT:  You may, sir.

13   BY MR. COUNTRYMAN:

14   Q    Agent Contreras, do you see what's been marked here in

15   Government Exhibit 6?

16   A    Yes.

17   Q    And do you recognize this area?

18   A    Yes.

19   Q    What is this area?

20   A    That's Zone 31 area.

21   Q    And is this -- can you see the Kermit-Williams Gate in

22   this photograph?

23   A    Yes.  It should be a little farther west from the

24   vehicle.  It's a little blurry but more or less around here.

25            MR. COUNTRYMAN:  And Agent Contreras used the laser

1   pointer to circle around the Kermit-Williams Gate to the

2   right center of Government Exhibit 6.

3   BY MR. COUNTRYMAN:

4   Q    In this photograph, Agent Contreras, can you identify

5   where the Rio Grande River is located?

6   A    Yes.  It should be more or less here.

7          MR. COUNTRYMAN:  And Agent Contreras is using the

8   highlighter to point to the green area on the left-hand side

9   in a horizontal line of Government Exhibit 6.

10  BY MR. COUNTRYMAN:

11  Q    And can you see the border wall, Agent Contreras?

12  A    Yes.

13  Q    And can you use the laser pointer to highlight the

14  border wall?

15  A    It's going to be this one right here.

16         MR. COUNTRYMAN:  And Agent Contreras is horizontal

17  line to the right highlighting the border wall.

18  BY MR. COUNTRYMAN:

19  Q    Agent Contreras, that area in between the Rio Grande

20  River and the border wall, is that part of the United States?

21  A    Yes, it is.

22  Q    And using that highlighter, are you able to identify the

23  area where you took custody of Ms. De La Cruz?

24  A    Yes.

25  Q    Could you please do that for the jurors?

1  A    It would be right here.

2          MR. COUNTRYMAN:  And Agent Contreras is circling

3  around the Kermit-Williams Gate.

4          MR. COUNTRYMAN:  Your Honor, if I may publish to

5  the jurors what has been marked as Government Exhibit 7?

6          THE COURT:  Yes, sir.

7  BY MR. COUNTRYMAN:

8  Q    Agent Contreras, do you see what's been marked here in

9  Government Exhibit 7?

10  A    Yes.

11  Q    And what are we looking at in Government Exhibit 7?

12  A    It's the border fence, the American levee, and the area

13  where I arrested Ms. De La Cruz.

14  Q    And you said the levee.  What are you referring to when

15  you say the levee?

16  A    It will be the -- that road, this one right here, we

17  call it the levee.

18          MR. COUNTRYMAN:  And Agent Contreras is using the

19  laser pointer to highlight sort of on the left-hand side of

20  Government Exhibit 7.

21  BY MR. COUNTRYMAN:

22  Q    And is that the levee road that you were referring to

23  that you were driving on back on May 12th in your Government

24  vehicle?

25  A    Yes.

1    Q    And in this photo, can you see, is it easier for you to

2    see the area where Ms. De La Cruz --

3    A    Yes.

4    Q    -- where you took her into custody?

5    A    Much better.

6    Q    Okay.  Could you please circle that area now where you

7    took Ms. De La Cruz into custody?

8    A    It would be around this area.

9         MR. COUNTRYMAN:  And Agent Contreras is circling

10   around sort of the vehicle and Kermit-Williams Gate to the

11   center left of Government Exhibit 7.

12   BY MR. COUNTRYMAN:

13   Q    Agent Contreras, you testified earlier that at the time

14   you didn't see anyone else other than Border Patrol or

15   National Guard in this particular area.  Is that correct?

16   A    Yes.

17   Q    Does that apply for around that time, around 6 p.m.,

18   6:03 p.m., when you took Ms. De La Cruz into custody?

19   A    Yes.

20        MR. COUNTRYMAN:  Your Honor, may I have a moment?

21        THE COURT:  Yes, sir.

22        MR. COUNTRYMAN:  Thank you, Your Honor.

23     (Whereupon, there was a brief pause in the proceedings.)

24   BY MR. COUNTRYMAN:

25   Q    Agent Contreras, you testified earlier that Ms. De La

1    Cruz had money in her possession.  Is that correct?

2    A    Yes.

3    Q    Based on your training and experience, is it normal for

4    people to have money in their possession who you apprehended

5    out in this area?

6    A    Yes, it is.

7    Q    And Agent Contreras, only if you know, but do you know

8    or do you recall how much money Ms. De La Cruz had in her

9    possession?

10   A    She had 500 --

11   Q    And let me -- Agent Contreras, if you know, how do you

12   know?

13   A    Because we count the money and then we put it in the

14   213, in her file.

15   Q    But --

16   A    There's a record.

17   Q    Okay.  But that's something that you were involved in?

18   A    I didn't count it, no.

19   Q    Okay.  So you only know that she had money in her

20   possession, but not exactly how much?

21   A    Well, I went over the 213 and the record is right there,

22   so I could see exactly how much was it because they put it on

23   the record.

24   Q    I understand, Agent Contreras.

25        Now, in this particular area, based on your training and

Contreras - Direct/Countryman

1  experience, is this a common area for people to try to come

2  into the United States illegally?

3  A    Yes, it is.

4  Q    Is this area here, is this designated port of entry?

5  A    No, it's not.

6  Q    Where is the closest port of entry to this area?

7  A    It would be east of the area, about 9.5 miles.

8  Q    And what port of entry is that?

9  A    The Tornillo Port of Entry.

10 Q    Has this area been designated as an area by Border

11 Patrol or Department of Homeland Security or anyone else

12 where people can enter the country legally?

13 A    No.

14 Q    Back on May 12th of this year, had this area been

15 designated as an area where people can come into the country

16 legally?

17 A    No.

18 Q    You mentioned that the initial radio call-out from Agent

19 Torres was approximately 5:55 p.m., is that correct?

20 A    Yes.

21 Q    And that then you were looking in this area for people

22 who potentially were staging on the south side of the river?

23 A    Yes.

24 Q    And then at approximately 6:03 p.m., you took custody of

25 Ms. De La Cruz here around the area of the Kermit-Williams

Contreras - Direct/Countryman

1    Gate?

2              MS. LERMA:  Objection, Your Honor.  Asked and

3    answered.

4              THE COURT:  I'll give you some leeway.

5              MR. COUNTRYMAN:  Thank you.

6              THE COURT:  I assume you're going somewhere else,

7    Mr. Countryman.

8              MR. COUNTRYMAN:  Yes, Your Honor.

9              THE COURT:  Okay.

10             MR. COUNTRYMAN:  Thank you, Your Honor.

11             THE COURT:  Sure.

12             MR. COUNTRYMAN:  Is that objection --

13             THE COURT:  Overruled.

14             MR. COUNTRYMAN:  Thank you, Your Honor.

15   BY MR. COUNTRYMAN:

16   Q    Agent Contreras, based on the timing of that original

17   call-out and the time that you took custody of Ms. De La

18   Cruz, chronologically, does it match up time-wise based on

19   that original call out?

20   A    Yes.

21   Q    And what about the distance from where Ms. De La Cruz

22   was apprehended to where the river is and those individuals

23   were seen staging?  Does it match up geographically?

24   A    Yes, it does.

25             MR. COUNTRYMAN:  Pass the witness, Your Honor.

1    Thank you.

2              THE COURT:  Cross-examination.

3              MS. LERMA:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5    BY MS. LERMA:

6    Q    Agent Contreras, right?

7    A    Yes.

8    Q    My name is Veronica Lerma.  I'm an attorney, one of the

9    attorneys for Ms. De La Cruz, okay?

10   A    Okay.

11   Q    I'm going to ask you questions.  If you don't understand

12   what I'm asking, please let me know.

13   A    Okay.

14   Q    Okay?  I'm happy to rephrase it to where you can find a

15   way to answer the question.  I want to clarify a couple of

16   things regarding Ms. De La Cruz's arrest.  You're the one who

17   arrested her, correct?

18   A    Yes.

19   Q    And when you arrested her, she was seated by the fence,

20   you said, correct?

21   A    Yes.

22   Q    And she was by herself, correct?

23   A    She was next to the National Guard.

24   Q    Okay.  Aside from the National Guard, nobody else was

25   with her?

Contreras - Cross/Lerma

```
1   A    No, nobody else.

2   Q    You didn't arrest anybody else that day?

3   A    No, I didn't.

4   Q    Or at that time, rather?

5   A    No.

6   Q    Okay.  And she was not with a group of people then?

7   A    At that moment?

8   Q    That's right.

9   A    No.

10  Q    All right.  And you didn't see a picture from the -- or

11  weren't sent a picture from the drone operator of this

12  supposed group of people that were approaching the fence,

13  correct?

14  A    Can you repeat the question?

15  Q    Yes.  The drone operator, Mr. Torres, is that correct?

16  A    Yes.

17  Q    He's the one who you testified made a call-out, correct?

18  A    Yes.

19  Q    He didn't send you any kind of picture of the group of

20  people that he supposedly saw, correct?

21  A    No.

22  Q    And you didn't see a picture of Ms. De La Cruz prior to

23  arresting her?

24  A    No.

25  Q    My understanding from your testimony is that you
```

1  approached and the National Guard that was with her was

2  detaining her, correct?

3  A     Yes.

4  Q     And you approached and you proceeded to arrest her,

5  right?

6  A     Yes.

7  Q     After you arrested her, you asked her about her

8  identity, her name, correct?

9  A     Yes.

10  Q     Then you asked her about her citizenship or nationality,

11  correct?

12  A     Yes.

13  Q     And you received responses from her?

14  A     Yes.

15  Q     Prior to arresting Ms. De La Cruz, you stated that you

16  were 600 yards away from the Kermit Gate, is that right?

17  A     Approximately.

18  Q     Okay.  So that's about six football fields away,

19  correct?

20  A     I'm not sure about that.

21  Q     Well, a football field is 100 yards from end to end, do

22  you know that?

23  A     Uh-huh.

24  Q     Okay.  So 100 yards times six would be 600 yards

25  approximately.

1   A    Okay.

2   Q    Is that correct?

3   A    Maybe I was closer than that.

4   Q    Okay.  So you don't think you were 600 yards away?

5   A    Maybe not.

6   Q    Okay.  You think you were closer?

7   A    Yes.

8   Q    And how close do you think you were then?

9   A    Maybe about 200 hundred yards.

10  Q    Oh, that's a significant difference.  So you were about

11  two football fields away, correct?

12  A    Yes, more or less.

13  Q    And being that much closer, in the span of receiving the

14  call-out and approaching -- you were in a vehicle, correct?

15  A    Yes.

16  Q    So at what rate of speed were you headed towards the

17  Kermit Gate?

18  A    I don't know the speed, but it was slow.

19  Q    About 10 miles an hour?

20  A    Maybe 15.

21  Q    Okay.  So to understand, when you receive a call-out,

22  you proceed to that call-out at a slow rate of speed,

23  correct?

24  A    Yes.

25  Q    You don't go fast to get to where you need to go?

1  A    It all depends how far is it, and it was very close.

2  Q    Okay.  So now that we know that it was closer, you were

3  able to get there in a few minutes?

4  A    No, it was less than that.  Maybe a few seconds.

5  Q    Okay.  So in a few seconds that you were able to get

6  there, you did not see a group of people approaching the

7  fence, correct?

8  A    No, I didn't.

9  Q    Prior to arresting Ms. De La Cruz, you did not tell her

10  that she had the right to remain silent, correct?

11  A    No, I didn't.

12  Q    You did not tell her that she had the right to an

13  attorney, correct?

14  A    No, I didn't.

15  Q    You did not tell her that she had the right to speak

16  with a person of her consulate, correct?

17  A    No, I didn't.

18  Q    And these are rights that everybody prior to being

19  arrested are told, correct?

20  A    No.

21          MR. COUNTRYMAN:  Objection, Your Honor.  That's not

22  an accurate summary of the law or characterization of the

23  law.  That this was identification out in the field, and that

24  was all, Your Honor.  So I think that's a mischaracterization

25  of the law after someone's arrested.

1              THE COURT:  Overruled.  Let's see what the witness

2    says.  If he doesn't know, he doesn't know.

3    BY MS. LERMA:

4    Q    Go ahead, sir.

5    A    Can you repeat the question?

6    Q    Yes.  Are these rights told to Defendants before they

7    are arrested?

8              MR. COUNTRYMAN:  Objection, Your Honor.  Again, you

9    don't have to mirandize someone beforehand.

10             MS. LERMA:  And Judge --

11             THE COURT:  Mr. Countryman, you're doing the

12   speaking objections.  If you have an objection, go ahead and

13   make it.  If he knows, he knows.  If he doesn't, he doesn't.

14             MR. COUNTRYMAN:  Thank you, Your Honor.

15             THE COURT:  Overruled.

16             THE WITNESS:  What we do, once we arrest her, we

17   take her to the station and that's when we do all that.

18   BY MS. LERMA:

19   Q    Okay.  When you were asking her those questions, you

20   were asking her to make a statement, right?  To tell you

21   something, correct?

22   A    I was asking her to identify herself and to see if she

23   had proof that she was legally in the United States.

24   Q    So you were asking her questions, right?

25   A    Yes.

Contreras - Cross/Lerma

```
 1  Q    Yes or no?  Were you asking her questions?

 2  A    Yes.

 3  Q    Okay.  And you were expecting a response to your

 4  questions, correct?

 5  A    Yes.

 6  Q    And during direct examination, you were asked whether

 7  you took custody of Ms. De La Cruz, correct?

 8  A    Yes.

 9  Q    And you answered, tell the ladies and gentlemen of our

10  jury, you answered yes.

11  A    Yes.

12  Q    So you took custody of her, correct?

13  A    Yes, I transported her to the station.

14  Q    Okay.  And when you took custody of her, you asked her

15  questions.  Yes or no?

16  A    Yes.

17  Q    Let me show you what has been entered into evidence as

18  Government's Exhibit Number 2.  Do you recognize this area,

19  sir?

20  A    Yes.

21  Q    What area is that?

22  A    That's Zone 31 and there's Kermit Gate.

23  Q    How do you know that it's Zone 31?

24  A    I can see the gate right there.  I think it's right

25  here.
```

1    Q    Okay.  And how do you know that that's the Kermit Gate?

2    A    Because those are the pictures that the drone operator

3    took from the sky on that area.

4    Q    I'm sorry, those are the pictures that what?

5    A    Of the drone operator.

6    Q    Oh.  So you know that this is the Kermit area because

7    those are the pictures that somebody else had shown you?  Is

8    that correct?

9    A    Yes.

10   Q    Okay.  When did he show you these pictures?

11   A    He didn't show them to you -- to me.  He gave them to

12   Mr. Countryman and then he presented it to us.

13   Q    Who presented it to you?

14   A    Mr. Countryman.

15   Q    When did that happen?

16   A    I believe it was on Monday.

17   Q    Okay.  So prior to your testimony today, you met with

18   Mr. Countryman and saw Exhibit 2, and that's how you're able

19   to identify this is the Kermit Gate, correct?

20   A    Yes.

21   Q    So you sitting here today, other than having this

22   picture in front of you, would not be able to recognize that

23   this is the Kermit Gate except through this picture, correct?

24   A    That one in particular, no.

25   Q    Okay.  And so the only way that you know this is the

 1  Kermit Gate is because the Government has told you it is,

 2  correct?

 3  A    Because they took a picture about the Kermit Gate --

 4            MS. LERMA:  Objection, nonresponsive.

 5  BY MS. LERMA:

 6  Q    My question to you is the only way that you know this is

 7  the Kermit Gate is because you saw this picture ahead of time

 8  and they told you that this is the Kermit Gate, correct?

 9  A    Yes.

10  Q    Now, help me identify this section here that I am

11  pointing to along this foliage green area.  What is that,

12  sir?

13  A    That's the American Vega.

14  Q    The American what?

15  A    Vega.  That's -- that's the United States.

16  Q    Okay.  Would it be fair to say that this is the

17  riverbank?

18  A    Pretty much the riverbank is all that brushy area.

19  Yeah, pretty much.

20  Q    Okay.  So all of this area that has all this green brush

21  is the riverbank?

22  A    Yes.

23  Q    And the river is beyond this picture on the right side,

24  correct?

25  A    The river is right here.

Contreras - Cross/Lerma

1    Q    Okay.  There's just no water?

2    A    There's no water, no.

3    Q    Okay.

4    A    Well, sometimes there is.

5    Q    But in this picture there's no water?

6    A    No, not that I can see.

7    Q    What is the distance between the riverbank and on the

8    left side this fence we see here?

9    A    The distance between the riverbank and the fence, I

10   don't know.

11   Q    If you know, sir.

12   A    I don't know.

13   Q    Okay.  And this picture has no measurements so we -- if

14   you don't know, we have no idea how far it is from the

15   riverbank to the fence, correct?

16   A    No.

17   Q    And you say that you are -- I'm sorry, how long have you

18   been employed with the Border Patrol, Agent?

19   A    Eighteen years.

20   Q    Okay.  And how long have you been assigned to this zone

21   area?

22   A    Many times.

23   Q    Okay.  And many times meaning more than five?

24   A    Yes.

25   Q    Okay.  And even having been there many times you don't

1  know the distance between the riverbank and the wall?

2  A     No, I don't.

3  Q     Now in Exhibit 2, sir, pointing along this foliage area

4  that we've termed the riverbank, there are no signs in this

5  picture, correct?

6  A     No.

7  Q     There are -- and you've been there.

8  A     Yes.

9  Q     And there are no signs, correct?

10  A     No.

11  Q     And there's no signs that even say U.S. property,

12  correct?

13  A     No.

14  Q     In your experience, people might think that you don't

15  get to the U.S. until you get to the other side of the wall.

16  Is that correct?

17        MR. COUNTRYMAN:  Objection, Your Honor.  Relevance,

18  misstatement of the law.

19        THE COURT:  Overruled.

20        THE WITNESS:  I'm sorry.  Can you repeat the

21  question.

22  BY MS. LERMA:

23  Q     Yes, sir.  In your experience, people might think that

24  you don't get to the U.S. until you cross the wall, correct?

25        MR. COUNTRYMAN:  Objection, Your Honor.

Contreras - Cross/Lerma

```
 1    Speculation.
 2              MS. LERMA:  I've asked in his experience, Judge.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Yes.
 5    BY MS. LERMA:
 6    Q    And there's no signs here in this middle area, correct?
 7    A    No.
 8    Q    And along the wall, we don't see any signs either,
 9    correct?  Yes or no, sir?
10    A    I'm not able to see that well the wall, but from here,
11    no, I don't see it.  But it's not -- it's not a clear
12    picture.
13    Q    All right.  Let me show you what has been introduced as
14    Exhibit 4.  Is this the Kermit Wall area?
15    A    It looks like it, yes.
16    Q    Okay.  And the way that you know that is because you
17    were shown this picture beforehand, correct?
18    A    Yes.
19    Q    And you were told by somebody from the Government that
20    this is the Kermit Wall area, correct?
21    A    Yes.
22    Q    Just by looking at that picture, you would not know that
23    it is the Kermit Wall area, correct?
24    A    No.
25    Q    Even though you've worked there at least more than five
```

Contreras - Cross/Lerma

1  times, that area.

2  A    Yes.

3  Q    There's no indicators there that would tell you this is

4  that area.

5  A    No.

6  Q    Okay.  Now, this picture has a different view, and

7  looking at the left side where the riverbank stretches along

8  here that I am pointing to, there are no signs, correct?

9  A    No.

10  Q    Again, not even a sign that says, "Entering U.S.

11  Property," correct?

12  A    No.

13  Q    And along the wall here, sir, on Exhibit Number 4 that I

14  am pointing to, there are no signs, correct?

15  A    It's hard to see from there.  It doesn't look like it.

16  Q    Okay.

17  A    But it's really far.

18  Q    So, my question, though, to you is, looking at this

19  picture, do you see any signage?

20  A    No.

21  Q    And in this middle area, there's no signage, correct?

22  A    No.

23  Q    Now, in your testimony, you stated that Ms. De La Cruz

24  was arrested along this area where I'm pointing to.  You see

25  a little orange barricade, a gate, or a fence opening.  Is

1  that correct?

2  A    Yes, around area.

3  Q    Okay.  In that area, extending beyond it, are there any

4  signs?

5  A    Yes.

6  Q    Where on the picture?  Can you point to it and show the

7  ladies and gentlemen of the jury where you see a sign?  Get

8  your red pointer.

9  A    Oh, on that one right there, on that picture?

10 Q    Yes, sir.

11 A    Oh no.

12 Q    Okay.

13 A    I don't see it.

14 Q    So, in that area where she was apprehended, there are no

15 signs, correct?

16 A    On that picture, no.

17 Q    Let me show you what has been entered as -- let me go

18 back.  I have one more question about Exhibit 4.  On Exhibit

19 4, if you know, Agent, do you know when this picture was

20 taken?  If you know.

21 A    It was taken the day that they came -- the group came in

22 and I arrested Ms. De La Cruz.

23 Q    You know that because this picture was taken by

24 yourself?

25 A    No.  No, ma'am.  That was Mr. Torres.

1    Q    Okay.

2    A    The drone operator.

3    Q    So, he took this picture, according to you, on the day

4    of May 12, 2025, correct?

5    A    Yes.

6    Q    And you received that picture at what point?

7    Q    No, I never received a picture.

8    Q    Okay.

9    A    He sent them the pictures to Mr. Countryman.

10   Q    Okay.  So, did you see him take these pictures?

11   A    No.

12   Q    But how do you know that he took this picture on May 12,

13   2025?

14   A    Because he was flying the drone that day and he was

15   taking pictures of the -- of the area, I believe.

16   Q    You understand that you are under oath, correct, sir?

17   A    Maybe I got it wrong.

18   Q    Okay.  My question to you is, you understand that you

19   are under oath?

20   A    Yes.

21   Q    And you stated you believe that he took the picture.  Is

22   that correct?

23   A    Yes, but maybe I got it wrong.

24   Q    Okay.

25   A    Maybe he didn't.

1    Q    So, you don't know?

2    A    I don't know.

3    Q    Okay.  So, you're assuming and telling the ladies in the

4    jury and the gentleman of the jury that you don't know.  Is

5    that correct?

6    A    Yes.

7    Q    And what you had said previously, that you know that Mr.

8    Torres took that picture through his drone, is incorrect.  Is

9    that right?

10   A    Well, those are the pictures that he gave Mr.

11   Countryman, so I assume they're going to be from that day.

12   Q    Agent Contreras, answer only what you know, okay?

13   A    Yes.

14   Q    If you don't know when Mr. Torres gave these pictures to

15   Mr. Countryman, don't assume.  Do we have an agreement on

16   that?

17   A    Okay.

18   Q    Okay.  Were you present when Mr. Torres provided

19   pictures to Mr. Countryman?

20   A    No.

21   Q    Okay.  Do you know what pictures Mr. Torres provided to

22   Mr. Countryman?

23   A    No.

24   Q    Okay.  So, you cannot tell the ladies and gentlemen of

25   our jury that this picture was taken on May 12, 2025,

Contreras - Cross/Lerma

1  correct?

2  A    No.

3  Q    And everything that you said that this picture was from

4  that day, taken by Mr. Torres, is false, correct?

5  A    Yes.

6  Q    Let me show you what has been entered into evidence as

7  Exhibit 5.  Exhibit 5, Agent Torres also shows the

8  Kermit-Williams area, correct?

9  A    Yes.

10  Q    And again, the reason that you know that is because you

11  were shown these pictures beforehand, correct?

12  A    Yes.

13  Q    And they were identified to you as the Kermit-Williams

14  Gate, correct?

15  A    Yes.

16  Q    And in so doing, that is the only way that you know what

17  area this is, correct?

18  A    Yes.

19  Q    There's nothing from your personal knowledge to identify

20  that this is the Kermit-Williams Gate, correct?

21  A    No.

22  Q    Or even the place where you apprehended Ms. De La Cruz,

23  correct?

24  A    Well, if that's the Kermit-Williams -- can you repeat

25  the question again?

1  Q    Sure, let me rephrase.  On Exhibit 5, sir, this area

2  does not include on the left side any picture of the

3  riverbank, correct?

4  A    No.

5  Q    Okay.  And from what we see in the picture, at least on

6  the left side, there is no signage, correct?

7  A    Yes.

8  Q    In this middle area as well, there is no signage,

9  correct?

10  A    No.

11  Q    Now, along the gate, is there any signage?

12  A    From that picture, I don't see it.

13  Q    I'm sorry?

14  A    No.

15  Q    You don't see any signage in Exhibit 5, correct?

16  A    Yes.

17  Q    On the day that you arrested Ms. De La Cruz, was this

18  orange barricade present?

19  A    I don't remember.

20  Q    And was this truck present?

21  A    Well, there was a truck from National Guard parked very

22  close to the entry.  I am not sure if that's the one or not.

23  Q    Okay.  Let me show you what has been entered into

24  evidence as Exhibit 6.  Would you agree with me that this is

25  the same area, sir?

Contreras - Cross/Lerma

```
1   A     From the picture, yes.

2   Q     Okay.  And again, you know that it is the same area

3   because you were told by Mr. Countryman that that is the

4   Kermit-Williams Gate, correct?

5   A     Yes.

6   Q     There is nothing in this picture that shows you, through

7   your personal knowledge, what area it is, correct?

8   A     There's a BSI marker, but I'm not able to see it.  If I

9   could see it, yes.  But I don't see the number on the BSI

10  marker, one above the fence.

11  Q     Okay.  So my answer to the question is no?

12  A     No.

13  Q     Along this green foliage on the left side of the

14  picture, again, there are no signs, correct?

15  A     Yes.

16  Q     There are no signs in the middle of this picture, along

17  this dirt road, correct?

18  A     Yes.

19  Q     And you don't see any signs along the wall, correct?

20  A     Behind this vehicle, there's one that looks kind of like

21  a sign, like a small sign.  But it's hard to see.

22  Q     Okay.  Could you point to the area that you're referring

23  to, sir?

24  A     It looks -- maybe it looks this one.

25  Q     Okay.
```

Contreras - Cross/Lerma

1  A    But it's hard to see.

2  Q    And whatever that is, you don't recall seeing that on

3  the day that you arrested Ms. De La Cruz, correct?

4  A    No.

5  Q    Let me show you what has been entered into evidence as

6  Exhibit 7, Government's Exhibit 7.  Do you see this picture

7  clearly, sir?

8  A    Yes.

9  Q    And you were shown this picture in advance of your

10  testimony here today, correct?

11  A    Yes.

12  Q    And in this picture, it was identified for you that this

13  was the Kermit-Williams area, correct?

14  A    Yes.

15  Q    Mr. Countryman told you that this was the

16  Kermit-Williams area, correct?

17  A    Yes.

18  Q    Is there anything in this picture, from your personal

19  knowledge and your experience, that would identify to you

20  that this is the Kermit-Williams area?

21  A    From that picture, I don't know.

22  Q    Now, on the left side of this picture, is there any

23  signage?

24  A    No.

25  Q    Do you recall on the date that you arrested Ms. De La

1  Cruz if this vehicle was located at that area?

2  A    Yeah, there was a vehicle from National Guard parked

3  very close there.

4  Q    And you don't remember if this orange barricade was

5  present on the day that you arrested Ms. De La Cruz, correct?

6  A    No, I don't remember.

7  Q    Okay.  Now, starting from the left side of this picture

8  along the wall, do you see any signage?

9  A    No.

10  Q    Your answer is no, sir?

11  A    No.

12  Q    Okay.  Let me show you what has been introduced as

13  Exhibit 1.  On Government's Exhibit 1, sir, did you prepare

14  this exhibit or did you prepare this picture?

15  A    No, I didn't.

16  Q    Okay.  But looking at the area, are you familiar with

17  it?

18  A    Yeah, most of it.  Yes.

19  Q    Okay.  Were you provided this picture by Mr. Countryman?

20  A    Yes.

21  Q    And to understand, the area here to the right is the

22  United States and the area here to the left is Mexico,

23  correct?

24  A    Yes.

25           MS. LERMA:  Your Honor, may I have a moment?

1                  THE COURT:  Yes.

2           (Whereupon, there was a brief pause in the proceedings.)

3                  MS. LERMA:  Agent Contreras, thank you very much.

4                  I have no further questions for this witness, Your

5    Honor.

6                  THE COURT:  Redirect, Mr. Countryman, sir?

7                  MR. COUNTRYMAN:  Yes, Your Honor.

8                       REDIRECT EXAMINATION

9    BY MR. COUNTRYMAN:

10   Q    Okay, Agent Contreras.  Take a deep breath and take a

11   minute.  Do you need any water or anything?

12   A    No, I'm good.

13   Q    Going back to these photos that we've been going over,

14   to the best of your knowledge, are these the photos that the

15   United States Border Patrol provided to my office during the

16   course of this investigation?

17   A    Yes.

18   Q    And you have been a Border Patrol agent for 18 years?

19   A    Yes.

20   Q    And that you worked specifically in this area?

21   A    Yes.

22   Q    All of these photographs that the Defense has shown you

23   that you and I went through, are you familiar with that area?

24   A    Yes, I am.

25   Q    Back on May 12th, when you took custody of Ms. De La

Contreras - Redirect/Countryman

1  Cruz, did you take custody of her by something that's a gate

2  in the border wall?

3  A    Yes.

4  Q    Amongst Border Patrol, what's the name of that gate?

5  A    The Kermit Gate.

6  Q    And those photographs that we were looking through, were

7  those photographs of that gate?

8  A    Yes.

9  Q    Is any of that being fabricated?

10 A    No.

11 Q    And is that the area that you were working back on May

12 12th of this year?

13 A    Yes, it is.

14 Q    Now, I believe that you refer to this area as Zone 31?

15 A    Yes, Zone 31.

16 Q    And why is it that you refer to it as Zone 31?

17 A    That's what we call it so we can know more or less what

18 it is.

19 Q    Are those markings on the border wall itself?

20 A    Can you repeat the question?

21 Q    Does it say Zone 31 on the border wall?

22 A    No, it doesn't.

23 Q    Are there other markings on the border wall?

24 A    There's BSI marker, yes.

25 Q    What's a BSI marker?

 1  A    It's a sign on top of the fence, and it has numbers.

 2  That's how we know the areas.

 3  Q    And in that particular area, and specifically the area

 4  where you took custody of Ms. De La Cruz, is there a marker

 5  on the fence in that area?

 6  A    Yes, there is.

 7  Q    And what is it?

 8  A    It's Marker 61.

 9  Q    And where is it in relation to the Kermit-Williams Gate

10  that you described?

11  A    It's just east of the Kermit Gate.

12        MR. COUNTRYMAN:  Now, if I may publish Government

13  Exhibit 5 to the jury, Your Honor?

14        THE COURT:  Yes.

15        MR. COUNTRYMAN:  Thank you, Your Honor.

16  BY MR. COUNTRYMAN:

17  Q    In this photograph, Agent Contreras, can you see where

18  that marker is on the border wall?

19  A    Do you want me to --

20  Q    With the pointer.  Thank you.

21  A    Right there.

22        MR. COUNTRYMAN:  And, Your Honor, Agent Contreras

23  is circling, sort of pointing towards what appears to be a

24  sign on top of the border wall, middle right of Government

25  Exhibit 5.

 1  BY MR. COUNTRYMAN:

 2  Q    And on that, what does it say?

 3  A    It (indiscernible) of the Kermit Gate, east 61.

 4  Q    And here's my question.  I certainly don't, and I don't

 5  want anyone else to put words in your mouth.  Are you

 6  familiar with this area?

 7  A    Yes.

 8  Q    And on May 12th, were you working in this area?

 9  A    Yes.

10  Q    And do you work in that area all the time?

11  A    Yes.

12  Q    And the gate that's in the area, what is it known as?

13  A    Kermit Gate.

14  Q    And is this the area where you took custody of Ms. De La

15  Cruz?

16  A    Yes.

17  Q    And then, Agent Contreras, the vehicle in the bottom

18  right corner, can you see that there?

19  A    Yes.

20  Q    You had mentioned, the Defense Counsel had mentioned

21  maybe a sign that's near that.  Could you circle that sign

22  that Defense Counsel asked you about, sort of behind the

23  vehicle?

24       And if you can't see it, I can go to a different --

25  A    Yeah, when you go to a different picture.  It's a little

1    hard because it's too far.

2              MR. COUNTRYMAN:  Your Honor, can I publish

3    Government Exhibit 8 to the jurors?

4              THE COURT:  Yes.

5              MR. COUNTRYMAN:  I apologize, Your Honor.

6    Government Exhibit 7.

7    BY MR. COUNTRYMAN:

8    Q    Can you see that sign, sir, in this photograph?

9    A    Yes.

10   Q    Can you circle that sign?  And what is that sign?

11   A    That's a Government warning sign from the Army.

12   Q    Now, based on the best of your recollection, do you

13   recall if that sign was there back on May 12th?

14   A    Yes, it was.

15   Q    It was there on May 12th?

16   A    Yes.

17   Q    And do you know that?

18   A    Yes.

19   Q    How do you know that?

20   A    They started putting those signs on I believe May 8th.

21   Q    And prior to that, had you been working in that area?

22   A    Yes.

23   Q    These photographs that we've gone through with the

24   jurors, are they a fair and accurate depiction of what that

25   area looked like at the time, back on May 12th?

Contreras - Redirect/Countryman

1   A     Yes.

2   Q     Has the border between the United States and Mexico

3   changed since May 12th?

4   A     No.

5   Q     This area that you found Mr. De La Cruz, was it in an

6   area that is the United States?

7   A     Yes.

8   Q     Now, Agent Contreras, I want to make sure that we get it

9   clear for the jurors, and that it's in your own words, about

10  the chronological sequence of events of what occurred when

11  you took Ms. De La Cruz into custody.

12  A     Okay.

13  Q     After you received the radio call-out from Agent Torres,

14  where were you located in relation to where you took custody

15  of Ms. De La Cruz?

16  A     West of the Kermit Gate.

17  Q     And after you take custody of Ms. De La -- or when you

18  come up and take custody of Ms. De La Cruz, where is she in

19  relation to the Kermit-Williams Gate and that sign that you

20  just described a little bit ago?

21  A     She was more or less -- she was around here, right here.

22  This area.

23         MR. COUNTRYMAN:  And Agent Contreras is circling

24  around the Kermit-Williams Gate.

25  BY MR. COUNTRYMAN:

1   Q    So Ms. De La Cruz was right around that gate?

2   A    Yes, the Kermit Gate.

3   Q    And so you're in your vehicle.  In your vehicle, are you

4   pointed west on the levee road or east on the levee road?

5   A    East.

6   Q    And after you received that initial call-out from Agent

7   Torres, that's when you get yourself ready, and then you

8   proceed to that area.

9   A    Yes.

10  Q    And I believe your -- and could you again describe for

11  the jurors what you saw as you approached the Kermit-Williams

12  Gate?

13  A    There was a subject by the fence sitting.

14  Q    And that subject was Ms. De La Cruz?

15  A    Yes, Ms. De La Cruz.

16  Q    And Ms. De La Cruz was near the two National Guard

17  members?

18  A    Yes, she was next to them.

19  Q    Now, in your own words, and I don't want to interfere,

20  could you just describe for the jurors what you did when you

21  walked up to Ms. De La Cruz?

22  A    I identified myself as a U.S. Border Patrol agent.  I

23  asked her if she had any documents to be legal in the United

24  States, and she said no.  I asked her where was she from, and

25  she said she was from Peru.

1  Q    And is that also -- and then following that, then did

2  you take Ms. De La Cruz into your custody?

3  A    Yes.

4  Q    And why was it that you needed to ask her for her

5  identification and who she was?

6  A    To see if she was legal here in the United States.

7  Q    So for purposes of identification?

8  A    Uh-huh.  Yes.

9  Q    And after you had made that -- made those, then you took

10 her into custody?

11 A    Yes.

12 Q    In any way, shape, or form, has that sequence of events

13 been changed, or is it out of order?  To the best of your

14 recollection, is that the sequence of events of what

15 happened?

16 A    Yes.

17         MR. COUNTRYMAN:  Pass the witness, Your Honor.

18 Thank you.

19         THE COURT:  Any recross-examination, Ms. Lerma?

20         MS. LERMA:  Yes, Your Honor.

21                    RECROSS-EXAMINATION

22 BY MS. LERMA:

23 Q    When you arrested Ms. De La Cruz, Agent Contreras, did

24 you inform her that she was in a restricted military area?

25 A    No, I didn't.

Contreras - Recross/Lerma

```
1   Q    Did you advise her that she was in a National Defense

2   Area?

3   A    No, I didn't.

4   Q    You provided her -- you transported her to the

5   processing center, correct?

6   A    To our station, the Clint Station.  Clint Border Patrol

7   Station.  Not the Central Processing Center.

8   Q    Okay, thank you for that clarification.  At that

9   station, did you tell her that -- or provide her some sort of

10  National Defense Area advisal?

11  A    None myself, but another agent --

12            MR. COUNTRYMAN:  Objection, Your Honor.  The

13  initial part of the response is fine, the rest of it is not

14  in response to the question.  And the Government would

15  further object that this line of questioning is seeking to

16  elicit self-serving hearsay, as discussed prior to the start

17  of this trial, Your Honor.

18            THE COURT:  Okay, let me go again on that.  I think

19  he answered the question.  You didn't object to that portion

20  of it, but you're objecting to further questions.  So I'm not

21  sure what he was going to say or what they were going to say.

22            But how about rephrasing the question, Ms. Lerma?

23            MS. LERMA:  Sure.

24  BY MS. LERMA:

25  Q    At any point did you, in particular, tell Ms. De La Cruz
```

Contreras - Recross/Lerma

1  that she was in a National Defense Area?

2  A    No.

3  Q    Let me show you what has been entered into evidence,

4  Government's Exhibit Number 7.

5      You stated that there is a sign in Government's Exhibit

6  7 when asked by Mr. Countryman, correct?

7  A    Yes.

8  Q    And can you indicate to us where you see that sign?

9  A    Right here.

10 Q    Okay.  What does that sign say, sir?

11 A    It's a warning that it's a restricted zone.

12 Q    As the sign is in the picture, can you read it?

13 A    No, I can't.

14 Q    Okay.  You indicated, or through your testimony, that

15 Ms. De La Cruz was arrested in this area near the gate, west

16 of the gate, correct?

17 A    Yes.

18 Q    Okay.  Can you point with your pointer more about the

19 area where you arrested her?

20 A    That area.

21 Q    Okay, sir.  How far is that area from this post that we

22 see here?

23 A    I don't know.

24 Q    Are there any measurements in this picture that would

25 help you identify how far that is?

 1  A    No, not from the picture.

 2  Q    In your experience, having been at the Kermit Gate many

 3  times, how far, if you know, is that from that post?

 4  A    I don't know.

 5  Q    Okay.  You stated -- well, let me ask this.  You don't

 6  know if this post was here on May 12th, 2025, correct?

 7  A    No.  Yes, I do because they started putting them up on

 8  May 8th, and that's the zone that I usually work.  So I've

 9  been driving around that area.

10  Q    Okay.  I'm asking you specifically about this sign.  Do

11  you know if this sign was there or post on May 12th, 2025?

12  Yes or no, sir.

13  A    Can you repeat the question?

14  Q    Do you know if this post was there on May 12th, 2025?

15  Yes or no?

16  A    No.

17           MS. LERMA:  Your Honor, may I have a moment?

18           THE COURT:  Yes.

19       (Whereupon, there was a brief pause in the proceedings.)

20           MS. LERMA:  Thank you very much, Agent Contreras.

21           No further questions, Your Honor.

22           MR. COUNTRYMAN:  Your Honor, to follow up with

23  Agent Contreras?

24                    FURTHER REDIRECT EXAMINATION

25  BY MR. COUNTRYMAN:

Contreras - Further Redirect/Countryman

1   Q    You responded "no" to that last question, but I believe

2   earlier you testified that the signs had gone up starting on

3   May 8th?

4   A    Yes.

5   Q    And that you had seen the signs?

6   A    Yes.

7   Q    And so when you said no, what do you mean?

8   A    Maybe, I guess I got confused because what I'm talking

9   about is where I arrested her, which was over there, where

10  you got in the arrest.   At that time of the arrest, I didn't

11  see the sign, but I had seen it before.   Maybe I didn't

12  explain it better.

13  Q    So my understanding is that your testimony was that

14  these signs went up on May 8th of this year?

15  A    Yes.

16  Q    And that you arrested -- and that had seen the signs up?

17  A    Yes.

18  Q    And that you arrested Ms. De La Cruz on May 12th, but

19  you don't recall seeing the sign on May 12th?

20  A    Yes, I don't recall it.

21           MR. COUNTRYMAN:   Okay, thank you.

22           Pass the witness, Your Honor.

23           MS. LERMA:   Nothing further, Your Honor.

24           THE COURT:   May this witness be excused or subject

25  to recall?

1             MS. LERMA:  Excused, Your Honor.

2             THE COURT:  Mr. Countryman, sir?

3             MR. COUNTRYMAN:  Subject to recall, Your Honor.

4             THE COURT:  Agent, if you can just kind of stay

5    around, they may recall you.

6             THE WITNESS:  Okay.

7             THE COURT:  You are under the Rule, so you can only

8    talk to lawyers about the case.  Please do not talk to anyone

9    else about this case, sir.

10            THE WITNESS:  Okay.

11            THE COURT:  Thank you, sir.

12        (Whereupon, the witness was excused.)

13            THE COURT:  Mr. Countryman, do you have additional

14   witnesses, sir?

15            MR. COUNTRYMAN:  Your Honor, based on the testimony

16   that we've heard from the three witnesses we've called so

17   far, if we could take a brief recess, maybe a bathroom break,

18   so I could confer with co-counsel based on what we heard to

19   decide how we should move forward, Your Honor.

20            THE COURT:  It's a great time for a break.

21            MR. COUNTRYMAN:  Thank you, Your Honor.

22            All rise for the jury, please.

23            MR. COUNTRYMAN:  And, Your Honor, when did you want

24   us back?

25            THE COURT:  About 15 minutes, if that's okay with

1   you all.

2        (Whereupon, the jury exited the courtroom.)

3            MR. COUNTRYMAN:  Thank you, Your Honor.

4            THE COURT:  We're in recess.

5        (Whereupon, at 10:27 a.m., a brief recess was taken;

6   reconvening at 10:45 a.m.)

7        (Outside the presence of the jury; Defendant present.)

8            THE COURT:  All rise for the jury.

9            MR. COUNTRYMAN:  I apologize, Your Honor.  There

10   was something we were hoping to take up with the Court.

11            THE COURT:  Sure.

12            MR. COUNTRYMAN:  I'll make it fast, Your Honor.

13            THE COURT:  Sure, absolutely.  Sorry about that.

14            MR. COUNTRYMAN:  Going back to the issue of the

15   passport that was seized from Ms. De La Cruz back on May

16   12th, the Government would just point out to the Court it was

17   in her possession, there is no question about the legitimacy

18   or at least the authenticity and by I mean is what she had in

19   her possession and what was hers and her claiming that she

20   was from Peru and that that's what she had in her possession.

21            So, I would point the Court towards 801(d)(2),

22   opposing party statement as hers.  I already brought up the

23   803(8) and as well (9) which are the exception of the hearsay

24   rule.  I would also bring up 804(b)(4), again, a statement

25   against interest, again, that being that she's from Peru and

1    her adoption of that.  The Government also does believe that

2    it's a foreign record as far as we know and that we have a

3    good-faith basis for that under 902(3), too.  Again, there's

4    also some case law on that, U.S. v. Valez.

5            But, Your Honor, the Government would ask the Court

6    to reconsider the admission of evidence seized from the

7    Defendant as to her alienage, Your Honor.  The Government

8    would ask the Court to reconsider allowing that to come in

9    and the agent being allowed to testify to the jurors about

10   that passport that was seized from the Defendant.

11           THE COURT:  Per my prior statements, your request

12   will be denied, Mr. Countryman, sir.

13           MR. COUNTRYMAN:  And to renew the Government's

14   request to submit the 213, just that the Page 1 of the 213

15   based on its notice earlier, to admit that as a public

16   document.  Again, I know I have it in my filings to the Court

17   already, but again, pointing the Court towards U.S. v.

18   Cazada, U.S. v. Noria, again, that Page 1 of that 213, which

19   is all we're seeking to admit.  It's that biographical

20   information.

21           THE COURT:  Okay.  What exhibit is that,

22   Mr. Countryman, sir?

23           MR. COUNTRYMAN:  Your Honor, I believe that was

24   marked as Government Exhibit 9.  And I had filed that motion,

25   that notice of intent to file public records, and I cited to

1  the case law on there.

2          THE COURT:  Correct.  But I don't think you moved

3  to introduce it since that time.  If I'm mistaken.

4          MR. COUNTRYMAN:  Yeah, I did it before we brought

5  in the jury and we brought it up, and you denied my motion to

6  admit that document, Your Honor.

7          THE COURT:  Are you talking about a couple of days

8  ago or before we started?

9          MR. COUNTRYMAN:  Yesterday, Your Honor.

10          THE COURT:  Because I think what my ruling was that

11  if you would take them up once at a time.  I didn't deny it.

12  I said, go ahead and take them up one at a time just so that

13  that would allow the Defendant to make their objections, sir.

14  But since that time, I don't think you've moved to re-admit

15  it, Mr. Countryman.

16          MR. COUNTRYMAN:  Then at this time then, I could

17  move to re-admit Government Exhibit 9.  And if the Court

18  would like me to show.

19          THE COURT:  I know which one it is, sir.

20          MR. COUNTRYMAN:  Okay.  The Government would move

21  to admit to Government Exhibit 9 as a public record, Your

22  Honor.

23          THE COURT:  Any objection from the Defense on

24  Exhibit 9?

25          MS. LERMA:  No objection, Your Honor.

1          THE COURT:  Exhibit 9 will be admitted, sir.

2          MR. COUNTRYMAN:  Thank you, Your Honor.

3      (Whereupon, Government's Exhibit Number 9 was admitted

4  into evidence.)

5          MS. KANOF:  Your Honor, I'm communicating with my

6  boss, but she's asked me to make a record and put some cases

7  on the record with some citations.  One is U.S. v. Williams,

8  865 F.3d 1328, it's a 2017 case, saying that the passport is

9  admissible under 902(3) and 902(12) as a foreign record of

10 regularly conducted activity and also to put on the record,

11 Velez-Acosta, a 2024 WL 806537.

12         Thank you for allowing me to do that, Your Honor.

13         THE COURT:  Thank you.

14         MR. COUNTRYMAN:  And, Your Honor, the Government's

15 intention here with the I-213 is we would call Agent Parga,

16 who is the case agent, she's been sitting in during the

17 duration of the trial, to explain the information contained

18 in the I-213.  And that is all, only the information

19 contained on this first page of the I-213.

20         And I bring this up, I want to bring this up now to

21 resolve.  We are not going to get into any statements that

22 may have been made by the Defendant to any Border Patrol

23 agents back at the station or anything else.  And if that's

24 going to come up as an issue, I think that needs to be

25 addressed now.  But her testimony, the questions being asked

1    from the Government would be limited to this I-213 and the

2    information contained in the I-213.  And that is all.

3            THE COURT:  So are we going to be in a long

4    argument because I hate for the fact that the jury's standing

5    out there and they thought we were ready?  Should I let them

6    go sit back down?  I just don't like that process.

7            MR. COUNTRYMAN:  I don't have anything else to --

8            THE COURT:  Is it something we can resolve quickly

9    or --

10            MS. LERMA:  Yeah.  I just have a simple response,

11    Judge.  The Government doesn't tell me how to do my

12    cross-examination.  I will do it in accordance to what the

13    Court tells me to do.  And so I should have the breadth of my

14    cross-examination.

15            THE COURT:  I think -- I don't know what questions

16    they're going to ask.  I'm certainly not going to ask.  But

17    it's your decision whether to put on a witness or not, Mr. --

18    I don't know if you need that witness, but you make the

19    decision.  I'm going to allow the Defense to cross-examine.

20    And you can make that call on your own.

21            If you need some time to make it, I can do that if

22    you want to take a break and if you want me to tell the

23    jurors to go sit back down.  Let me know whatever you want to

24    do, Mr. Countryman, sir.

25            MR. COUNTRYMAN:  Yes, Your Honor.  But for the

1  record to be clear, Government Exhibit 9 has now been

2  admitted to the jurors.

3          THE COURT:  Yes, it's admitted.

4          MR. COUNTRYMAN:  Thank you, Your Honor.

5          THE COURT:  Do you want to take some time and see

6  what you're going to do, Mr. Countryman, or do you want to go

7  ahead and just bring in the jury?

8          MR. COUNTRYMAN:  Your Honor, yes, Your Honor.

9  Could I --

10          THE COURT:  Do you want a minute?

11          MR. COUNTRYMAN:  Yes, Your Honor.  Just --

12          THE COURT:  Go ahead.  Take a minute here.

13          MR. COUNTRYMAN:  Thank you, Your Honor.  It could

14  just be in place just for a brief moment.

15          THE COURT:  Sure.  Absolutely, Mr. Countryman.

16      (Whereupon, there was a brief pause in the proceedings.)

17          MR. COUNTRYMAN:  We're ready, Your Honor.

18          THE COURT:  Okay.

19          MR. COUNTRYMAN:  I apologize.  Thank you.

20          THE COURT:  Thank you.

21          All rise for the jury.

22      (Whereupon, the jury entered the courtroom.)

23          THE COURT:  You may be seated.

24          Mr. Countryman, sir, do you want to call another

25  witness, sir?

1              MR. COUNTRYMAN:  I do, Your Honor, and thank you

2    for the Court's patience.   At this time, the Government

3    would call Agent Maria Parga Davis.

4              THE COURT:  If you'll raise your right hand.

5         MARIA PARGA DAVIS, GOVERNMENT'S WITNESS, SWORN

6              THE COURT:  Thank you.  You may be seated.

7              MR. COUNTRYMAN:  Thank you, Your Honor.

8                        DIRECT EXAMINATION

9    BY MR. COUNTRYMAN:

10   Q    Ma'am, can you state your full name?

11   A    Maria Isabel Parga.

12   Q    Can you spell your last name?

13   A    P-A-R-G-A.

14   Q    And, ma'am, where are you currently employed?

15   A    I'm a U.S. Border Patrol agent?

16   Q    And how long have you been a U.S. Border Patrol agent?

17   A    Eighteen years.

18   Q    And what do you currently do for the United States

19   Border Patrol?

20   A    I'm currently assigned to the El Paso Sector

21   Prosecutions Office.

22   Q    And what do you do in that capacity?

23   A    In that capacity, we receive A-file from the stations

24   that have apprehended somebody and they're seeking criminal

25   prosecution.  I review the totality of the A-file and I

1  prepare my criminal complaint.

2  Q    Now you said an A-file.  What is an A-file?

3  A    An A-file is a folder that gets assigned a unique number

4  and that unique number is called an A-file.  It's something

5  like this.  And --

6         MR. COUNTRYMAN:  And, Your Honor, for the record,

7  Ms. Parga just held up a binder that she has in front of her.

8         THE WITNESS:  It's just a regular folder with an A

9  number on top and that A number is -- will always contain the

10 individuals, the subject, the alien's immigration data, any

11 encounter.  Anything that's related to immigration would be

12 conducted through that A number.  And it's personalized to

13 that person.

14 BY MR. COUNTRYMAN:

15 Q    Are these A-files only created for aliens to the United

16 States?

17 A    No, sir.

18 Q    Okay.  Why are the A-files created?

19 A    They are created to maintain any and all records related

20 to the apprehension, the entry of even U.S. citizens.

21 Q    And but they are created in the event that someone who's

22 an alien to the United States is apprehended?

23 A    Yes.

24 Q    And does that -- are they created in every -- are they

25 supposed to be created in every case?

Davis - Direct/Countryman

```
 1  A    Yes.

 2  Q    And does that have anything to do whether or not there's

 3  criminal prosecution at a later date?

 4  A    No, not related.

 5  Q    And I asked you alien, mentioned that word "alien."

 6  What is an alien to the United States?

 7  A    An alien is somebody who is not natural born to the U.S.

 8  or has not been naturalized as a U.S. citizen.

 9  Q    And was that file, were those records created in the

10  instant case?  For Ms. De La Cruz, was that A-file created?

11  A    This particular A number, yes, sir.  She was assigned

12  this particular A-file.

13  Q    And was that because Ms. De La Cruz is an alien to the

14  United States?

15  A    Correct.

16  Q    And also because did it have in part anything to do with

17  her apprehension back on May 12th?

18  A    I'm sorry, rephrase that question?  I mean can you --

19  Q    Was it created after her apprehension on May 12th?

20  A    Correct.

21  Q    Did she have an A-file prior to May 12th?

22  A    She did not.

23  Q    As part of that A-file, is there a record created that's

24  called an I-213?

25  A    Yes, sir.
```

Davis - Direct/Countryman

1  Q    What is an I-213?

2  A    An I-213 is a record of the portable and inadmissible

3  alien.

4  Q    And what kind of information is contained in an I-213?

5  A    The first page is the biographical information.

6  Q    Now in addition to the first page of the I-213, what

7  other types of things are contained in an individual's

8  A-file?

9  A    We -- when a subject gets apprehended and if they are in

10  possession of any identification documents, these documents

11  are seized because when the subject, after -- after an

12  immigration judge, which is another court, determines if the

13  alien is going to be able to stay or not.  If the immigration

14  judge decides that the person is removable, that, you know --

15  that it's -- that they're going to be back -- sent back to

16  their country, their identification documents is utilized so

17  that their country can receive them back to their country.

18  It facilitates them being sent back to their country.

19  Q    And so those are kept in the A-file as a regular course

20  of business?

21  A    Yeah, so regular course of business.  Their passport or

22  any type of identification is kept within the A-file.

23  Q    And was there a passport seized from the Defendant in

24  this case?

25  A    Yes, sir.

Davis - Direct/Countryman

1   Q    And from what country was that passport?

2   A    Peru.

3   Q    And has that been kept in the Defendant's A-file?

4   A    Yes, sir.  It's here.

5   Q    Were you able to do a records check on that?

6   A    Yes, sir.

7   Q    What did you find?

8            MS. LERMA:  Objection to any hearsay, Your Honor.

9            THE COURT:  Sustained.

10  BY MR. COUNTRYMAN:

11  Q    What records did you check?

12  A    I checked any and all records.  I checked for criminal

13  histories.  I checked to see if she has any prior immigration

14  histories.  I checked her travel data.  I checked any --

15  anything on her.  Any apprehensions, any alerts, anything.

16  Q    Do you check with the home country?  Do you do a check

17  with the home country?

18  A    With the home country, no, I don't.  Unless I need to, I

19  see I need to.  But in this case, I didn't because she had a

20  Peruvian passport.

21  Q    Now, going back to that 213 --

22           MR. COUNTRYMAN:  And, Your Honor, if at this time I

23  could publish Government Exhibit 9 to the jurors?

24           THE COURT:  Yes.

25  BY MR. COUNTRYMAN:

1   Q    Ma'am, what I'm showing you now is Government Exhibit 9

2   in front of the jurors.  Is this the 213, that first page of

3   the 213 that was created for Ms. De La Cruz?

4   A    Correct.

5   Q    And if it helps, ma'am, what I will -- ma'am, are you

6   able to see that okay?

7   A    Yes.

8           MR. COUNTRYMAN:  And, Your Honor, may we poll the

9   jurors to see if the jurors can see that, in case we need to

10  zoom more?

11          THE COURT:  Sure.  And they're having a little bit

12  of hard time maybe hearing, so you might want to speak a

13  little louder.

14          MR. COUNTRYMAN:  I apologize, Your Honor.

15  BY MR. COUNTRYMAN:

16  Q    Agent Parga, this is a copy of the I-213 that was

17  created in this case?

18  A    Correct.

19  Q    Specific to Ms. De La Cruz?

20  A    Correct.

21  Q    And this is the document that contains Ms. De La Cruz's

22  biographical information that you described?

23  A    Correct.

24  Q    Now, starting in the top left-hand corner where it says

25  family name, do you see that?

Davis - Direct/Countryman

1    A    I do.

2    Q    What name is reflected there?

3    A    De La Cruz-Alvarez, Adely Vanessa.

4    Q    Is that the Defendant in this case?

5    A    Correct.

6    Q    And directly below that, what information is contained

7    in the block directly below that?

8    A    Her country of citizenship.

9    Q    And which country is that?

10   A    Peru.

11   Q    And then to the right, what information is contained in

12   that block?

13   A    Her passport number and the country that it's from.

14   Q    And which country is it from?

15   A    Peru.

16   Q    And to the right, what's contained in the block to the

17   right of that?

18   A    It contains the case number, which is anytime there's an

19   apprehension, El Paso AOR has different stations.  For

20   example, in the El Paso area, the case number which start

21   with this EPS in this precise case, that event happened in

22   Clint so it starts the CTX followed by the year, followed by

23   the month and the number of the event for that month.

24   Q    And then the sequence, there appears to be a letter and

25   a number after that.  What was that information?

Davis - Direct/Countryman

1  A    That is her assigned A number.

2  Q    Unique to Ms. De La Cruz?

3  A    Unique to Ms. De La Cruz.

4  Q    And then below that?

5  A    Below that is the U.S. address if the person provides

6  where she was heading to, we go ahead and document it.

7  Q    And then below that, what information contains the block

8  below that?

9  A    It contains the date, the place, and the manner in which

10  the person entered the U.S.

11  Q    And below that, what information is contained?

12  A    It contains where the Defendant is from, La Libertad

13  Cesar Vallejo Peru, Lima, Peru (phonetic).

14  Q    And then below that, what information --

15  A    It's her date of birth is 5/14/2004.  When she came in,

16  she was 20.

17  Q    And then to the right of that?

18  A    To the right of that is the date of action.

19  Q    What does that mean?

20  A    The date that we proceeded to process her for criminal.

21  Q    And those are the things that occurred back at the

22  station after she was apprehended?

23  A    Yes.

24  Q    And then to the right that, what information is

25  contained there?

Davis - Direct/Countryman

1  A    It's the location code, EPT meaning El Paso Sector, CTX

2  meaning the Clint Border Patrol Station.

3  Q    And then going back over to the left and in the box

4  below there, what information is contained?

5  A    The city that she's from.

6  Q    And in this case, is that a city of Peru?

7  A    Yes.  It's Angasmarca, La Libertidad, Peru.

8  Q    And then if we move a couple of blocks down from there

9  in the box that says "Immigration Record," what information

10  is contained there?

11  A    Normally, if a person does not have a prior immigration

12  record, it shows negative.  If the person has been

13  apprehended before, it will show a positive.

14  Q    And what is it in this case?

15  A    A negative.

16  Q    And what that does that mean?

17  A    Meaning that she has no record of ever being here in the

18  U.S.

19  Q    And then below that skipping down two lines, what

20  information is contained?

21  A    It will provide the name and address, the parents'

22  names, if they have any property, the mother's name.

23  Q    And now if we scroll down here to the -- and then

24  starting sort of at the top there in the bottom half of this

25  document in that box, what information is contained there?

Davis - Direct/Countryman

1  A    The FINS number.  That is a unique number based on her

2  fingerprint.  That is unique and it will never change, like a

3  -- it's unique.

4  Q    And could you circle with that laser pointer what number

5  you're referring to.

6       And just above those blocks, what information is

7  contained?

8  A    I'm sorry.  I can't see it there.

9       Name, name and country of last current employer.

10 Q    And in this case, there was none?

11 A    None.

12       MR. COUNTRYMAN:  And so that the record is clear,

13 Agent Parga used the laser pointer to circle in the area in

14 the top in the left-hand side of Government Exhibit 9, sort

15 of in the middle part of that document.

16 BY MR. COUNTRYMAN:

17 Q    And so below that -- and you described that, it says

18 FINS number?

19 A    It's the fingerprint identification number.

20 Q    Again, unique to the Defendant?

21 A    Yes.  Unique to the Defendant.

22       MR. COUNTRYMAN:  And Agent Parga used the laser

23 pointer to circle that FINS number.

24 BY MR. COUNTRYMAN:

25 Q    And then to the right of that, there appears to be a

Davis - Direct/Countryman

1  sequence of numbers.  What is that?

2  A    That right there, when we seize property from the alien

3  or if they're in possession of any property, they get

4  assigned an I-77 number and that tracks where the property is

5  and how to find it easily.

6  Q    And would that be returned to the individual at a later

7  time?

8  A    Yes.  They have 30 days to pick up their property.  They

9  can always ask their defense attorney  or the Government of

10  their country to retrieve it for them.

11           MR. COUNTRYMAN:  And for the record, Agent Parga

12  used the laser pointer to circle around the I-77 number.

13  BY MR. COUNTRYMAN:

14  Q    And then to the right of that, there's something that

15  says DNA envelope.  What is that?

16  A    We take DNA samples from every single person that is

17  encountered, and we submit it for the FBI.

18           MR. COUNTRYMAN:  And Agent Parga used the laser

19  pointer to circle around that DNA envelope and number.

20  BY MR. COUNTRYMAN:

21  Q    And now moving back to the left-hand side below the FINS

22  number, there appears to be a photograph.  What is what?

23  A    Those are the arrest coordinates of where the Defendant

24  was found.

25  Q    Above the arrest coordinates, is there a photograph?

1    A    Yes, there is.

2    Q    Who's that a photograph of?

3    A    That photograph is of the Defendant.

4    Q    And when would that photograph have been taken?

5    A    At the time of apprehension.

6    Q    And then to the right of that photograph, what are we

7    looking at here to the right of the photograph?

8    A    We're looking at her left index print and her right

9    index print.

10   Q    And now again going back over to the left-hand side

11   below the photograph, what information is contained directly

12   below the photograph?

13   A    The arrest coordinates.

14   Q    And then to the right, there's I believe it starts with

15   212-F, what is that?

16   A    It's where she's going to be processed under criminally.

17   Q    And then back over on the left-hand side below the

18   arrest coordinates, what information is contained there?

19   A    It's the consequence and delivery system.  The

20   classification FERA (phonetic) means a first-time

21   apprehension.  The programs, prosecution, standard

22   prosecution.  That means that the A-file will be routed to

23   our office at the El Paso Sector Prosecutions Office to be

24   reviewed and to file the criminal complaint.

25   Q    And then, ma'am, if I scroll down there a bit more, in

Davis - Direct/Countryman

1   the bottom left-hand corner of this document, what

2   information are we looking at?

3   A    At the very bottom?

4   Q    In the bottom left corner, yes.  Very bottom left

5   corner.

6   A    The A-file prosecutions review CPA EPT.

7   Q    What does that mean?

8   A    That means the distribution, the I-213 goes in the A-

9   file.  One goes to the prosecution for review, and another

10  one goes to a CPA EPT.

11  Q    And then to the right of that, what information is

12  contained in the bottom right corner?

13  A    The information on the -- that little box is the officer

14  who processed the Defendant, the date and time.  It also

15  shows the disposition, how we're going to process her at this

16  -- it was an expedited removal as per 212-F.  And then the

17  reviewing officer, which is a supervisor who approves the

18  A-file.

19  Q    What's an expedited removal?

20  A    An expedited removal, it's -- you remove them -- Border

21  Patrol agents have the authority to perform expedited

22  removals.  If you determine that the person is here

23  illegally, you process them for removal, for immediate

24  removal.

25  Q    And that decision has already been made in this case?

 1  A    Correct.

 2  Q    And, ma'am, again to clarify, these I-213s, these

 3  documents are created in every one of these types of cases?

 4  A    Yes, sir.

 5           MR. COUNTRYMAN:  May I have a moment, Your Honor?

 6           THE COURT:  Yes, you may, sir.

 7       (Whereupon, there was a brief pause in the proceedings.)

 8           MR. COUNTRYMAN:  I will pass the witness, Your

 9  Honor.

10           Do you want me to leave this up?

11           MS. LERMA:  Sure.  Thank you.

12                         CROSS-EXAMINATION

13  BY MS. LERMA:

14  Q    Agent Parga or Davis, what do you prefer?

15  A    Parga.

16  Q    Okay.  Agent Parga, let me bring your attention to what

17  has been entered into evidence as Exhibit, Government's

18  Exhibit Number 9, which is on the screen already.  The

19  section that is listed, "Status When Found," do you see that

20  ma'am?

21  A    Yes.

22  Q    It says "Travel Seeking," is that correct?

23  A    Correct.

24  Q    And the section that says "Length of Time Illegally in

25  U.S." says "At Entry," correct?

Davis - Cross/Lerma

```
1   A    Correct.

2   Q    Let me bring your attention and invite the jury's

3   attention to the section that says "Monies Due Property in

4   U.S. Not in Immediate Possession" says "None Claimed," is

5   that correct?

6   A    "Monies" -- I'm sorry, the ones right under immigration

7   --

8   Q    Ma'am, my question to you is --

9   A    Yes.  Yes.

10  Q    -- it says "None Claimed," correct?

11  A    Yes.

12  Q    All right.  And you heard, you've been here sitting

13  hearing testimony that there was approximately 500-and-some

14  dollars that was found on Ms. De La Cruz, did you hear that

15  testimony?

16  A    I heard that she was in possession of money.  I know how

17  much money there was because I reviewed the entire file.

18  However, I don't think the amount was testified to.

19  Q    Okay.  But that there was monies that she had on her

20  person?

21  A    Correct.

22  Q    Okay.  But on this form it says "None Claimed," correct?

23  A    Correct.

24  Q    And where it says "Arrest Coordinates, Latitude and

25  Longitude," this would be the specific section of where she
```

Davis - Cross/Lerma

1  was arrested, correct?

2  A    Correct.

3         MS. LERMA:  Your Honor, may we approach please?

4         THE COURT:  Yes, you may.

5     (Whereupon, at 11:13 a.m., a bench conference began.)

6         MS. LERMA:  Your Honor, Ms. Kanof cannot be up here

7  at this moment, but I can hear everything she's telling

8  Mr. Countryman.  They're seated right in front of the jury,

9  and they can hear what she's saying.

10         MR. COUNTRYMAN:  I'm sorry.  I'm sorry.

11         THE COURT:  Yeah, just have her lower her voice.

12         MR. COUNTRYMAN:  I'll ask her to.  I'm sorry.

13         THE COURT:  You can have her pass you a note, you

14  can have her pass you notes.

15         MR. COUNTRYMAN:  Okay, I will.  I'm sorry.

16         THE COURT:  Okay.

17     (Whereupon, at 11:13 a.m., a bench conference ended.)

18  BY MS. LERMA:

19  Q    Okay.  Now, Agent Parga, to clarify a couple of things,

20  you were not present during the arrest of my client, correct?

21  A    Correct.

22  Q    And you have no personal knowledge of the events of May

23  12, 2025, correct?

24  A    Other than the official Government documents provided to

25  me, no, ma'am.

Davis - Cross/Lerma

```
1   Q    Okay.  You weren't actually present, is what I'm asking.

2   A    No.

3   Q    All right.  And when you say other than the official

4   Government documents provided to you, you're referring to

5   that A-file?

6   A    Correct.

7   Q    And you're referring to whatever investigation other

8   agents or other people did, you reviewed, correct?

9   A    Correct.

10  Q    So if there's any errors in their investigation, you're

11  relying, or you may rely, on their errors, correct?

12  A    If I -- while reviewing the A-file in preparation for

13  the criminal complaint, I do my best attempt to seek any

14  errors and then I prepare my criminal complaint.

15  Q    Okay.  I understand that.  But if there are any errors

16  in the information they have provided to you that you aren't

17  able to ferret out or find, you've relied on those errors,

18  correct?

19  A    Correct.

20  Q    Okay.  And you reviewed the entire file in preparation

21  for filing your complaint, correct?

22  A    Correct.

23  Q    And in that file, you were aware that Ms. De La Cruz was

24  provided a National Defense advisal?

25            MR. COUNTRYMAN:  Objection, Your Honor.  This was
```

 1  not testimony elicited during direct examination and, again,

 2  it goes back to issues raised to the Court in advance.

 3          THE COURT:  Overruled.

 4  BY MS. LERMA:

 5  Q    Is that correct, ma'am?

 6  A    Can you ask the question again, please?

 7  Q    In your review of the file, you saw that Ms. De La Cruz

 8  was provided a National Defense Area advisal, correct?

 9  A    Correct.

10  Q    And that she made the statement that she was not aware

11  --

12          MR. COUNTRYMAN:  Objection, Your Honor.  This is

13  hearsay.

14          MS. LERMA:  Your Honor, for purposes of the record,

15  may I finish my question before I receive the objection so

16  that the record could be clear?

17          THE COURT:  Go ahead.

18          MS. LERMA:  Okay.

19          THE COURT:  You may ask your question.  Don't

20  answer, Ms. Varga, until I get to rule on it.  Make your

21  objection.  Go ahead.

22  BY MS. LERMA:

23  Q    That Ms. De La Cruz made the statement that she was not

24  aware that the area had been designated as such?

25          THE COURT:  Make your objection.

1              MR. COUNTRYMAN:  Objection, hearsay.

2              THE COURT:  Sustained.

3              MR. COUNTRYMAN:  Your Honor, at this point, not

4   only would the Government ask the jurors to disregard that,

5   but at this time, the Government would move for a mistrial.

6              THE COURT:  The jury will disregard anything -- you

7   understand a question by a lawyer is not evidence.  You all

8   have been here.  And your motion for mistrial is denied.

9              MR. COUNTRYMAN:  And, Your Honor, the Government

10  would renew its objections to these lines of questionings for

11  the reasons previously addressed to the Court.  It's an

12  ongoing objection on behalf of the Government.

13             THE COURT:  Overruled, Mr. Countryman.  Thank you,

14  sir.

15  BY MS. LERMA:

16  Q    Agent Parga, let me invite your attention where it says,

17  "Status When Found Travel Seeking."  Do you see that?

18  A    I do.

19  Q    And travel means traveling, correct?

20  A    That is designated for minors.  It's in travel for any

21  adults.  It's a system-generating travel seeking.

22  Q    Okay.  And it means that they're seeking travel.  Is

23  that what that means?

24  A    Travel seeking, yes.

25  Q    Yes?  Okay.  It doesn't say attempting to enter a

Davis - Redirect/Countryman

1    restricted military area, correct?

2    A    No, ma'am.  Above that, it does.

3    Q    I have not propounded a question to you, ma'am.

4         The immigration record says negative, correct?

5    A    Correct.

6    Q    And there's no criminal record listed, correct?

7    A    Correct.

8    Q    And you did a background check on the criminal record,

9    correct?

10   A    Correct.

11   Q    And there was no criminal record, correct?

12   A    Correct.

13   Q    Thank you very much, Agent Parga.  I have no more

14   questions for you.

15   A    I wanted to clarify.

16            THE COURT:  Any further redirect?

17            MR. COUNTRYMAN:  Yes, Your Honor.  Thank you.

18                      REDIRECT EXAMINATION

19   BY MR. COUNTRYMAN:

20   Q    And, Agent Parga, I believe there was something that you

21   asked to clarify.  What were you seeking to clarify?

22   A    When I seek any criminal record, I run national and

23   international.  And then only record that I found having to

24   do with law enforcement was with Mexican immigration.

25            MS. LERMA:  I'm going to object as to hearsay, Your

1    Honor, and non-responsive to the question.

2            THE COURT:  Sustained.  The jury word disregard her

3    last answer.

4    BY MR. COUNTRYMAN:

5    Q    Agent Parga, in my rush getting through this, I did

6    neglect to ask you about the information contained in the top

7    right corner of the 213.

8    A    Yes, sir.

9    Q    Starting on the top right corner, what information is

10   contained there in the top right corner?

11   A    It contains her gender, her hair color, her eye color,

12   her complexion, her height and weight, her occupation, if any

13   scars or marks, her FBI number, if she's single, divorced,

14   widowed, the method and location of apprehending, P.B. means

15   "Patrolling the Border" at or near Tornillo, Texas, the date

16   and time, by who apprehended her.  The status at entry is

17   P.W.A., which means "Present Without Admission."  And then

18   the other one was reviewed by the Defense Counsel.

19   Q    And, ma'am, you mentioned earlier something called a

20   criminal complaint.  What is that?

21   A    It's a document that I prepare for the Court to submit

22   the Defendant for prosecution.

23           MR. COUNTRYMAN:  Pass the witness, Your Honor.

24   Thank you.

25           THE COURT:  Any additional cross-examination,

1    Ms. Lerma?

2             MS. LERMA:  No, Your Honor.  Witness may be

3    excused.

4             THE COURT:  Thank you.  You may be seated,

5    Ms. Parga.  Thank you.  And you're under the Rule, also.

6    Keep that in mind.  Thank you, Ms. Parga.

7             MR. COUNTRYMAN:  And we would ask that she be

8    subject to recall.  We know she's here anyway but just so the

9    record is clear.

10            THE COURT:  Subject to recall, Ms. Parga.

11            Yes, and don't speak to anyone except for

12   attorneys.

13            THE WITNESS:  Thank you.

14            THE COURT:  Thank you.

15        (Whereupon, the witness was excused.)

16            THE COURT:  Mr. Countryman, sir, call your next

17   witness.

18            MR. COUNTRYMAN:  Thank you, Your Honor.  Ten

19   seconds?

20            THE COURT:  Yes, absolutely.

21            MR. COUNTRYMAN:  Your Honor, at this time the

22   Government rests.

23            THE COURT:  I think what we're going to do, since

24   we have some motions, is we're going to go ahead and take an

25   early lunch, and I'm going to let you all come back at 1 p.m.

1    1 p.m., because it takes a little longer to kind of find a

2    place to eat.  So if you'll be back, you'll know we're on the

3    fifth floor today at 1 p.m.  That would be great.  Thank you

4    all so much.

5                 THE CLERK:  All rise.

6           (Whereupon, the jury exited the courtroom.)

7                 THE COURT:  You may be seated.

8                 Does the Defense have a motion?

9                 MR. McMAHON:  Your Honor, not only does the Defense

10   have a motion, and this, I understand, is unusual.

11   Ordinarily, these motions are done orally.  I've just filed a

12   motion for acquittal under Rule 29.  I have a courtesy copy

13   for the Court and for the Defense -- or for the Government.

14                 THE COURT:  Thank you.

15                 Can we take, like, five minutes to read it?  Is

16   that okay, and then we can start --

17                 MR. McMAHON:  Take as much time.  Of course, Your

18   Honor.

19                 THE COURT:  We can start in five minutes.  That's

20   fine.

21                 MR. McMAHON:  Thank you, Your Honor.

22                 MR. COUNTRYMAN:  Shane, do you have (indiscernible)

23   copy?

24                 MR. McMAHON:  Sure.  How many do you need?

25                 THE COURT:  And the Court can make you all a copy

1  if you need.

2          MR. McMAHON:  Do you want another copy, Your Honor?

3          THE COURT:  No, I can make you all copies.  Does

4  anyone need it?

5          MR. McMAHON:  I've got six.

6          THE COURT:  Okay, perfect.

7          MR. McMAHON:  Thank you.

8      (Whereupon, there was a brief pause in the proceedings.)

9          MR. COUNTRYMAN:  Has this actually been filed with

10  the Court?

11          MR. McMAHON:  The moment -- the second you said

12  "rest," I hit file.  It's been filed.  Absolutely.

13      (Whereupon, there was a brief pause in the proceedings.)

14          THE COURT:  The Court's ready.  Go ahead,

15  Mr. McMahon.

16          MR. McMAHON:  Thank you, Your Honor.

17          THE COURT:  And just to be clear, if you can just

18  make it sure, the way the information reads, I have Count 1

19  is 1325(a)(1).  Count 2 is the 797, 50 United States Code

20  Section 797.  And then Count 3 is the 1382.

21          Are the lights still off here so maybe we can put

22  this?  And Count 3 -- so if you'll let me know.  I mean, I

23  think I can read from your motion, but just to make it clear

24  on the record, Mr. McMahon, sir.

25          MR. McMAHON:  Thank you, Your Honor.

1    And as the Court can see, I did not argue the 1325

2 in the motion.  I will make the motion as to the Rule 1325

3 but not argue it further.  Submit on the evidence.

4    As to the other two counts, Your Honor, even

5 viewing the evidence in the light most favorable to the

6 non-moving party, a reasonable trier of fact could not find

7 Ms. De La Cruz guilty of the elements of those offenses.

8    It's easier, Your Honor, to make the motion when we

9 have pattern jury instructions for sure because we can point

10 to specific elements that the Government failed in.  And I

11 think that the Court has an idea based on the jury

12 instructions that the Defense has filed what the Defense's

13 belief that those elements are that should be presented to

14 the jury.  And inherent in, and I can group them, Your Honor,

15 inherent in the offenses is the idea of either knowing or

16 willfulness.  And the way that an individual like Ms. De La

17 Cruz arrives at a knowing entry or willful entry onto what

18 has been designated as this military zone is through signage.

19    And you can see through the testimony, both the

20 Government and the Defense attempted to create an idea, an

21 issue about whether or not there is sufficient signage,

22 sufficient warning, that the area that you're coming onto is

23 in fact controlled now by Fort Bliss as opposed to the way

24 that it's been since the days of the signing of the treaty

25 where it was controlled by the Commission.

1          So the Government has put on evidence that starting

2   late -- about a month ago, just over a month ago, that the

3   transfer of control over land where Ms. De La Cruz crossed

4   had been transferred to the military.  In the light most

5   favorable to the Government, they have established that.

6          What they failed to establish to do is provide any

7   public notice that is a reasonable amount of public notice.

8   The best that they can come up with is that maybe the Army

9   has it somewhere on their own internal website.  And

10  certainly, the Government's own exhibits establish that the

11  area where Ms. De La Cruz is said to have been apprehended is

12  void of any notice at all.  It simply cannot be the fact that

13  Ms. De La Cruz stumbles upon this land and is in violation of

14  something where the statutes themselves either say knowingly

15  or imply some sort of a knowing or willful -- I'm sorry, they

16  either say willfully or imply a knowing trespass onto this

17  land.

18         We saw in the Government's exhibits the beginning,

19  the middle, and the end of this disputed land.  The

20  beginning, it seems to be uncontroverted, is in the middle of

21  the river, although we did hear some testimony that it might

22  start at the bank of the river.  In any case, we're talking

23  about the river.  Then we're talking about lands that the

24  Government has claimed has been given control to the Army.

25  The Defense would note that nobody from the Army came to

1    testify.   This commander did not come to testify.

2            And in the only warning that the Government does

3    present to any would-be violators of this, it provides for

4    specific authorization from the commander.  The Government

5    fails to present any evidence that the commander did not give

6    authorization to Ms. De La Cruz or anyone else to enter upon

7    this land.

8            And in reading this, I sort of liken it to the

9    1326, the fourth element of the 1326.  In the fourth element

10   of 1326, you have to have applied for admission from the

11   Secretary of -- from the Attorney General or the Secretary of

12   State to reapply for admission to the United States.  And the

13   way the Government always proves this is, well, we did record

14   checks.  And the only way to do this is by submitting a

15   petition, and we get these record checks, and it's void.  In

16   a trial, they actually have certificates of non-existence.

17           But here, we have a way that the commander can give

18   authorization, and the Government's burden is to prove that

19   there is no such authorization.  The Government fails to do

20   that.  The area where Ms. De La Cruz is said to have crossed

21   is completely void of any signage until we get to, and I'm

22   pointing at something that's not there, until we get to this

23   gate, the Kermit Gate where she's said to have been found.

24   Now, there is a sign today.  We have, I think, some competing

25   testimony about whether or not we can be sure that there was

1  a sign on May 12th.

2          But even if there was, because, again, this motion

3  is viewed in the light most favorable to the non-moving

4  party, even if there was a sign, the Government doesn't even

5  come close to placing Ms. De La Cruz physically near that

6  sign, doesn't have her entering, through drones or otherwise,

7  towards that sign.  And from my vantage point, which

8  admittedly was right under the exhibit, everywhere where the

9  witnesses would use a pointer to point where she was

10 apprehended, it's nowhere near the sign, it's far west of the

11 sign, there's no evidence that there's any notice at all.

12 And there has to be, Your Honor.

13          In order to support this, a reasonable trier of

14 fact would have to be able to say, okay, the Government at

15 least showed me this.  And whether they believed it or not

16 would be up to them, but when there's zero evidence to that

17 effect, the Defense is of the opinion that a Rule 29 motion

18 is the appropriate remedy, as to those counts.

19          THE COURT:  Thank you.

20          Mr. Countryman, sir, your response, sir.

21          MR. COUNTRYMAN:  Thank you, Your Honor.

22          I didn't have a chance to go through the written

23 submission by Defense Counsel.  I perused through it as

24 quickly as I could.  The Government would, again, refer back

25 to some of the issues raised before we called in the jury,

1  about clarifying what the definitions would be, what the

2  elements would be, so that we would know that going into

3  advance.  And I think that this exactly gets to the heart of

4  that, of what those are, what those definitions and elements

5  would be.

6         The Government submitted to the Court what the

7  Government believes the elements that need to be proven in

8  this case and what the definitions should be applied in this

9  particular case.  And in that, Your Honor -- and do I need to

10 take up the 1325 charge?

11        THE COURT:  No, I'm going to go ahead and deny the

12 1325, which is the Count 1, the motion on that one, so that

13 we can talk about Count 2.  Can you take up Count 2 first?

14 I'm going to take up Count 2 first, and then I'm going to ask

15 Mr. McMahon a little bit more information about Count 3

16 afterwards, sir.

17        But I'll let you respond to him first on this, but

18 I just kind of want to take them like that, if everyone's

19 okay with that.  Thank you.

20        MR. McMAHON:  Thank you, Your Honor.

21        THE COURT:  And so specifically as to that, Your

22 Honor, I know we do have -- you did hear the testimony from

23 Agent Walker about the records that were created, that they

24 were public records, and then also the order that came out

25 from Fort Bliss, that came out and is part of the record,

1    Your Honor, making that a restricted area.

2             So the Government's, and I believe it should be

3    consistent with what the Government has been arguing in the

4    prior cases that we've had in this particular Court, is as to

5    that Count 2, it's that the Defendant willfully violated

6    Defense property security regulation, right?  That's the

7    unauthorized entry into that Texas National Defense Area.  We

8    specifically provided evidence on that regarding Ms. De La

9    Cruz's unlawful entry into the United States, which was in

10   that area that is the Texas National Defense Area.

11            And you heard the testimony from Agent Torres, who

12   testified about the area, you heard from Ms. Walker about the

13   area being a National Defense Area, and then from Agent

14   Contreras about finding Ms. De La Cruz in that area.  So the

15   Government has presented evidence as to that first element.

16            Going back, and then to the second element about

17   the being promulgated and approved by the Secretary of

18   Defense and by a military commander, again, I would refer the

19   Court back to the public documents that have been admitted in

20   this case, and specifically the letter from Major General

21   Curtis D. Taylor as to that area, and then the third element

22   being an area that's relating to the ingress and egress of

23   that area, which is exactly what that area is.  And you also

24   heard from Ms. Walker about the fact that Border Patrol and

25   that they have permission to go out there and operate in that

1  area, and that that's also the area where National Guard

2  members are operating, Your Honor.

3       So we provided testimony as to each one of those

4  elements to include the public documents that we've submitted

5  to the Court for the jurors to consider in their evaluation

6  and applying that law, what we believe the elements of the

7  case to be, to the law, the facts that have been presented

8  during the course of the trial, and that the jurors have

9  enough to consider, and whether or not the law fits those

10 facts that have been presented during the course of the

11 trial, Your Honor.

12      So we have presented evidence on each and every one

13 of those, and it is enough in the Government's position that

14 the jurors be allowed to consider that.

15      THE COURT:  Thank you, Mr. Countryman.  Did you

16 have more?  I just wanted to make sure that we're still on

17 the 797, sir?

18      MR. COUNTRYMAN:  No, Your Honor.

19      THE COURT:  Okay.

20      MR. COUNTRYMAN:  I think that's -- we filed our

21 proposed jury charge, which I think lays out what we believe

22 the elements are and the language, the definitions in that.

23 We also had filed that motion on the 797 charge about what we

24 believe that should be.  So we stand by what we've already

25 submitted to the Court.

1          I think for purposes of the Rule 29 hearing, the

2    elements that the Government believes that they are, which

3    has been submitted to the Court, we've presented evidence

4    through testimony and documents as to each one of those

5    elements, and that the jurors should be able then to consider

6    that and apply the law to those facts that have been

7    presented.

8               THE COURT:  Thank you.

9               Mr. McMahon, anything specific you want to respond

10   to that?

11              MR. McMAHON:  No, Your Honor.

12              THE COURT:  Okay.  Let me take the 797 first.  The

13   Court will state that it appears that this statute

14   criminalizes the willful violation of a Defense property

15   security regulation.  The Court does agree with the mens

16   reas, a document that was filed by the Defense, that it

17   appears, unlike general trespass laws or routine regulatory

18   offenses, 797 specifically targets conduct that violates

19   security protocols tied to property reserved for military

20   defense purpose.

21              The Court believes that the willful definition is

22   governed by Bryan v. the United States of America, 524 U.S.

23   184 (1998).  And there was a lot of cases cited about

24   willfulness, and we note that Bryan v. the United States did

25   distinguish cases like Ratzlaf and Cheek where they discussed

1    basically whether, like Cheek, whether punishing a failure to

2    comply with a complex and sometimes obscure regulation would

3    be different than what the Bryan court dealt with, which was

4    dealing with firearms without a license.

5         And so based on all of these issues, the Court

6    agrees that the Government would have to show the Defendant

7    knew that her conduct violated the specific type of law on

8    this particular case.  And the Court would state that, absent

9    direct evidence that she knew that she was in violation of

10   797, which I don't believe there was, then we look at the

11   circumstantial evidence.

12        What evidence came out in this particular case?  I

13   know that the Defendant has filed and talked about what

14   happened.  Probably one of the biggest things was the

15   statement by Mr. Torres that said that it's 30 yards from

16   that sign on Exhibit Number 7 to the gate; 30 yards times 3

17   feet, it's 90 feet.

18        In this Court, there was evidence that the signs

19   may be visible from 10 to 15 feet.  That was the sign.  There

20   was evidence that there were Border Patrol cars being used by

21   Army personnel.  I don't think there was evidence that the

22   Army personnel were in uniform.  There was evidence that the

23   National Guard was in uniform, but it was unclear if those

24   Army vehicles had tinted windows or not.

25        What there was clear evidence was is that the Army

1  was .85 miles away.  That's where the station was.  That was

2  clear from Mr. Torres.  Mr. Torres testified that he had no

3  personal knowledge that the Defendant was part of the group,

4  no personal knowledge of whether or not she was the one that

5  came in.  He took pictures the week before.  He didn't take

6  any drone pictures.  He had no personal knowledge of whether

7  those signs were there on May 12th, the sign that from his

8  own testimony is 30 yards away from where the Defendant was

9  arrested based on what we know this morning from Agent

10  Contreras.

11        He admitted that the sign doesn't say it's a crime.

12  He admitted that he doesn't know who the commander is that

13  you would ask permission.  He admits that it doesn't say that

14  it's where the military begins.  He admits there's no signs

15  on the bank.  He admits there's no signs on the flood zone.

16  He admits there's no signs on the riverbank.  He admits by

17  the time the possible notice had already happened, by the

18  time there's notice that you've already crossed into it.

19        Ms. Walker from the IBWC testified that there's no

20  signs down by the river.  She doesn't know if there was any

21  public disclosure.  She testified that this information was

22  on the Army website, but she isn't sure if it was ever made

23  public, and she's only seen pictures of the sign.

24        Agent Contreras testified possibly, possibly not

25  those signs were there.  I think he may have impeached

1  himself.  That's up to the jury to decide whether those signs

2  were there on May 12th.  But he certainly didn't see where

3  she crossed in.  When he saw her, he encountered her seated

4  by the fence at 30 yards away from her.  She was not with a

5  group of people.

6          She was with the National Guard, but we don't know.

7  We didn't hear from any National Guardsmen, so we don't know

8  when she saw the National Guard, if she saw them, if they

9  came after she was seated by the fence or where.  We don't

10  have any information of that.  He doesn't know the distance

11  between the riverbank and where the signs are.

12          And looking at the documents that were admitted in

13  evidence, it appears Exhibit 7 is the one that does show

14  there's a sign.  Going back again to what Agent Torres said,

15  that he believed that sign was 30 yards away, there's

16  evidence of where she was arrested on the latitude and

17  longitude that came out from that Exhibit 9.  However, there

18  was no testimony as to where that sign is with respect to the

19  latitude and longitude.

20          Simply put, the Court does not believe that there

21  is evidence that would rise to the requirements under this

22  statute.  So the Court does grant the Rule 29 as to Count 2,

23  which is the 797.  If we can take up Count 3 next.

24          MR. COUNTRYMAN:  And, Your Honor, may I just have a

25  moment?

 1              THE COURT:  Yes.

 2              And if I can ask Mr. McMahon first on Count 3 since

 3    it's his motion.

 4              MR. McMAHON:  Thank you, Your Honor.

 5              THE COURT:  I believe a lot of, obviously the

 6    statute is different, the 1382 statute, but the Defendant did

 7    raise an issue on Page 6.  And if you can talk to me about

 8    that, I want to focus on that.  You said that, "Simply

 9    stated, one cannot enter the territory with a purpose of

10    violating the statute when he or she is already in violation

11    of the statute and cannot be charged multiple times for the

12    same offense."

13              What I'm looking at in this information is that the

14    allegations are that if she is entered -- she violated

15    Section 1325, then she has entered the military reservation

16    for an unlawful purpose, and so she's violated Section 1382.

17    And I think you raised an issue with that, so I want to hear

18    that from you, sir.

19              MR. McMAHON:  Well, Your Honor, I mean, certainly I

20    would have preferred that the statute give us a mens rea for

21    the first part of this statute.  That would make all of our

22    lives easier, I think, today.  But given that it does not, I

23    believe that we are left with the duty of inferring one.

24    That is to say, it can't be the case that there is no mens

25    rea attached to the first part at all.  And so it's the

1   Defense position certainly that knowingly has to apply and

2   that it must apply to knowing that it's a military

3   reservation.

4            Now, as to the language on Page 6, essentially what

5   that is arguing is that if Ms. De La Cruz is allowed to

6   essentially violate these two statutes with the exact same

7   conduct and with the exact same intent and with the exact

8   same purpose, then that would be a violation of her right to

9   be free of multiplicitous, duplicitous charges.  The way that

10  the zone has been set up, by putting it by the border, it

11  essentially creates a situation where she's ostensibly,

12  according to the Government, intending to commit this one

13  offense and accidentally stumbles upon this second offense.

14           That cannot be the way the law is set up.  We don't

15  punish people apart from the conduct that we're saying is

16  prohibited and this is something that is disallowed and has a

17  mens rea attached to it.  Apart from that, you accidentally

18  and almost incomprehensibly to her, to the public, as it

19  turns out to the legal community, commit this other offense.

20  And incorporating by reference all of the arguments related

21  to signage, there's no possible way that Ms. De La Cruz could

22  have conceived that she was ever violating this offense.

23           And as such, Your Honor, I would ask the Court to

24  grant the motion as to that count, as well.

25           THE COURT:  Mr. Countryman, sir?

1          MR. COUNTRYMAN:  Your Honor, as to Count 3, the

2     Government believes the statute itself as written is fairly

3     clear.  As the Court at the beginning of this hearing

4     described this and these charges as basic charges, the

5     Defense Counsel is asking the Court to include additional

6     elements, a higher burden, mens rea, than what is

7     contemplated within the statute and what's outlined in the

8     statute and at least what we have in case law from the Fifth

9     Circuit.

10         So for purposes of Rule 29, Your Honor, the

11    Government presented evidence to the Court as to element one

12    of the offense, that is that Ms. De La Cruz went upon a

13    military reservation, in this particular case the Texas

14    National Defense Area.  The Court specifically heard

15    testimony from Agent Torres about this area being a military

16    area.  You heard from Ms. Walker about this area being

17    transferred to the control of the Department of Army, that

18    it's recorded in the public documents, and that it's under

19    the control of Fort Bliss, and again, we have that.

20         And you heard that, again, and also from Agent

21    Torres about finding Ms. De La Cruz within that area.  As --

22         THE COURT:  Mr. Countryman, what is the mens rea

23    for this --

24         MR. COUNTRYMAN:  Your Honor --

25         THE COURT:  -- from the Government's perspective?

1           MR. COUNTRYMAN:  General intent crime, Your Honor,

2    which a mistake of law is no defense.  Again, just keeping it

3    simple, consistent with other instructions in the Fifth

4    Circuit Pattern Jury Instructions, and not adding anything

5    additional to it, Your Honor.

6           We believe what the Government is asking from the

7    Court, again, is to be consistent with how we've handled

8    similar types of cases, crimes, as the law and instructions

9    provided by the Fifth Circuit in these types of cases, Your

10   Honor.  So again, the Government's not asking for anything

11   different, any additional elements, Your Honor, just how it

12   is and how the statute is written.  And, again, general

13   intent crime, as we all know, mistake of law is not a

14   Defense.

15          And then we get to the second element, Your Honor,

16   which goes to that the Defendant went upon that area for an

17   unlawful purpose.  And again, in this particular case, that

18   being illegal entry, which, again, you heard the testimony,

19   Agent Contreras, about Ms. De La Cruz entering that area,

20   that it's not a port of entry.  You also heard that from

21   Agent Torres.  It's not an area designated as a legal area

22   for legal entry into the United States.  Again, that Ms. De

23   La Cruz was coming into the country unlawfully.  Therein, we

24   meet that second element, Your Honor, or at least presented

25   evidence as to it for the jurors to consider.

1    And that goes to that unlawful purpose, Your Honor.

2 And again, it's just the steps and the actions taken by Ms.

3 De La Cruz.  As well, Your Honor, you asked me specifically

4 about the mens rea element.  In 141 of the Pattern Jury

5 Instructions, it does give a definition of knowingly.  But I

6 would also point the Court to 2.24b of the instructions.

7 That's addressing the illegal importation of merchandise.  So

8 it's a different statute, Your Honor.  But there, the Fifth

9 Circuit outlines about the knowledge element, as at least

10 applies in that case.  But I think it's relevant for this

11 one, Your Honor, at least for the Court to look into.

12    And it just says, with respect to the knowledge

13 element, it is not necessary for the Defendant to have known

14 the specific statute violated.  It is enough if he or she

15 acts knowing that his or her conduct is illegal in some

16 respect.  And, Your Honor, that's, again, what we have in

17 this case.  That's the law as it's been provided to us by the

18 Fifth Circuit.  And that's the evidence that's been presented

19 to the jurors during the course of this trial.

20    THE COURT:  Thank you, Mr. Countryman.

21    Mr. McMahon, do you have any further rebuttal on

22 this?

23    MR. McMAHON:  Nothing based on that, Your Honor.

24    THE COURT:  The Court's going to deny the motion on

25 the 1382.  I don't know how much the Government has, but I

1    guess you have enough possibly to get to a jury.  So I think

2    we've got two charges that are left.  Both of those charges

3    are petty misdemeanors, so that would generally not allow for

4    a jury trial.  However, in this particular case, based on the

5    motion by the Defendant, I did rule that we would have all of

6    the cases decided by the jury.  So I think we'll continue

7    with that unless there's some sort of an agreement.

8         But I just want to note that, for the record, both

9    of the charges that are left are petty misdemeanors that

10   would not entitle the parties to a jury trial.  But just

11   noting what was the originally ruling in this case by the

12   Court, that we would hear all of them on the matter of

13   judicial economy.

14        So I want to give you all an opportunity to talk

15   and see if there's anything different.  I'm assuming we're

16   going to go to the jury on these two charges, and the jury

17   can make a determination.  But I think that's something you

18   all need to discuss.

19        MR. COUNTRYMAN:  And, Your Honor, I apologize.  Was

20   the Defense going to put on a case?  I believe we addressed

21   the Rule 29 issue, I think.  And we would proceed to the next

22   portion of the trial.

23        THE COURT:  Right.

24        MS. LERMA:  Judge, we would ask for a few minutes

25   if the Court could provide that to us.

1          THE COURT:  Yeah.  Let's take like a 10-minute

2   break so you all can talk.

3          THE CLERK:  All rise.  Court's in recess.

4       (Whereupon, at 11:57 a.m., a brief recess was taken,

5   reconvening at 12:09 p.m.)

6       (Outside the presence of the jury; Defendant present.)

7          MR. McMAHON:  Thank you, Your Honor.  After some

8   discussion with both the Government together and with my

9   client, the Defense's election would be to continue with the

10  jury.  For scheduling purposes, the Defense intends to rest

11  and close, not put on a case, move to arguments.

12         THE COURT:  Okay.  So I think what we can do is for

13  sure we're going to take a lunch so that the interpreters and

14  everyone could take a lunch.  So we'll take a lunch.  And

15  then we told the jury to come back at 1, but I think that's

16  fine.

17         Then my thought is that we bring in the jury and

18  then tell them that we're going to need a little time to work

19  on the charge.  And then maybe we can start argument like at

20  2 o'clock?

21         MR. McMAHON:  That would be fine for the Defense,

22  Your Honor.

23         THE COURT:  Do you all think this 1382 charge is

24  going to be that difficult?

25         MR. COUNTRYMAN:  Your Honor, so we'll bring the

1   jurors back in at one, rest and close, and the Government

2   will close in front of the jurors.

3              THE COURT:  Yeah.

4              MR. COUNTRYMAN:  And then we'll break.  And at then

5   that point, we'll take up the jury charge that we'll receive

6   from the Court?

7              THE COURT:  Yeah, but we'll need to bring the

8   jurors back in a little bit later.  We can have them tell

9   them just so that everybody has at least an hour of lunch,

10  because it's 12:10.

11             MR. COUNTRYMAN:  And the reason the Government just

12  wants clarification on the sequence of events is, while I

13  think the 1325 piece of the jury charge will be

14  straightforward enough. we just want to have enough time to

15  look through what the elements and the definitions might be

16  for the 1382 charge, so that any objections we might have for

17  the Court, that we have time to articulate those.  And that's

18  --

19             THE COURT:  Okay.

20             MR. COUNTRYMAN:  -- I don't know how long that will

21  take.

22             THE COURT:  If we start at, what if we tell them

23  that -- that way the jury can be kind of doing whatever.

24  What if we tell the jury that -- we bring them back at 1:15,

25  and we tell them that we're going to start at three?  Do you

 1   think that'll give us enough time, Mr. Countryman, sir?  I

 2   want to make sure you have enough time, sir?

 3            MR. COUNTRYMAN:  Yes, Your Honor.  And I also know

 4   the Court probably needs some time, as well.  So that's fine.

 5   It should be plenty of time for the Government.

 6            THE COURT:  Okay, so let's do that.  I'll try to

 7   get you -- I'll work on my kind of what I'm working on.  And

 8   then I think someone -- I saw what people -- and then we can

 9   kind of work from there.  You can start looking at it.

10            Mr. McMahon, sir?

11            MR. McMAHON:  Thank you, Your Honor.

12            THE COURT:  Anything else?  What do you all think?

13            MR. COUNTRYMAN:  Not from the Government, Your

14   Honor.

15            MR. McMAHON:  No, I think that's good.

16            THE COURT:  Okay.

17            MR. McMAHON:  Good plan.  Thank you.

18            THE COURT:  Thank you.

19            COURTROOM DEPUTY:  All rise.

20            THE COURT:  So we're adjourned until 1:15.

21       (Whereupon, at 12:12 p.m., a brief recess was taken,

22   reconvening at 1:17 p.m.)

23       (Outside the presence of the jury; Defendant present.)

24            THE COURT:  All rise for the jury.

25       (Whereupon, the jury entered the courtroom.)

1                THE COURT:  You may be seated.

2                The Government has rested.  Does the Defense wish

3     to put on any witnesses or evidence?

4                MS. LERMA:  Your Honor, the Defense rests and

5     close.

6                THE COURT:  Okay.  Does the Government close?

7                MR. COUNTRYMAN:  The Government closes, Your Honor.

8                THE COURT:  Okay.  So all of you, you have all the

9     evidence that's going to be submitted.  All we're going to

10    work on is this charge and we're going to start the argument

11    at 3:00.  Just to make sure we have -- we'll give you all the

12    instructions.  So we'll be beginning at 3:00.

13               We may be staying a little bit later if anyone has

14    an issue, just because I don't know the deliberations y'all

15    will get to take time.  But if there's an issue with picking

16    up someone or there's any issue, if y'all will let someone

17    know for tonight.  But at some point, we'll be back on the

18    record at 3:00 and ready for the closing arguments.  So you

19    all can take a break in your room until then.

20               All rise for the jury.

21          (Whereupon, the jury exited the courtroom.)

22               THE COURT:  You may be seated.

23               So, Counsel, how do you all want to do this?  Do

24    you want to do like an informally kind of talk about this and

25    then sort of formally?

1          MR. McMAHON:  First, it was brought to my attention

2    that we neglected to re-urge our Rule 29 motion, which we

3    have to do after we rest.  So for the record, Your Honor, I

4    would ask the Court to re-urge the Rule 29 motion, and there

5    won't be any more argument.

6          THE COURT:  And on the 1382 and on the 1325, those

7    motions are denied based on what we previously discussed.

8          MR. McMAHON:  Thank you, Your Honor.

9          THE COURT:  You're welcome.

10          Anything else you all want to put on the record?

11          MR. COUNTRYMAN:  Your Honor, the Government is open

12    to however the Court would like to handle reviewing the jury

13    charge.  I think as soon -- I mean, as soon as we get

14    something from the Court, we can start going through that.

15          THE COURT:  You'll be shocked to know that I'm

16    pretty far along.  So I can give you all -- give me five

17    minutes, and I'm going to give you all sort of kind of a

18    draft, and you can start kind of saying yes/no to this.  But

19    I'm almost five minutes away from kind of a draft.  And I may

20    need to look at, make sure that I got both sides.  It doesn't

21    mean that if I left something out that I'm going to leave it

22    out, but you just have to sort of remind me.  But in five

23    minutes, I'm going to have, because I've been working on it

24    during lunch.

25          MR. McMAHON:  Thank you, Your Honor.

1              THE COURT:  And, Your Honor, for the witnesses who

2     testified during the course of the trial, will they be

3     allowed to sit in during the reading of the instructions and

4     closing argument?

5              THE COURT:  Do you have any objections from the --

6              MR. McMAHON:   No, Your Honor.

7              THE COURT:  No objection, so yes, absolutely.

8              THE CLERK:  All rise.

9              (Whereupon, at 1:20 p.m., a brief recess was taken,

10    reconvening at 2:29 p.m.)

11        (Outside the presence of the jury; Defendant present.)

12             THE COURT:  Back on the record.

13             Have counsel had time to review the charge?

14             UNIDENTIFIED SPEAKER:  Yes, ma'am.

15             THE COURT:  Do I have any objections from the

16    Government?

17             MR. COUNTRYMAN:  Yes, Your Honor.

18             THE COURT:  Go ahead.

19             MR. COUNTRYMAN:  The Government has had time to

20    review the charge and does have objections.

21             THE COURT:  Okay.  Go ahead, Mr. Countryman.

22             MR. COUNTRYMAN:  Your Honor, starting on Page 15,

23    the Government would object to instruction provided on Page

24    15.  That's the confession statement voluntariness

25    instruction.

1          THE COURT:  Overruled.

2          MR. COUNTRYMAN:  On Page 17, Your Honor, as to the

3   elements of the offense, the Government would object to the

4   second element that reads, "the Defendant knowingly entered

5   the United States."  The Government would request that that

6   read, "the Defendant knowingly entered or attempted to enter

7   the United States."  The Government makes that request based

8   on the practice of charging in the conjunctive and proving in

9   the disjunctive.

10          If the criminal statute, like the one in 1325 here,

11   Your Honor, provides that it can be violated in several ways,

12   then you plead it in the conjunctive, but you instruct in the

13   disjunctive.  And I will specifically cite to the Fifth

14   Circuit, United States v. Haymes, 610 F.2d 309: "To avoid any

15   uncertainty in charging an offense in which the statute

16   enumerates several different acts in the alternative, the

17   practice is to plead the offense by substituting the

18   conjunctive 'and' for the disjunctive 'or'."

19          And so the Government requests that the second

20   element track along with the information, Your Honor, and

21   that it read that "the Defendant knowingly entered or

22   attempted to enter the United States."

23          THE COURT:  Let me just go back because I may need

24   to be giving the reasons for my rulings.  On the confession

25   statement voluntarily, there was some evidence on those

1    issues and that's why the Court wants to include that.

2            On your objection, your current objection, the

3    reason why the Court is going to deny that and overrule your

4    objection is because it was undisputed that she entered into

5    the United States.  I don't think there was any issue similar

6    to the found-in, so that's sort of why I don't want to put

7    "or attempted to enter."

8            MR. COUNTRYMAN:  And Your Honor, will the jurors be

9    instructed that it was undisputed that she was -- enter or

10   found in the United States, Your Honor?

11           MR. McMAHON:  Your Honor, we would not agree to an

12   instruction that proves an element of the offense that the

13   Government has to prove beyond a unreasonable doubt.

14           MR. COUNTRYMAN:  Exactly the Government's point,

15   Your Honor.

16           THE COURT:  That's overruled based on the

17   statements I just made.

18           Any other objections, Mr. Countryman?

19           MR. COUNTRYMAN:  Yes, Your Honor.

20           Starting on Page 18, not the first full paragraph,

21   Your Honor, but when we get down to the elements of the

22   offense specifically, the Government objects to these

23   elements of the offense, and the Government respectfully

24   requests that the Court instruct the jurors as the

25   instructions provided to the Court by the Government.

1          THE COURT:  Okay.  And those are noted, and the

2    Court's going to deny that and is going to include a

3    "knowingly" -- I think that's the issue, "knowingly" based on

4    the information provided by the Defense attorney in the

5    proposed instructions along with the cases cited.

6          MR. COUNTRYMAN:  Yes, Your Honor.

7          To renew the Government's objection, the Government

8    does not believe these are the correct elements for the

9    offense in this particular case, but knowing that these are

10   the elements that the jurors are going to be instructed on,

11   the term "knowingly" is not an element of the offense, is now

12   being included as an element of the offense.  And, again, the

13   Government would object now to this term "knowingly" being

14   used as an element.

15         THE COURT:  Overruled.

16         MR. COUNTRYMAN:  The Government now, based on that,

17   would further ask that in the instructions that are provided

18   to the jurors, that the jurors be instructed that an 18

19   U.S.C. Section 1382 offense is a general intent crime, and

20   that mistake of law is no defense.

21         THE COURT:  Do you want to respond to that to the

22   Defense, or?

23         MR. McMAHON:  We don't have a response.  We will

24   defer to the Court.

25         THE COURT:  Okay.  Overruled.  Anything else?

 1          MR. COUNTRYMAN:  No -- may I have a moment, Your

 2   Honor?

 3          THE COURT:  Yes, absolutely.

 4      (Whereupon, Government counsel confer briefly.)

 5          MR. COUNTRYMAN:  Your Honor, at this time, the

 6   Government would ask for a stay to conduct a written

 7   mandamus, an opportunity to look into these instructions and

 8   definitions that will be provided to the jurors, and address

 9   those accordingly.

10          THE COURT:  Your request will be denied.

11          As you know, both of these offenses are petty

12   misdemeanors.  That wouldn't even entitle you to a jury

13   trial, but the request was made for a jury trial on the total

14   case, and then afterwards, when the charge that would be a

15   jury charge issue was -- I granted a Rule 29 motion, both

16   parties still agreed to pursue that with the jury.

17          So I think we need to let the jury decide this, and

18   then you can take up whatever you need to afterwards.  That

19   request will be denied, sir.

20          MR. COUNTRYMAN:  Yes, Your Honor.  And so that the

21   record is -- as it's been reflected on before, but this jury

22   trial was requested on these two counts at the last minute by

23   the Defense, Your Honor.  Again, the Government renews the --

24   again, just so that the record is clear, it was not the

25   Government who asked for a jury trial on these two additional

1    counts.  That came from the Defense, Your Honor.

2            THE COURT:  Right, right.  And so, just so it's

3    clear, from the very beginning of this case, the Defense

4    attorney, Ms. Lerma, has said that she would agree to a bench

5    trial, and it was the Government that has insisted that there

6    be a jury trial, and you do get a jury trial on that Class A

7    misdemeanor, so for that reason, it went to.

8            So then, because they were in the situation where

9    they had to go before a jury trial because of the

10   Government's specific request that it had to be a jury trial,

11   then, for judicial economy, then they suggested, let's put

12   all of them together.

13           I just want to make sure the record is clear so

14   that there is not some sort of issue that the Defendant, from

15   the very beginning, said that they were looking for jury

16   trials on any of these.  They were willing to waive the jury

17   trial even on the Class A misdemeanor.

18           Am I correct on that, Ms. Lerma?

19           MS. LERMA:  That is correct, Your Honor.

20           THE COURT:  Thank you.

21           MR. COUNTRYMAN:  And again, Your Honor, I think,

22   initially, the trial was set for the 797 charge, not these

23   additional two.

24           THE COURT:   Correct.

25           MR. COUNTRYMAN:  And that's the Government's point

1   only.

2              THE COURT:  Okay.

3              MR. COUNTRYMAN:  I believe we've sort of talked

4   about that quite a bit leading up to now.

5              THE COURT:  Absolutely.  And if there's anything

6   I've overruled, I just want to make sure you've got a ruling,

7   Mr. Countryman, sir.

8              MR. COUNTRYMAN:  Yes, Your Honor.

9              THE COURT:  Thank you.

10             MR. COUNTRYMAN:  I appreciate it.  Thank you.

11             THE COURT:  Sure.  Any objections by the Defense?

12             MR. McMAHON:  No, Your Honor.

13             THE COURT:  We told the jury we were going to start

14  at three.  I don't know if they can be ready earlier, or --

15             MR. COUNTRYMAN:  I apologize, Your Honor.

16  Mr. McMahon had notified the Government earlier.

17             MR. McMAHON:  That's right.  I talked with the

18  Government.  The Government said it doesn't have a problem

19  with this.  On the verdict form, we would ask that they be

20  swapped.  That not guilty, consistent with the concepts of

21  presumption of innocence come first, and then the guilty

22  option for the jury be second.

23             MR. COUNTRYMAN:  And to clarify, I understood

24  Mr. McMahon's objection.  The Government's position is that

25  the verdict form stay as-is.

1          MR. McMAHON:  Oh, okay.  I misunderstood you.

2          THE COURT:  Okay.

3          MR. COUNTRYMAN:  But stays as-is.

4          THE COURT:  We'll leave it like that.

5          MR. McMAHON:  Thank you, Your Honor.

6          THE COURT:  Okay.  Do you all want us to -- do you

7    want a couple of minutes and start at 3 o'clock?  We just

8    need to be ready to go.  How much time did each side need for

9    closing argument?  Are we still at 20 minutes, or do we need

10   more time?  What do you all want?

11         MR. McMAHON:  We're at 20 minutes, and then ready

12   to go whenever you want to bring the jurors.

13         THE COURT:  Okay.  And Mr. Countryman, sir, you

14   need a little bit more time?

15         MR. COUNTRYMAN:  No, Your Honor.

16         THE COURT:  It's up to you, sir.

17         MR. COUNTRYMAN:  Twenty minutes for closing is

18   fine, Your Honor, and we're ready.  If we can have a

19   five-minute bathroom break, but otherwise we're ready to go.

20         THE COURT:  Yeah, take your time, because I don't

21   even know if the jurors are ready.  I think they'll need to

22   go check.  So we can start taking a look at that.

23         MR. McMAHON:  Thank you, Your Honor.

24         MR. COUNTRYMAN:  Thank you, Your Honor.

25         THE CLERK:  All rise.

1          (Whereupon, at 2:38 p.m., a brief recess was taken,

2     reconvening at 2:45 p.m.)

3          (Outside the presence of the jury; Defendant present.)

4               THE CLERK:  All rise.

5               THE COURT:  Stay standing for the jury.

6               THE INTERPRETER:  (Indiscernible).  We're having a

7     little bit of trouble hearing Mr. Countryman.  If the Court

8     could just --

9               THE COURT:  Yeah, I'll let them know before.

10              THE INTERPRETER:  Thank you.  Okay, thank you.

11              THE COURT:  You all have a copy of the charge?

12              THE INTERPRETER:  Yes, ma'am.  Thank you.

13              THE COURT:  Okay.

14         (Whereupon, there was a brief pause in the proceedings.)

15              THE COURT:  Mr. Countryman, they're having trouble

16    hearing you, so whenever you speak, if you can speak loudly

17    because the interpreters are having problems hearing you,

18    okay?  Just so you know.

19              MR. COUNTRYMAN:  I apologize, Your Honor.

20              THE COURT:  You're good.

21              MR. COUNTRYMAN:  Does it help at all if I turn the

22    microphone down a little bit?  Is that a little bit better?

23              THE INTERPRETER:  Thank you so much.  It's just we

24    don't want to interpret you.  It's just sometimes your voice

25    (indiscernible).

```
 1              THE COURT:  Okay.

 2              THE INTERPRETER:  Thank you.

 3              THE COURT:  And on these microphones, if I speak

 4   over here, is the microphone located -- is that okay?

 5              THE INTERPRETER:  If you speak (indiscernible), no

 6   problem.  Thank you.

 7              MR. COUNTRYMAN:  Okay.  If I speak at this volume,

 8   okay?

 9              THE INTERPETER:  Thank you.

10              MR. COUNTRYMAN:  I'll do my best.

11              THE CLERK:  Let me just adjust those and then we

12   can, Judge?

13              THE COURT:  Absolutely.

14              THE CLERK:  And I'm going to move both of those

15   closer to you because these are very (indiscernible).

16              MR. COUNTRYMAN:  All right.  And if I speak at this

17   volume, this is okay?

18              THE INTERPRETER:  (Indiscernible).

19              MR. COUNTRYMAN:  Thank you, Your Honor.  My

20   apologies.

21              THE COURT:  Absolutely, Mr. Countryman.  I just

22   want to make sure, we want to make sure the interpreters can

23   interpret.

24              MR. COUNTRYMAN:  Yes, and that everything's

25   captured for the record.
```

1              THE COURT:  All rise for the jury.

2          (Whereupon, the jury entered the courtroom.)

3              THE COURT:  You may be seated.

4              I've given y'all one to follow along.  It's front

5   and back, but there's only going to be one original.  I'm

6   going to sign it, so I'll give that to you.  But let's go

7   ahead and proceed.

8              Court instructions to the jury, back on the record.

9              Members of the jury, you have now heard all of the

10  evidence in this case. It is almost time for you to begin

11  your deliberations.  But first, I must provide you with

12  instructions.  In any jury trial, there are, in effect, two

13  judges.  I am one of the judges.  The other is you, the jury.

14  It is my duty to preside over the trial and decide what

15  evidence is proper for your consideration.  It is also my

16  duty at the end of the trial to explain to you the rules of

17  law that you must follow in applying and arriving at your

18  verdict.

19              First, I will give you general instructions which

20  apply in every case.  For example, I'll give you instructions

21  about the burden of proof and how to judge the believability

22  of witnesses.  Then, I will give you specific rules of law

23  about this particular case.  Finally, I will explain to you

24  the procedures you should follow in your deliberations.

25              Duty to follow instructions.  You, as jurors, are

1    the judges of the facts.  But in determining what actually

2    happened, that is, in reaching your decision as to the facts,

3    it is your sworn duty to follow all of the rules of law as I

4    explain them to you.  You have no right to disregard or give

5    special attention to any one instruction or to question the

6    wisdom or correctness of any rule I may state to you.  You

7    must not substitute or follow your own notion or opinion as

8    to what the law is or ought to be.

9         It is your duty to apply the law as I explain it to

10   you, regardless of the consequences.  It is also your duty to

11   base your verdict solely upon the evidence, without prejudice

12   or sympathy.  That was the promise you made and the oath you

13   took before being accepted by the parties as jurors, and they

14   have the right to expect nothing less.

15        During your deliberations, you must not communicate

16   with or provide any information to anyone by any means about

17   this case.  You may not use any electronic device or media,

18   such as the telephone, a cell phone, a smartphone, iPhone, or

19   computer, the Internet, any Internet service, any text or any

20   instant messaging service, any Internet chatroom, blog, or

21   website, such as Facebook, Instagram, LinkedIn, YouTube, or

22   Twitter, to communicate to anyone information about this case

23   or to conduct any research about this case until I accept

24   your verdict.  In other words, you cannot talk to anyone on

25   the phone, correspond with anyone, or electronically

1   communicate with anyone about this case. You can only discuss

2   the case in the jury room with your fellow jurors during

3   deliberations.  I expect you will inform me as soon as you

4   become aware of another juror's violations of these

5   instructions.

6       You may not use these electronic means to

7   investigate or communicate about the case because it is

8   important that you decide this case based solely on the

9   evidence presented in this courtroom.  Information on the

10  Internet or available through social media might be wrong,

11  incomplete, or inaccurate.  You're only permitted to discuss

12  the case with your fellow jurors during deliberations because

13  they have seen and heard the same evidence as you.

14      In our judicial system, it is important that you

15  are not influenced by anything or anyone outside of this

16  courtroom.  Otherwise, your decision may be based on

17  information known only by you and not by your fellow jurors

18  or the parties in this case.  This would unfairly and

19  adversely impact the judicial process.

20      Presumption of innocence, burden of proof,

21  reasonable doubt.  The information or formal charge against

22  the Defendant is not evidence of guilt.  Indeed, the

23  Defendant is presumed by the law to be innocent.  The law

24  does not require a defendant to prove his or her innocence or

25  produce any evidence at all and no inference whatsoever may

1    be drawn from the election of a Defendant, not to testify.

2            The Government has the burden of proving the

3    Defendant guilty beyond a reasonable doubt, and if it fails

4    to do so, you must acquit the Defendant.  While the

5    Government's burden of proof is a strict or heavy burden, it

6    is not necessary that the Defendant's guilt be proved beyond

7    all possible doubt.  It is only required that the Government

8    exclude any reasonable doubt concerning the Defendant's

9    guilt.

10           A reasonable doubt is a doubt based upon reason and

11   common sense after careful and impartial consideration of all

12   the evidence in this case.  Proof beyond a reasonable doubt,

13   therefore, is proof of such convincing character that you

14   would be willing to rely and act upon it without hesitation

15   in the most important of your own affairs.

16           Sympathy to play no role.  You are not to be swayed

17   by sympathy.  You are to be guided solely by the evidence,

18   and the question that you must ask is, has the Government

19   proven the guilt of the Defendant beyond a reasonable doubt?

20   If you have a reasonable doubt as to a defendant's guilt, you

21   should not hesitate for any reason to render a verdict of not

22   guilty.  But on the other hand, if you should find that the

23   Government has met its burden of proving Defendant's guilt

24   beyond a reasonable doubt, you should not hesitate because of

25   sympathy or any other reason to render a verdict of guilty.

1          Evidence excluding argument of counsel and comment

2    of Court.  It is your duty to determine the facts.  In doing

3    so, you must consider only the evidence.  The term "evidence"

4    includes the sworn testimony of the witnesses, stipulations,

5    and the exhibits admitted in the record.  Anything you may

6    have seen or heard outside the courtroom is not evidence and

7    must be disregarded.

8          Remember that any statements, objections, or

9    arguments made by the lawyers are not evidence.  The function

10   of the lawyers is to point out those things that are most

11   significant or most helpful to their side of the case and, in

12   doing so, to call your attention to certain facts or

13   inferences that might otherwise escape your notice.  In the

14   final analysis, however, it is your own recollection and

15   interpretation of the evidence that controls in this case.

16   What the lawyers say is not binding upon you.

17          During the trial, I occasionally made comments to

18   the lawyers, asked questions of a witness or admonished a

19   witness concerning the manner in which he or she responded to

20   the questions of counsel.  I also sustained objections to

21   certain questions and exhibits.  Do not speculate as to what

22   the witness would have said if permitted to answer the

23   questions or as to the contents of any exhibit.

24          Finally, do not assume from anything I may have

25   said that I have or intended to suggest that I have any

1    opinion concerning any of the issues in this case.  No

2    particular significance should be attached to any question or

3    comment made by me.  Except for my instructions to you on the

4    law, you may disregard anything I may have said during the

5    trial in arriving at your own findings as to the facts.

6         Objections and rulings.  It is the duty of the

7    attorneys on each side of a case to object when the other

8    side offers testimony or other evidence which may not be

9    admissible.  You should not infer any improper motive against

10   an attorney or his or her client because the attorney has

11   made such objections.  Allowing testimony or other evidence

12   to be introduced over an objection is not intended to

13   indicate any opinion as to the weight or effect of such

14   evidence.

15        You, the jurors, are the sole judges of the

16   credibility of all witnesses and the weight and effect of all

17   the evidence.  When an objection to a question has been

18   sustained, the jury must disregard the question entirely and

19   may draw no inference from the wording of it or speculate as

20   to what the witness would have said if he or she had been

21   permitted to answer the question.

22        Evidence, inferences, direct and circumstantial.

23   While you should consider only the evidence, you are

24   permitted to draw such reasonable inferences from the

25   testimony and exhibits as you feel are justified in the light

1    of common experience.  In other words, you may make

2    deductions and reach conclusions that reason and common sense

3    lead you to draw from the facts which have been established

4    by the evidence.

5            You may consider both direct and circumstantial

6    evidence.  Direct evidence is the testimony of one who

7    asserts actual knowledge of a fact such as an eyewitness.

8    Circumstantial evidence is proof of a chain of events and

9    circumstances from which you may infer facts as are

10   reasonable and logical.  The law makes no distinction between

11   the weight you may give to either direct or circumstantial

12   evidence.  It requires only that you weigh all of the

13   evidence.

14           While you may draw reasonable inferences, you may

15   not speculate or surmise as to any fact.  Neither may you

16   base an inference on any fact unless those facts have been

17   found to have been proven.  Only if you are convinced of the

18   Defendant's guilt based on all the evidence beyond a

19   reasonable doubt can she be convicted.  Any inference relied

20   on to prove any fact essential to any charge in this case

21   must be substantiated beyond a reasonable doubt before you

22   may draw such inference.

23           Credibility of witnesses.  I have said that you

24   must consider all of the evidence.  This does not mean,

25   however, that you must accept all of the evidence as true or

1    accurate.  You are the sole judges of the credibility or

2    believability of each witness and the weight to be given to

3    the witness's testimony.  An important part of your job will

4    be making judgments about the testimony of witnesses who

5    testified in this case.  You should decide whether you

6    believe all or any part of what each person had to say and

7    how important that testimony was.

8         In weighing the testimony of a witness, you should

9    consider his or her relationship to the Government or the

10   Defendant, his or her interest, if any, in the outcome of the

11   case, his or her manner of testifying, his or her opportunity

12   to observe or acquire knowledge concerning the facts about

13   which he or she testified, his or her candor, fairness and

14   intelligence, and the extent to which he or she has been

15   supported or contradicted by other credible evidence.  You

16   may, in short, accept or reject the testimony of any witness

17   in whole or in part.

18        The weight of the evidence is not necessarily

19   determined by the number of witnesses testifying as to the

20   existence or nonexistence of a fact.  It is the quality and

21   nature of the evidence that should determine the weight you

22   give it.  You may find that the testimony of a smaller number

23   of witnesses or even a single witness as to any fact is more

24   credible than the testimony of a larger number of witnesses

25   to the contrary.

1            In weighing the testimony of a witness, you should

2    consider his or her appearance up on the stand.  You should

3    try to size the witness up.  You should have in mind all

4    those little circumstances which point to his or her

5    truthfulness or untruthfulness.  You should consider any

6    possible bias or prejudice he or she may have, whether for or

7    against the Government or the Defendant, his or her interest

8    or lack of interest of whatever sort in the outcome of the

9    trial, and whether he or she has permitted bias or interest

10   to color his or her testimony, his or her ability to observe

11   the facts correctly and to remember and relate them truly and

12   accurately and not exaggerate them.

13           You should test the evidence the witness gives you

14   by your own knowledge of human nature and of the motives

15   which influence and control human action.  If any facts are

16   admitted or otherwise proved to you, you may well bring them

17   into relation with the witness testimony and see if they fit

18   together with it.

19           In short, you are to bring to bear upon such

20   testimony the same conditions and use the same sound judgment

21   you apply to the questions of truth and veracity which are

22   daily presenting themselves for your decision in the ordinary

23   affairs of life.  The credit that you will give to the

24   testimony offered by the various witnesses is something which

25   you must determine.

1          When a witness testifies inaccurately and you do

2   not think that the inaccuracy was consciously dishonest, you

3   should bear in mind and scrutinize the whole testimony of

4   that witness.  Thus, if you find that there has been

5   inaccuracy in one respect on the part of a witness, remember

6   it in judging the rest of his or her testimony and give it

7   that weight which your common sense leads you to think it

8   ought to have and which you would attach to it in the

9   ordinary affairs of life.

10          Inconsistencies or discrepancies in the testimony

11  of a witness or between the testimony of different witnesses

12  may or may not cause you, the jury, to discredit such

13  testimony.  Two or more persons witnessing the same incident

14  or transaction may see or hear it differently.  Innocent

15  misrecollection, like failure of recollection, is not an

16  uncommon experience.

17          In weighing the effect of a discrepancy, always

18  consider whether it pertains to a matter of importance or to

19  an unimportant detail and whether the discrepancy results

20  from innocent error or intentional falsehood.  If, however,

21  you conclude that a witness has not only testified falsely

22  but that he or she has done so intentionally or willfully,

23  the facts cast a very serious doubt upon all his or her

24  testimony and you might well conclude that you cannot accept

25  any of it.  That, however, is a matter for you, the jury, to

1   determine.

2          Even though you may find that a witness

3   intentionally gave false testimony as to certain matters, you

4   may find that, as to certain other matters, he gave testimony

5   worthy of acceptance by you as truth.  After all, whether you

6   should believe all of that witness's testimony or believe any

7   portion of it is for you to decide.

8          Testimony of officers, officials, or agents.  There

9   was testimony here from law enforcement agents.  The

10  testimony of an officer or agent is entitled to no special or

11  exclusive sanctity merely because it comes from an officer or

12  agent.  An officer or agent who takes the witness stand

13  subjects his or her testimony to the same examination and the

14  same test that any other witness does.  And in the case of an

15  officer or an agent, you should not believe him or her merely

16  because he or she is an officer or an agent.

17         You should recall his or her demeanor on the stand,

18  his or her manner of testifying, the substance of his or her

19  testimony, and weigh and balance it just as carefully as you

20  would the testimony of any other witness.  Each officer or

21  agent who testified is not entitled to be given more or less

22  credibility or to be believed more or less than any other

23  witness who might be called as a witness only because of

24  their position.

25         Caution, consider only crime charged.  You are here

1   to decide whether the Government has proved beyond a

2   reasonable doubt that the Defendant is guilty of the crime

3   charged.  The Defendant is not on trial for any act, conduct,

4   or offense not alleged in the information.  Neither are you

5   concerned with the guilt of any other person or persons not

6   on trial as a Defendant in this case except as you are

7   otherwise instructed.

8          Caution, punishment.  If a Defendant is found

9   guilty, it will be my duty to decide what punishment will be.

10  You should not be concerned with punishment in any way.  It

11  should not enter your consideration or discussion.

12         Confession statement voluntariness.  In determining

13  whether a statement claimed to have been made by the

14  Defendant outside of court and after an alleged crime has

15  been committed was knowingly and voluntarily made, you should

16  consider the evidence concerning such a statement with

17  caution and great care.  You should give such weight to the

18  statement as you feel it deserves under all the

19  circumstances.

20         Identification testimony.  In any criminal case,

21  the Government must prove not only the essential elements of

22  the offense or offenses charged, and as hereinafter defined,

23  but also must prove, of course, the identity of the Defendant

24  as a perpetrator of the alleged offense or offenses.  In

25  evaluating the identification testimony of a witness, you

1  should consider all the factors already mentioned concerning

2  your assessment of the credibility of any witness in general

3  and should also consider in particular whether the witness

4  had an adequate opportunity to observe the person in question

5  at the time or times about which the witness testified.

6      You may consider in that regard such matters as the

7  length of time the witness had to observe the person in

8  question, the prevailing conditions at the time in terms of

9  visibility or distance and the like, and whether the witness

10 had known or observed the person at earlier times.  You may

11 also consider circumstances surrounding the identification

12 itself including, for example, the manner in which the

13 Defendant was presented to the witness for identification and

14 the length of time that elapsed between the incident in

15 question and the next opportunity the witness had to observe

16 the Defendant.

17     If, after examining all of the testimony and

18 evidence in the case, you have a reasonable doubt as to the

19 identity of the Defendant as the perpetrator of the offense

20 charged, you must find the defendant not guilty.

21     Summary of case.  Defendant Adely Vanessa De La

22 Cruz-Alvarez is charged with Count 1, violation of 8 U.S.C.

23 1325(a)(1), Improper Entry By An Alien, on or about May 12,

24 2025.  Count 1 of the information reads as follows.

25     Count 1, 8 U.S.C. 1325(a)(1), on or about May 12,

1  2025 in the Western District of Texas, Defendant Adely

2  Vanessa De La Cruz-Alvarez, who was then and there an alien,

3  did knowingly and unlawfully enter and attempt to enter the

4  United States at a time and place other than designated by

5  immigration officials of the United States for entrance of

6  immigrants into the United States in violation of Title --

7  United States Section Code 1325(a)(1).

8          Count 1, Elements of the Offense.  Title 8 -- I'm

9  going to correct that.  It should be Title 8.

10          Count 1, Elements of the Offense.  Title 8, United

11 States Code Section 1325(a)(1) makes it a crime for an alien

12 to enter the United States without consent at any time and

13 place other than designated by immigration officers.

14          For you to find the Defendant guilty of this crime,

15 you must be convinced that the Government has proved each of

16 the following beyond a reasonable doubt: first, the Defendant

17 was an alien; second, the Defendant knowingly entered the

18 United States; and, third, the Defendant entered at a time

19 and place other than as designated by immigration officers.

20 An alien is any person who is not a natural born or

21 naturalized citizen of the United States.

22          Count 2, 18 U.S.C. 1382.  On or about May 12, 2025,

23 in the Western District of Texas, Adely Vanessa De La

24 Cruz-Alvarez entered a military reservation, post, fort,

25 arsenal, station ,and installation, specifically the National

1   Defense Area created by lawful authority on April 30, 2025,

2   by the senior commander, U.S. Army Fort Bliss, establishing a

3   National Defense Area and declaring the lands to be a

4   restricted area of the Department of the Army, comprising

5   approximately 2,000 acres of land located along the southern

6   border of the United States and said entry was for any

7   purpose prohibited by law or lawful regulation, specifically

8   Title 8 U.S.C. Section 1325(a)(1), all in violation of Title

9   18 United States Code Section 1382.

10          For you to find the Defendant guilty of this crime,

11  you must be convinced that the Government has proved each of

12  the following beyond a reasonable doubt: first, that the

13  defendant knowingly entered a military, naval, or Coast Guard

14  reservation, post, fort, arsenal, yard, station or,

15  installation; second, that Defendant's entry upon the post,

16  fort, arsenal, yard, station, or installation was for a

17  purpose prohibited by law or lawful regulation, specifically

18  Improper Entry in violation of 8 U.S.C. Section 1325(a)(1).

19  Military, naval, Coast Guard, reservation, post, fort,

20  arsenal, yard, station, or installation have been defined

21  boundaries under the command of a military officer.

22          Definitions relevant to the above count.

23          On or about.  You will note that the information

24  charges that the offense was committed on or about a

25  specified date.  The Government does not have to prove that

1  the crime was committed on that exact date so long as the

2  Government proves beyond a reasonable doubt that the

3  Defendant committed the crime on a date reasonably near the

4  date stated in the information.

5  Knowingly to act.  The word "knowingly," as a term

6  that has been used from time to time in these instructions,

7  means that the act was done voluntarily and intentionally,

8  not because of a mistake or accident.

9  Alien.  An alien is a person who is not a natural

10  born or naturalized citizen of the United States.

11  Duty to deliberate.  To reach a verdict, whether it

12  is guilty or not guilty, all of you must agree.  Your verdict

13  must be unanimous on each count of the information.  Your

14  deliberations will be secret.  You will never have to explain

15  your verdict to anyone.

16  It is your duty to consult with one another and to

17  deliberate in an effort to reach agreement if you can do so.

18  Each of you must decide the case for yourself, but only after

19  an impartial consideration of the evidence with your fellow

20  jurors.  During your deliberations, do not hesitate to

21  reexamine your own opinions and change your mind if convinced

22  that you were wrong.  But do not give up your honest beliefs

23  as to the weight or the effect of the evidence only because

24  of the opinion of your fellow jurors or for the mere purpose

25  of returning a verdict.

1              Remember, at all times, you are judges, judges of

2    the facts.  Your duty is to decide whether the Government has

3    proved the Defendant guilty beyond a reasonable doubt.  When

4    you go to the jury room, the first thing that you should do

5    is select one of your number as your foreperson who will help

6    you guide your deliberations and will speak for you here in

7    the courtroom.

8              A verdict form has been prepared for your

9    convenience.  The foreperson will write the unanimous answer

10   of the jury in the space provided for each count of the

11   information, either guilty or not guilty.  At the conclusion

12   of your deliberations, the foreperson should date and sign

13   the verdict.  If you need to communicate with me during your

14   deliberations, the foreperson should write the message and

15   telephone my courtroom deputy, Adriana Quesada, at 9 for

16   outside line, (915) 834-0532.  I will either reply in writing

17   or bring you back into the courtroom to answer your message.

18             Bear in mind that you are never to reveal to any

19   person, not even to the Court, how the jury stands,

20   numerically or otherwise, on any count of the information

21   until after you have reached a unanimous verdict.  When you

22   have reached unanimous agreement as to the verdict, you will

23   contact my chambers by telephone.  You will then be returned

24   to the courtroom to announce your verdict.

25             I'm going to sign my copy because this is the one

1    I'm going to give to you all.

2            And then next, the verdict form.  We, the jury,

3    unanimously find, Count 1, Illegal Entry, 8 U.S.C.

4    1325(a)(1), as to the charge of Illegal Entry, we, the jury,

5    unanimously find Adely Vanessa De La Cruz-Alvarez -- and

6    there's a blank for guilty, blank for not guilty.

7            Count 2, Entering Military, Naval, or Coast Guard

8    Property, 18 U.S.C. 1382.  As to the charge of Entering

9    Military, Naval, or Coast Guard Property, we, the jury,

10   unanimously find Adely Vanessa De La Cruz-Alvarez -- there's

11   a blank for guilty, not guilty.  Dated this day of June, and

12   then the foreperson, so you would date it and a foreperson.

13           Are we ready for closing arguments?

14           MR. COUNTRYMAN:  Yes, Your Honor.  And the

15   Government's understanding is that both sides will be

16   permitted 20 minutes.

17           THE COURT:  Yes.  If you need a little bit more

18   time, that's fine, but let's stick to 20-ish.

19           MR. COUNTRYMAN:  And, Your Honor, I know Ms. Kanof

20   would like to be able to address the jurors, Your Honor.  I

21   will do the opening/closing for the Government.  If I could

22   have 13 minutes and reserve 7 minutes for Ms. Kanof.

23           THE COURT:  Absolutely, yes.

24           MR. COUNTRYMAN:  And if I could get a warning at 1

25   minute, so I guess about the 12-minute mark, Your Honor?

```
 1              THE COURT:  Okay, I'll do that.

 2              MR. COUNTRYMAN:  And, Your Honor, again, if we

 3   could dim the lights a little bit for purposes of showing the

 4   jurors the exhibits up on the screen.

 5              THE COURT:  Yes.

 6       (Whereupon, there was a brief pause in the proceedings.)

 7              THE COURT:  We're going to try to turn it off and

 8   on a couple times to see.

 9       (Whereupon, there was a brief pause in the proceedings.)

10              THE COURT:  I'm not going to start counting until

11   we get the -- hopefully, we get the lights to work.

12       (Whereupon, there was a brief pause in the proceedings.)

13              THE COURT:  It might be too dark, huh?

14              How do you want to do that?  Do you want to leave

15   the lights on, or -- it's up to you.

16              MR. COUNTRYMAN:  Your Honor, if I wasn't nervous

17   enough as it was already, I definitely am now.  I understand

18   that just for practical purposes that the lights need to be

19   up a little bit.  The jurors will have the exhibits for them

20   to review later, so.

21              THE COURT:  Yeah.  Okay, we'll leave them on.

22              Go ahead, Mr. Countryman, sir.

23              MR. COUNTRYMAN:  Thank you, Your Honor.

24                  CLOSING ARGUMENT BY THE GOVERNMENT

25              MR. COUNTRYMAN:  And may it please the Court,
```

1    Co-Counsel, Opposing Counsel, ladies and gentlemen of the

2    jury.

3            So starting with the testimony that we heard from

4    Ms. Walker from the IBWC, the International Boundary and

5    Water Commission, that she's the realty specialist that came

6    in and testified yesterday and she talked with you about the

7    transfer of land from the IBWC to the Department of Army that

8    then made its way to Fort Bliss and now is under the control

9    of Fort Bliss.

10           And her testimony to you about what is now the

11   Texas National Defense Area, and she walked through you,

12   right, told you the public documents that were involved, that

13   she was involved in that land transfer, that you'll have to

14   go back there and consider, starting with Government Exhibit

15   11-A, that's actual deeds of the document, the records to

16   show the transfer of property, the Government documents

17   showing the transfer, again, from IBWC to the military, and

18   then the Fort Bliss order ordering that area as under the

19   control of Fort Bliss and that it is a restricted military

20   zone and the restrictions there.

21           All documents that you have for you to go back

22   there and consider and all that she testified about during

23   the course of her testimony yesterday.  And why is that

24   important?  Because she described for you that area that is

25   now the Texas National Defense Area that runs from the

1  American Dam, so up there by Executive, that it runs all the

2  way to about the Fort Hancock.  And it's that area between

3  the Rio Grande River and the border wall.  And that area in

4  between, that's the Texas National Defense Area.  And that

5  area in between, again, the river and the wall, is that area

6  that is now restricted military property.

7           And her testimony, along with the testimony of the

8  Border Patrol agents that you heard, the international

9  boundary, the Rio Grande River, the demarcation between

10  Mexico and the United States, the boundary, the border wall

11  that you heard about, located north of the river, and that,

12  as her testimony was -- and as you heard from Agent Torres as

13  well -- that this area all here is that military area under

14  restrictions under the control of Fort Bliss.

15           That is military property.  And you even heard the

16  testimony of the Border Patrol agents, of the National

17  Guard's members who are out there involved in patrolling that

18  area and who, in fact, were present when Ms. De La Cruz was

19  taken into custody.  She specifically even talked to you

20  about the area where Ms. De La Cruz was apprehended, how that

21  is U.S. property.  It came into U.S. possession back in 1933

22  in the treaty with Mexico.  And that area where she was

23  apprehended is the Texas National Defense Area.  It is

24  military property under the control of Fort Bliss and the

25  United States Department of the Army.

1    And that goes specifically to Count 2 that you're

2   going to have to consider.  And so, again, you have the

3   documents laying out the transfer of land and who has control

4   of that property.  Now, where does that get us next?  And

5   that occurred, as you heard, that transfer started to occur

6   back on April 30th of this year.  So what happens April 30th

7   of this year?  You heard about testimony about on May 8th in

8   that area, signs being posted out there in that area.

9    And in the photographs that you have, you can see

10  one of those signs that had been posted out there.  Not a

11  huge sign.  You saw the Defendant's demonstrative aid that's

12  out there.  You know, something like a speed limit sign that

13  you might see going down the highway.  But that we know, at

14  least on May 8th of this year, that those signs were being

15  posted out there.

16    Now, what happens after May 8th?  Uncontroverted,

17  on May 12th of this year, Ms. De La Cruz is found in that

18  area, as you heard, by a gate that the Border Patrol agents

19  know as the Kermit-Williams Gate.  That she is found just on

20  the south side of that gate on May 12th, after the signs had

21  already started going up.

22    Now, what led up to Ms. De La Cruz's apprehension

23  out there on May 12th?  That's when you heard from Agent

24  Torres, the drone operator.  He was working his shift in that

25  area on May 12th and he's operating his drone.  And what does

1    he observe?  He observes a group staging on the south side of

2    the Rio Grande River.  Staging, as they testified about, this

3    is a common area for illegal crossings.  A group staging on

4    the south side around this bush here.  And that occurred

5    around 5:50 p.m. that he observes that and that he puts that

6    out over the radio for the other agents in the area to hear,

7    to include Agent Contreras, who you heard from.  And he

8    testified that he put that out.

9            And then you heard from Agent Contreras, who

10   testified about what he heard and what he did.  Now, before

11   we get to Agent Contreras, you also heard from Agent Torres

12   that this is not a port of entry.  This is not an area where

13   you can make legal entry into the United States.  That needs

14   to be at a port of entry, the closest one being the one about

15   9-1/2 miles east of there in Tornillo.  Not designated as a

16   legal area where you can come into the United States.  Not

17   only is this the National Defense Area, but as you heard

18   uncontroverted, this is the United States.

19           Now, you heard that the staging occurred here, just

20   south of the Rio Grande River.  He puts that out over the

21   radio.  That was about 5:50 p.m.  Now, why does that matter?

22   Why does that matter?  The sequence of events following what

23   happened at 5:50 p.m.  I will refer you to Page 8 of the

24   instructions that you have there in the definition that Judge

25   gave us as the circumstantial evidence.  Circumstantial

1    evidence is proof of a chain of events or circumstances from

2    which you may infer facts are reasonable and logical.

3            5:50 p.m., Agent Torres sees the individual staging

4    on the south side of the river.  Agent Contreras hears the

5    radio call-out.  He responds, and at approximately 6:03 p.m.,

6    he responds to where the Defendant is found near that

7    Kermit-Williams Gate.  And what did Agent Contreras testify

8    about?  He testified that the timing lined up and the

9    location, the distance lined up for someone to come across.

10   They're all lined up and made sense based on the radio

11   call-out from Agent Torres.

12           Circumstantial evidence of Ms. De La Cruz's entry

13   into the United States and where she was found and taken into

14   custody by Agent Contreras, it lines up with the time and

15   with the geography, the sequence of events that occurred.

16           Now, after Agent Contreras' responds to that area,

17   what happens?  She's there with the two National Guard

18   members.  What does Agent Contreras do?  He identifies

19   himself as a Border Patrol agent, and he asks Ms. De La Cruz,

20   do you have any documents?  Her response, no.  Agent

21   Contreras asks Ms. De La Cruz, where are you from?  Peru.

22   What does she have in her possession?  A Peruvian passport.

23           Defense did not hold back from going after Agent

24   Contreras, and he was obviously nervous.  I think that was

25   obvious.  He clarified to you the sequence of events.  He

1  identified himself as Border Patrol.  He asked her, Ms. De La

2  Cruz, if she had documents.  She said no.  He asked her,

3  where are you from?  I'm from Peru.  What does she have in

4  her possession?  A Peruvian passport.  Then what does Agent

5  Contreras do?  He transports her back to the station for

6  processing.  And what happens?  He takes her fingerprints.

7  And you heard about the results that he got back from taking

8  those fingerprints, the negative results.

9          And what happens after that?  As you heard from

10 Agent Parga, people who come into the country, undocumented

11 aliens, they get what's called an A-file.  An A-file is

12 created.  And the A-file is created in this case.  And what's

13 maintained in that A-file?  Information about who that person

14 is and where they're from.  And that's reflected in

15 Government Exhibit 9 that you have and that you'll be able to

16 take back there for you to consider.

17         Why does that matter?  Why does that matter?  This

18 is not just -- we're not just asking you to rely on what

19 Agent Contreras said to you out in the field.  Is it?  He

20 says -- he told you what the Defendant said to you about

21 where she's from.  It's corroborated by the fact that she has

22 her Peruvian passport, but the fact then that fingerprints

23 were taken from her and verified where she's from and

24 documented in that I-213 and that A-file being created to

25 track where she's from. so that we know where she's from.

1                The steps taken to verify that we know that she's

2    an alien to the United States.  As you heard the Judge say,

3    not a naturally-born citizen or naturalized.  The steps taken

4    to confirm and make sure that that's actually the case and

5    Ms. De La Cruz's status here in the United States.  That back

6    on May 12th she was an alien to the United States and she had

7    no permission to be here.  And she entered at a location

8    that's not a port of entry.  Again, uncontroverted.

9    Uncontroverted that that area out by Kermit-Williams Gate out

10   there is not a port of entry.

11               You've heard the testimony from Agent Torres, it's

12   agricultural area.  It's rural.  The port of entry is miles

13   away from there.  But for whatever reason, it's a popular

14   area and it's common for people to enter into the country

15   illegally.  Now, those facts that you heard, those facts that

16   you heard from the agents, the testimony that you received,

17   and the documents that you have and that you can rely on, the

18   213 documented her alienage.  Take the law as the Judge gave

19   it to you and apply it to those facts.

20               So, as to Count 1, that's the 1325 charge.  It's on

21   Page 17.  Well, I apologize, it's on Page 17 on mine.  Mine

22   is not double-copied.  But as to Count 1, what is the first

23   element?  The Defendant is an alien.  So, what's the evidence

24   that we have, is that she's from Peru.  She's not a

25   natural-born citizen.  She's not a naturalized citizen to the

 1   United States.  She knowingly entered the United States.

 2           Exactly as you heard, the demarcation line between

 3   the United States and Mexico, that Rio Grande River where the

 4   group is seen staging and then she's found by that

 5   Kermit-Williams Gate.  And the third element, that she

 6   entered at a time and place other than designated by

 7   immigration officers.

 8           THE COURT:  Mr. Countryman, you used 12 minutes,

 9   just to let you know.  You have one minute.

10           MR. COUNTRYMAN:  Thank you, Your Honor.

11           As you heard from Agent Torres and Agent Contreras,

12   again, not a port of entry, not a place where you can make

13   legal entry into the United States.  And so, Ms. De La Cruz

14   knowingly -- and by knowingly, in case you have any

15   questions, refer to the definition of "knowingly" that the

16   Judge provided to you, then voluntarily, intentionally, not

17   because of mistake or accident.  Not because of mistake or

18   accident.  Ms. De La Cruz made her way here from Peru, and

19   she entered in this area and was found right here by the

20   Kermit-Williams Gate.  Not an accident, not a mistake.

21           And when you consider Count 2, that's that military

22   property charge, again, go back, you have the documents

23   showing that that's now military territory.  You have the

24   testimony from Ms. Walker that that's military property.

25   Testimony from the agents that the military members are out

1    there.  That sign that's out there.

2            I'll tell you, I admit to you now that's not a huge

3    sign.  It would be great if it was 100 feet tall, 100 feet

4    wide and headlights on it.  But it's a sign.  Again, no

5    different than a speeding sign that you might see, a mile-

6    per-hour sign that you might see down the road.  That's

7    posted out there.  It's also military property.

8            And, again, I would just refer you to that

9    definition of "knowingly" that the Judge has given you.  The

10   testimony of the agents, the documents that have been

11   presented, the photographs that you have to consider, Ms. De

12   La Cruz came into the country illegally.  She's not from

13   here; she's from Peru.  She didn't have permission to be

14   here.  She has no documents allowing her to be here.  And she

15   tried to come into a place that's not for legal entry, and

16   that place also is military property.

17           Thank you very much for your time.

18           THE COURT:  Fourteen minutes used, just so you

19   know.

20           The Defense?

21           MR. McMAHON:  Thank you, Your Honor.

22               CLOSING ARGUMENT BY THE DEFENDANT

23           MR. McMAHON:  May it please the Court?

24           THE COURT:  Yes.

25           MR. McMAHON:  No different than a speeding sign

1    that you would pass on the highway.  Well, the problem with

2    that analogy is that when I drive down the highway, those

3    speeding signs are right there where I can see them.  And for

4    the Government to say that these signs were anywhere near

5    where Ms. De La Cruz was, is a gross mischaracterization of

6    what you know to be true.  And these signs are important.

7          And as you listen to this evidence and as you

8    listen to our arguments and you're told by the Judge that you

9    consider these arguments under the framework of deciding

10   whether or not there's proof beyond a reasonable doubt, that

11   concept can be a little murky.  Right?

12         Reasonable doubt can mean certainly one thing to

13   you, something different to you.  But it's not the only

14   burden of proof we have in the law.  So you can kind of think

15   about reasonable doubt like this.  We have a standard of

16   proof that's called preponderance of the evidence.  And

17   preponderance of the evidence is a standard that we as

18   lawyers use when we're kicking money around.  When money is

19   what's important.  When I'm being sued --

20         MS. KANOF:  Objection, Your Honor.  That's not the

21   law.

22         MR. McMAHON:  It is the law.

23         THE COURT:  Overruled.  This is closing argument.

24         MR. McMAHON:  And when money is at issue, a court

25   or a jury decides whether it's more likely than not that one

1  party is right and makes a decision based on that.  There's a

2  higher standard of proof than that, and it's called clear and

3  convincing evidence.  And clear and convincing evidence is

4  what you would use for even more important things.  For

5  example, it's the standard they use if a court were to

6  determine that you're an unfit parent and they need to reach

7  into your home and take your child away from you.  A court

8  would have to use clear and convincing evidence if that was

9  the right thing to do.

10        But here in criminal court, because the stakes are

11  so high, we use the highest standard of proof.  And that's

12  beyond a reasonable doubt.  So as you think about all this

13  evidence, think about them under that framework, that this is

14  the highest standard of proof that the law asks you to apply.

15        Now, in voir dire, Mr. Countryman said that here in

16  El Paso, we all know there are military zones.  We drive out

17  and we know where White Sands is or where Fort Bliss is,

18  right?  And when I go to Fort Bliss, I see walls and I see

19  machine gun guards.  And I pass through this military

20  checkpoint, and I see signs and I know that, well, this is

21  Fort Bliss, for sure.  But the signage that is in this area

22  that has been given to the Army not for some grand, lofty,

23  legal "we must do this" purpose, but for the next three

24  years.  For the next three years, this land is going to be

25  like this.

1          And so the signage out there that this change has

2    been made is important.  And you'll notice that all of our

3    questions were about that.  Where are these signs?  Is there

4    any evidence that Ms. De La Cruz saw any of these signs, was

5    anyone ever around any of these signs, knew that this was now

6    military land?  And why is it important that she know?  Well,

7    the Judge is telling you that it's important that she know

8    because the word "knowingly," as emphasized by the Government

9    in its closing argument, means intentional and voluntary and

10    not by mistake and not by accident.

11          So Ms. De La Cruz is now being charged with

12    knowingly coming into the United States and knowingly coming

13    onto this military land.  Military land that they didn't even

14    really publicize to Americans, let alone Peruvians, that they

15    had made this change.  So the Government then tries to say,

16    well, okay, there's this group, right, and they all came

17    across.  And they were doing a slow crawl.  And, well, I'm

18    guessing the idea is that someone in this group must have

19    known.

20          Where is this group?  Nobody knows who is in this

21    group.  This group is a -- by the way, could have been

22    recorded, there could have been evidence of this group with

23    the push of a button.  It could have been brought to you with

24    the push of a button, but there is no push of a button

25    because there's no evidence of this group actually existing.

1           The only thing that we've learned is that this

2    group goes somewhere, I guess.  But Ms. De La Cruz is found

3    alone with a National Guardsman who I didn't hear testify.

4    You didn't hear testify.  We know nothing about it.  Whatever

5    conversations or interactions were supposedly had between the

6    two, you'll never know anything about.  Despite the

7    Government having the burden to present evidence beyond a

8    reasonable doubt, you know nothing about.  And was she trying

9    to get into the United States?  Was she climbing the wall?

10   She was sitting there by a door, by a door that leads into

11   the United States.

12           Now, Ms. De La Cruz is charged with two offenses.

13   Knowingly entering the United States and knowingly entering

14   on military land.  Those are the two charges.  The problem

15   you have with the military land is pretty clear.  There's no

16   signage.  You get to the river, there's no signs.  You go

17   across that flood land, there's no signs.  You walk up to the

18   wall, there's no signs.  I had to stand here for the person

19   here to be able to read the sign.  So to say there's proof

20   beyond a reasonable doubt that she knew she was entering a

21   military land, to me, lacks every form of evidence that I

22   talked to you about, but especially not proof beyond a

23   reasonable doubt.

24           Now, what did the Government also tell you about

25   the country, the United States?  Now, we live here in El

1   Paso.  We know that the Rio Grande is the border between the

2   United States.  Probably the people in Juarez know that the

3   Rio Grande is the border between the United States and

4   Mexico.  Ms. De La Cruz is from Peru.  So additionally, the

5   lack of military signs is important, but remember my

6   Co-Counsel's questions.  There's also a lack of your entering

7   the United States signs.

8           And in fact, the Government's own witness tells

9   you.  Most people think it's the wall.  Whether you call it

10  the border wall, the K1 wall, the Trump wall, whatever you

11  want to call it, most people think it's that.  That's what

12  the testimony was.  So you cannot say that Ms. De La Cruz

13  knew that she was in the United States.  That's the first

14  count.  And you cannot say that Ms. De La Cruz knew she was

15  in a military zone.  And that's the second count.

16          And my Co-Counsel is about to come up here and

17  finish our closing arguments.  But I ask that you keep all of

18  this in mind.  And in the end, we're going to ask you to go

19  back and find Ms. De La Cruz not guilty.

20          THE COURT:  You all have used nine minutes. You

21  still have 11 minutes.

22          MS. LERMA:  Thank you, Judge.  If I could get a

23  one-minute warning?

24          THE COURT:  Yes, absolutely.

25          MS. LERMA:  Now, ladies and gentlemen, I know that

1    in a few minutes, ASA Kanof will address you, and she will

2    basically tell you, ignore what they're saying.  They're

3    wrong.  I know that's going to happen. But at the very

4    beginning, during my opening statement, I described to you

5    what this evidence was going to show.

6         Let me make it a lot simpler.  When you go to

7    somebody's house, you park on the street, you walk through

8    their driveway, their front yard, and you knock on their

9    door, or you ring their doorbell.  You hope that they answer,

10   and you wait until they do.  Ms. De La Cruz waited.  She sat

11   there and waited by the door.

12        Agent Contreras told you in his 18 years of

13   experience, and don't buy it for one second, that he was

14   nervous.  He's been an agent much longer than I've been an

15   attorney.  He told you in his experience, a lot of people

16   believe once they cross the wall, they are in the United

17   States.  No one from the National Guard --

18        MS. KANOF:  Your Honor, I would object to assuming

19   facts not in evidence.

20        THE COURT:  Overruled.

21        You may continue, Ms. Lerma.

22        MS. LERMA:  Thank you.

23        No one from the National Guard told you about a

24   group, as Shane expressed to you right now.  And Contreras

25   even told you he was there, well, first he said it was 600

1   yards, then it was 200 yards.  But either way, he was there

2   in a matter of seconds, and he didn't see a group, nor could

3   he describe a group, nor have any pictures of this expensive

4   drone that has reporting capability been produced to you.

5          Ms. De La Cruz, who you saw on the 213, Exhibit 9,

6   all of five-foot, 116 pounds, by herself, waiting.  And they

7   never produced to you a sign that says "Do Not Enter."  And

8   the sign that they did produce to you, take time.  Take the

9   time to review the evidence.  What they did tell you, their

10  assessment in their own document, Exhibit 9, was they had

11  assessed that she was travel-seeking.  What does that mean?

12  Seeking travel.  Traveling.  Not that she was here for any

13  other purpose.  There's no notation that she was with a group

14  or arrested with a group.  And you will not leave your common

15  sense at that door.  We don't leave that when we come here.

16         Now, ladies and gentlemen, before you step down on

17  those chairs, you took an oath.  I ask you to deliberate with

18  conscience, to deliberate intelligently, and to deliberate

19  with diligence.  Look, there always comes to a point where I,

20  as an attorney, look at my clients, and I have to ask myself,

21  have I done everything that is my constitutional

22  responsibility?  Have I zealously advocated for my clients?

23  I submit to you that we have.  We have risen to our duties,

24  and now I ask that you rise to yours.

25         Turn to Page 22, please, in your jury charge.  This

1   is a verdict form.

2           THE COURT:  Ms. Lerma, I'm sorry.  Can you get

3   closer to the mic?  I apologize.

4           MS. LERMA:  Yes, Your Honor.

5           THE COURT:  Just so they can get you.

6           MS. LERMA:  This is the verdict form.  In this

7   verdict form, when you go back there to deliberate

8   consciously, with intelligence, and diligence, to all the law

9   that applies to this case, to the facts that you have

10   received in this case, and to the evidence, and the quality

11   and credibility of the evidence that you have received, you

12   will return a verdict of not guilty.

13           Thank you very much for your time.

14           THE COURT:  Thank you.

15           Ms. Kanof, you have six minutes.  Do you need for

16   me to give you a warning?

17           MS. KANOF:  Yes, Your Honor, two minutes.  But

18   could I have a minute to get over here so that --

19           THE COURT:  Absolutely.  I won't get started.

20   Absolutely.

21           MS. KANOF:  Thank you.

22       (Whereupon, there was a brief pause in the proceedings.)

23           REBUTTAL CLOSING ARGUMENT BY THE GOVERNMENT

24           MS. KANOF:  I think I can stand for six minutes.

25   I'm going to attempt to do it.  I really just wanted to do

1  rebuttal arguments so you didn't think that I was Phil's

2  mother here to make sure he was a good boy in trial.

3          Ladies and gentlemen, it's absurd to think she

4  didn't know that she was coming into the United States.  She

5  waded across the river to get where she was.  And one of the

6  keys to this trial is Government's Exhibit Number 9.  It's

7  the I-213 because it tells you a lot.  But one of the most

8  important things it tells you is her destination.  She was

9  going to Miami.  How many people come across to a border wall

10  to go to Miami?

11          The other thing is a question was asked by

12  Ms. Lerma of Agent Parga, did that agent testify she had

13  $500?  Five hundred dollars in her pocket and she can't get

14  on an airplane to fly to Miami?  No, she came into this

15  country illegally, and that's all Count 1 is about.  Count 1

16  has nothing to do with military property or anything like

17  that.  It's coming into a place other than a designated port

18  of entry by immigration officials.  That's it.

19          And if you think for a minute she didn't think

20  coming from Mexico across a river through bushes, whether she

21  was in that group under a tree or not, and then ends up in a

22  big wall, if you think for a minute she did not think that

23  she was coming into the United States illegally, I just don't

24  know what else we can argue.

25          MS. LERMA:  I'm going to object.  That's not in

1    evidence, Your Honor.

2            THE COURT:  Overruled, closing argument.

3            MS. KANOF:  So Count 2 does have to do with

4    military property.  And contrary to what was just told to you

5    in opening statement what Ms. Lerma said was, when I go to

6    Alamogordo, I see a big sign that says home.  That's evidence

7    from her.  That isn't necessarily something you can or cannot

8    do.

9            There's no obligation for the Government to say you

10   are entering the United States all the way across the river.

11   One of the charges that the Judge has given you has to do

12   with circumstantial evidence.  And TV has really done us a

13   misservice, oh, it's just circumstantial evidence.  The

14   charge will tell you circumstantial evidence is as powerful

15   and is as important direct evidence because circumstances --

16   you know, you're in an automobile accident, it's a whole lot

17   better than somebody who says I saw them in the accident,

18   then examining the vehicles and doing all that kind of stuff.

19           And that's really what you're going to do.  You're

20   going to examine the circumstantial evidence with regard to

21   the knowledge.  The IBWC witness said that they had --

22   there's no obligation to tell people you're entering military

23   property.  We are a military family in this community.  And a

24   decision was made to protect us with the military not just at

25   Fort Bliss.  And by the way, I lived on Fort Bliss.  The way

1    that he explained how you get into Fort Bliss, there's no

2    machine guns at the entryway.  I got on my bus to go to

3    Burgess every day from Fort Bliss and I didn't see any signs.

4        Because circumstantially, people know whether or

5    not they're permitted.  And the most important thing is the

6    definition of knowingly.  She committed this crime knowingly

7    and knowingly means, as that term is used in this

8    instruction, the act was done voluntarily and intentionally.

9    Not done, you know, knowing all this other information.  It's

10   voluntarily and intentionally.  And that's all -- it's called

11   a culpable mens rea.  By the way, a preponderance of the

12   evidence is a civil standard.  It's not just used monetary

13   cases.

14       Read the Judge's charge regarding credibility of a

15   witness, because any statement that you received or didn't

16   receive, did you think that Agent Contreras was lying to you?

17   The question whether or not a drone picture was taken, I'm

18   sorry, I am from El Paso and I've never seen wings like we've

19   had lately.  So, he wants to say this $150,000 drone that

20   isn't really his, I think --

21       THE COURT:  Two minutes.

22       MS. KANOF:  -- judging him for not having pictures

23   is a little bit absurd in this particular case.  But

24   regardless --

25       THE COURT:  Sorry, Ms. Kanof, two minutes you have

1  --

2          MS. KANOF:  What the pictures have shown, of this
3  guy who couldn't possibly identify anyone.  What that
4  evidence was is to show you how people come into the United
5  States.  They stage and then they run.  And there's no
6  evidence that the group stays together.  A lot of times, they
7  come in groups just to protect them, mostly in Mexico.  But
8  this woman came in illegally, knowing she came in illegally,
9  she knew she was coming into the United States.

10         And the question of whether or not she knew that it
11 had been designated as a military area, is a question a jury
12 is going to answer.  And you can talk about it
13 circumstantially or not, but it was on the news.  It was
14 discussed.  And you can -- for a minute, an educated -- well
15 what appears to be an educated woman with $500 going to Miami
16 coming this way, you can circumstantially also assume that
17 those men, those National Guard men who are in military
18 uniforms, are maybe there for a reason.

19         Your Honor, I just want to impose upon the jury the
20 most important thing in the charge, and that's use your
21 common sense.  Jurors just need to talk about it and discuss
22 it, and use your common sense as to what really happened,
23 especially, you know, one of the questions that that was
24 asked was, was she wearing makeup.  And she was.  I don't
25 know what that might tell you about anything, except as a

1    woman, it meant something to me.  Maybe privilege?

2                MS. LERMA:  Objection, Your Honor.  Facts not in

3    evidence.

4                THE COURT:  Sustained.  And you're --

5                MS. LERMA:  May I have an instruction to the jury?

6                THE COURT:  Please disregard.

7                Ms. Kanof, your time is also up, ma'am.

8                MS. KANOF:  Okay. Thank you all.  We'll rely on you

9    doing your deliberations.

10                THE COURT:  Thank you.

11                Ladies and gentlemen of the jury, at this time,

12    first I will discharge Juror Number 13, sir.  Thank you so

13    much for sitting with us.  I'm going to discharge you before

14    they go back for deliberation.  We appreciate you, sir.

15                Thank you, sir.

16                Next, if you all will leave your charge.  I'm going

17    to have the one charge.  Leave -- that one's back and forth.

18    Mine is going to be signed by me.  And I'm going to make sure

19    that gets back to you all.  So if you leave those documents,

20    that way everybody doesn't have one.  You're only going to

21    have one charge when you go back there.

22                All rise for the jury.

23        (Whereupon, the jury was excused for deliberations.)

24                THE COURT:   We're in recess.

25                Do you all have anything else?

1          MR. COUNTRYMAN:  Your Honor, the Government would

2   like to raise an issue.

3          THE COURT:  Sure.  You may be seated.

4          MR. COUNTRYMAN:  Thank you, Your Honor.

5          THE COURT:  Do I need to get this to the jury first

6   so that they're --

7          MR. COUNTRYMAN:  Your Honor, that would be exactly

8   what I'm addressing.  Based on the charges, the general

9   intent and nature of the charges, and this definition of

10  knowingly, the Defense argument during closing about the

11  Defendant not knowing about where the international boundary

12  is, the Government would renew its objection and request the

13  Court instruct the jurors that in these crimes, mistake of

14  law is not a defense.

15         THE COURT:  You need --

16         MR. McMAHON:  Your Honor, I think the Government

17  made up for it by calling my client a whore during their

18  closing arguments.

19         THE COURT:  Okay, let's like not get on -- that

20  will be overruled.  And I'm going to go ahead and send back

21  this jury charge to the jury.

22         Are there any other objections you want to put on

23  the record?

24         MR. COUNTRYMAN:  No, Your Honor.  Thank you.

25         THE COURT:  Okay.  We're in recess.

1              THE CLERK:  All rise.

2         (Whereupon, at 3:55 p.m., a brief recess was taken,

3    reconvening at 6:31 p.m.)

4         (Outside the presence of the jury; Defendant present.)

5              THE COURT:  Back on the record, 6:30 p.m., on the

6    cause is 25-MJ-02401.  The jury has some questions, and I

7    think there are four questions, and we can take them one at a

8    time.  That might work.

9              Question Number 1, can we have a flip chart with

10   markers and more water?  They went ahead and sent them waters

11   because I think everybody is gone, but I don't have a flip

12   chart.  But does anyone have an objection to me sending them

13   some pens and blank paper?

14             MR. COUNTRYMAN:  No objection from the Government,

15   Your Honor.

16             MS. LERMA:  No objection from the Defense, Your

17   Honor.

18             THE COURT:  Okay, then I will do that.  I'm just

19   going to send them these black pens.  I'm not going to put

20   colors.  Are you all okay with that, to make it --

21        (No audible response)

22             THE COURT:  Okay.

23             MS. LERMA:  Yes, Judge.

24             THE CLERK:  I think there's a flip chart in the

25   fourth floor jury room.

1          THE COURT:  Do you think that's why they --

2          THE CLERK:  (Indiscernible).  There's one in there.

3          THE COURT:  Do you have an objection to them

4   getting that flip chart?

5          MS. LERMA:  No, Your Honor.

6          MR. COUNTRYMAN:  No, Your Honor.

7          THE COURT:  Okay.  So we'll either give them the

8   flip chart or that.  So I'm planning to answer this question,

9   "Okay."  What do you all think?

10          MR. COUNTRYMAN:  That works for the Government,

11   Your Honor.

12          THE COURT:  Yes?  How about yes?

13          MS. LERMA:  For Number 1, Judge?

14          THE COURT:  Yes.

15          MS. LERMA:  Yes.

16          THE COURT:  Okay.  Question Number 2, "We are

17   seeking clarification only if we are to render judgment based

18   on the charge on Count 1, the Defendant knowingly and

19   unlawfully entered, or judgment on the law itself in Title 8

20   Code Section 1325(a)(1), which does not include the verbiage

21   knowingly."

22          Do you want to look at this?  Can I get you all to

23   look at this and make sure I read this correctly?

24          MR. COUNTRYMAN:  Yes, Your Honor.

25       (Whereupon, there was a brief pause in the proceedings.)

1              THE COURT:  And you know what, and I know we said

2    take them separately, but I think these are all kind of

3    combined.  So let's do that.

4              So this next question, I'm going to call it

5    Question 3, "Are we supposed to come to a verdict according

6    to the law, Title 8 Code Section 1, 3, 2, 5, 8-I, one, I'm

7    sorry, or based on your instructions, including knowingly,

8    which is the same word included on Count 1?"

9              And the fourth question is the one we talked about,

10   "Your Honor, seeking clarification on the charge.  The law

11   states that it is a crime for an alien to enter the U.S.

12   without consent, but the instructions in Count 1 says did

13   knowingly and unlawfully enter."

14             So I'm going to let you all look at those also.

15   And my proposal is that we do one answer for the remaining

16   questions.

17       (Whereupon, there was a brief pause in the proceedings.)

18             MR. COUNTRYMAN:  It's interesting, you know, as to

19   the question about Count 2, because the charge does not

20   include the word "knowingly" and the --

21             THE COURT:  There's no questions about charge two.

22   I thought it said Count 1.

23             MS. LERMA:  Yeah, on Count 1.

24             THE COURT:  It's only talking about Count 1.

25             MS. LERMA:  We're ready whenever the Court is.

1          I would suggest, Judge, that we provide a response

2    on all three of them that says something to the effect of all

3    the law has been provided to you in my jury charge and you

4    will follow the law as I have instructed.  I think there is a

5    Pattern Jury that probably states that a little bit better

6    than I have, but that's what my inclination would be.

7          THE COURT:  Something like that's fine.  What do

8    you think, Mr. Countryman?  That's my thought.  I mean, kind

9    of like you have all the law, you know, something like that.

10   If you want me to put it lighter or something like that, I'm

11   happy to do that.  As long as -- I'm not going to give any

12   additional instructions, that I can tell you.  So how do you

13   want me to word it?

14         MR. COUNTRYMAN:  Well, Your Honor, if that's what

15   the Judge, if that's what you're going to send back as a

16   response, then telling them that they have the law as you

17   provided and that's what they're to follow.

18         I guess one of the concerns for the Government is

19   it appears that this question is specifically to the -- it

20   says, and I guess I read this to understand that this is

21   about Count 2, the 1382 charge.

22         MS. LERMA:  Which question is that one?

23         MR. COUNTRYMAN:  This one.

24         And I interpret that to say --

25         THE COURT:  I don't read any of them to be about

1    Count 2, but I could be wrong.  I mean, I don't --

2          MR. COUNTRYMAN:  That they're asking about the

3    description of the charge as it's been charged, and there's

4    nothing about knowingly in there, but down here now it is.

5          THE COURT:  And so do you have like a request of

6    what you want me to say?

7          MR. COUNTRYMAN:  The Government would renew its

8    objection that adding the "knowingly" element to that count

9    is again adding an element to that count that doesn't exist

10   in the statute, and that they be re-instructed consistent

11   with the statute.

12         THE COURT:  Okay, I understand.  Overruled.

13         So, you're just saying -- that's basically what

14   you're saying.  But as far as specifics, I think what I am

15   going to say is something like that, very generic.  You have

16   -- I know there's like a standard, you know, PJC one that if

17   it wasn't 6:40 in the evening, maybe we could pull together

18   pretty quickly.

19         But my thought is just, because I'm going to bring

20   them back at 7:00 because it's getting too late and it gets

21   very hot sort of from the direction that I got.  So my

22   thought is just to go ahead and tell them you have all the

23   law or something like that and the Court will refer you to

24   the Court's charge.  How about something that simple?  The

25   Court refers you to the charge.  Something that simple.

1          MS. LERMA:  Yes, Judge, or to its instructions or

2     to its charge, whatever.

3          THE COURT:  I just don't want to -- like, I feel

4     like they might think, well, she means instructions so I'm

5     supposed to be looking at something.  So I just thought maybe

6     the Court to the -- oh, it does, to the Court's instruction

7     to the jury, how about that?  Because that's the title of the

8     document.

9          MS. LERMA:  Yes, Judge.

10         THE COURT:  Okay, and then I'm going to bring them

11    back at 7:00 and just have them come back tomorrow.

12         MS. LERMA:  Judge, I was going to ask if we could

13    have them continue deliberating as long as they want to

14    deliberate because they haven't asked to be broken up.

15         THE COURT:  They haven't, and that's why I didn't

16    want to interrupt.  It was my initial inclination to do that,

17    but then someone with more experience told me don't do it.

18    And so I haven't asked, and they've been talking.  So let's

19    see how far.  I just -- I understand -- I don't even know

20    where they park, okay, so I'm a novice.

21         But I understand that the parking may close at

22    7:00, so that's the other worry I have.  So I do need to

23    probably -- let's send this back, and then we'll go ahead.

24    And my thought is I'm going to put Question 1, yes, and then

25    I'm going to put to of the remaining questions because, you

1    know, the Court refers you to the Court's instructions to the

2    jury.

3              MS. LERMA:  Yes, Judge.

4              THE COURT:  Okay.

5         (Whereupon, there was a brief pause in the proceedings.)

6              THE COURT:  I'm going to show it to you all so you

7    all can see it.  I understand Mr. Countryman objects and he's

8    put what he had on the record.  But that's sort of what we're

9    going to send back.  I think I'm going to have to bring them

10   back because of the parking, I'm concerned.

11        (Whereupon, there was a brief pause in the proceedings.)

12             THE COURT:  For the record, I'll put what we've

13   put.  Question number 1, the response was "Yes."  And then it

14   says, "To the remaining questions, the Court" -- I'm sorry?

15             THE CLERK:  This just turned off.

16             THE COURT:  Okay.

17             THE CLERK:  I think they're doing a --

18             THE COURT:  A reset?

19             Okay.  Well, I think it's fine because it's

20   written.  So I think it's okay.  Go ahead and send it back,

21   and I think -- are we going to be able to bring them back?  I

22   think I'm going to have to bring them back in 10 minutes.

23   I'm concerned.

24             So go ahead and send them back that question, and

25   then go ahead and give them that thing and bring them back

1  because I want to make sure they get out of here by 7:00.  I

2  don't know who's here that could tell me if they can open the

3  parking lot, and so that's my concern about it.  And I

4  apologize to the Defense, but I don't even know if that can

5  happen.  So I think that's what I'm going to do is go ahead

6  and -- but we're not going to be able to put it on the

7  record?

8        THE CLERK:  I don't know if this is -- if they're

9  bringing it down for cleaning or it's just doing an update

10 right now.  (Indiscernible).

11       THE COURT:  Okay.  Well, go take them that, and

12 then hopefully we can -- that will be fixed in a couple of

13 minutes.

14     (Whereupon, at 6:43 p.m., a brief recess was taken,

15 reconvening at 6:55 p.m.)

16     (Inside the presence of the jury; Defendant present.)

17     (Audio recording begins mid-sentence.)

18       THE COURT:  -- here tomorrow morning at 9:00 a.m.

19 The same thing, don't discuss it with anyone.  Don't talk,

20 only when you all are together.  The same instructions.

21       Thank you all so much.

22       THE CLERK:  All rise for the jury.

23     (Whereupon, the jury exited the courtroom.)

24       THE COURT:  We're in recess.  I think they're

25 coming back tomorrow at 9:00 a.m.

1          MR. COUNTRYMAN:  Did you need us here at 9:00 a.m.,

2  Your Honor?

3          THE COURT:  I don't think so, unless there's a

4  question.  Just make sure I have Adriana has y'all's phone

5  numbers.  I'm sure y'all can get here pretty quickly.

6          MR. McMAHON:  Thank you, Your Honor.

7          THE COURT:  Thank you.  We're in recess.

8      (Whereupon, at 6:56 p.m., the proceedings were

9  adjourned.)

10                        *  *  *  *  *

11

12

13

14              C E R T I F I C A T I O N

15          I, DIPTI PATEL, court-approved transcriber, certify

16  that the foregoing is a correct transcript from the official

17  electronic sound recording of the proceedings in the above-

18  entitled matter, and to the best of my ability.

19

20

21  _____

22  DIPTI PATEL, AAERT CET-997

23  Expires: December 6, 2026

24  LIBERTY TRANSCRIPTS          DATE:  June 16, 2025

25